# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

|  |  |
|---|---|
| TONY K. MCDONALD, JOSHUA B. HAMMER, and MARK S. PULLIAM,<br><br>       *Plaintiffs*,<br><br><br>v.<br><br><br><br>JOE K. LONGLEY, et al.,<br><br>       *Defendants*. | Case No. 1:19-cv-219-LY<br><br>**ORAL HEARING REQUESTED** |

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY

William S. Consovoy
Jeffrey M. Harris
Cameron T. Norris
Samuel D. Adkisson
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, VA 22201
(703) 243-9423
cam@consovoymccarthy.com

*Counsel for Plaintiffs*

March 25, 2019

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION .................................................................................................................... 1

BACKGROUND ...................................................................................................................... 2

I.       Texas Law Requires Those Who Want To Practice Law To Join The Bar. ............................. 2

II.      The Bar's Use Of Compelled Dues For Ideological And Political Activities. ......................... 3

III.     The Bar's Constitutionally Inadequate Opt-Out Procedures. ............................................. 7

ARGUMENT .......................................................................................................................... 8

I.       Plaintiffs Are Entitled To Summary Judgment On Liability On All Of Their Claims. ............ 9

   A.    The First Amendment prohibits compelled membership in the Bar because the Bar
         engages in political and ideological activities. .................................................................. 9

   B.    In the alternative, the First Amendment prohibits compelled support for the Bar's
         activities beyond the regulation of attorneys. ................................................................ 12

   C.    The Bar's opt-out procedures for identifying non-chargeable expenses violate the First
         Amendment. .............................................................................................................. 14

CONCLUSION ..................................................................................................................... 17

# TABLE OF AUTHORITIES

**Cases**

*Abood v. Detroit Bd. of Ed.*,
   431 U.S. 209 (1977) ................................................................................................................ 9

*Chicago Teachers Union v. Hudson*,
   475 U.S. 292 (1986) ............................................................................................... 7, 8, 17, 18

*Cooper v. Brown*,
   156 F. Supp. 3d. 818 (N.D. Miss. 2016) ............................................................................. 8

*Citizens United v. FEC*,
   558 U.S. 310 (2010) ............................................................................................................ 11

*Ellis v. Bhd. of Ry., Airline & S.S. Clerks*,
   466 U.S. 435 (1984) ............................................................................................................ 16

*Fleck v. Wetch*,
   139 S. Ct. 590 (2018) ......................................................................................................... 15

*Harris v. Quinn*,
   573 U.S. 616 (2014) ....................................................................... 1, 2, 3, 9, 10, 11, 17

*In re Petition for a Rule Change to Create a Voluntary State Bar*,
   841 N.W.2d 167 (Neb. 2013) ......................................................................................... 9, 12

*In re Vasquez Laboy*,
   647 F.3d 367 (1st Cir. 2011) .............................................................................................. 8

*Janus v. AFSCME*,
   138 S. Ct. 2448 (2018) .................................................1, 9, 10, 11, 12, 13, 14, 15, 16, 17

*Keller v. State Bar of California*,
   496 U.S. 1 (1990) .................................................... 1, 2, 9, 10, 11, 12, 13, 17, 18

*Knox v. Services Emps. Int'l Union*,
   567 U.S. 298 (2012) ..................................................................... 2, 11, 14, 15, 16, 17

*MGD Partners LLC v. First Am. Title Ins. Co.*,
   440 Fed. Appx. 368 (5th Cir. 2011) ................................................................................ 8

*NAACP v. Alabama*,
   357 U.S. 449 (1958) ............................................................................................................ 11

*Roberts v. United States Jaycees*,
   468 U.S. 609 (1984) ............................................................................................................ 9

*United States v. United Foods*,
    533 U.S. 405 (2001) ................................................................................................ 14

*Wooley v. Maynard*,
    430 U.S. 705 (1977) .................................................................................................. 1

**Statutes**

Fed. R. Civ. P. 56(a) .................................................................................................... 8

Tex. Gov't Code § 81.011 .............................................................................................. 2

Tex. Gov't Code § 81.051(b) ......................................................................................... 2

Tex. Gov't Code § 81.052 .............................................................................................. 3

Tex. Gov't Code § 81.053 .............................................................................................. 3

Tex. Gov't Code § 81.054 .......................................................................................... 3, 6

**Other Authorities**

State Bar, *How To Make Online Payments*, https://pbvideo.vids.io/videos/a09ddcb41d1be3c428/sbot-
    how-to-make-online-payments, accessed March 18, 2019 .......................................... 8

Wright & Miller § 2736 (4th ed.) ..................................................................................... 8

## INTRODUCTION

The First Amendment protects "the right to speak freely and the right to refrain from speaking." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). It also protects the right to "eschew association for expressive purposes." *Janus v. AFSCME*, 138 S. Ct. 2448, 2463 (2018). When the government compels speech or association, significant "damage is done," because "individuals are coerced into betraying their convictions." *Id.* at 2464. This coercion "always demean[s]" citizens of a republic, which is why it is unconstitutional. *Id.* Yet Texas law requires attorneys to join and financially support the State Bar of Texas ("Bar"). This violates the First Amendment, especially because the Bar engages in political and ideological activities, including but not limited to, lobbying, diversity initiatives, and "access to justice" programs.

Plaintiffs Tony K. McDonald and Joshua B. Hammer are attorneys licensed to practice law in Texas and active members of the Bar. *See* McDonald & Hammer Decls. Plaintiff Mark S. Pulliam is an inactive member of the Bar. *See* Pulliam Decl. Plaintiffs move for summary judgment on liability, because the current structure of the Bar violates their First Amendment rights in three independent ways.

*First*, compelling membership in, and financial support for, the Bar violates Plaintiffs' First Amendment right to freedom of speech and association. When an organization engages in political and ideological activities, members cannot be compelled to join the organization or fund *any* of its activities. Here, Texas compels attorney membership in the Bar despite its extensive political and ideological activities. This is unconstitutional because it "significant[ly]" burdens Plaintiffs' First Amendment rights and cannot be justified under strict or exacting scrutiny. *See Harris v. Quinn*, 573 U.S. 616, 647-48 (2014).

*Second*, at minimum, compelling Plaintiffs to support the Bar's activities beyond attorney regulation violates the First Amendment. *See Keller v. State Bar of California*, 496 U.S. 1, 13-14 (1990).

To the extent that *Keller* remains good law, the Supreme Court should overrule it. But even under *Keller* and related cases, compelled bar dues can be used to support activities associated with "proposing ethical codes and disciplining bar members"; they cannot be used for "political or ideological purposes." *Harris*, 573 U.S. at 655. The Bar nonetheless uses compelled dues to fund expansive political and ideological activities such as lobbying, diversity initiatives, "access to justice" programs, pro bono initiatives, and more. This goes far beyond the regulation of attorneys and is therefore unconstitutional under existing Supreme Court precedent.

*Third*, Defendants' procedures for identifying non-chargeable expenses violate the First Amendment. Under *Janus* and *Knox*, an organization that collects compelled dues must adopt procedures under which members *opt in* to supporting political and ideological causes, rather than charging everyone the fee by default and expecting objectors to *opt out*. The Bar does the opposite. It charges all attorneys full membership dues without separating its political and ideological activities. If an attorney objects to paying for the Bar's many political and ideological activities, he is required to pursue a complex and burdensome opt-out process in which the attorney must identify the non-chargeable activities and refunds are given only at the Bar's "discretion." *See* Exs. W, EE.[1] This process conflicts with recent Supreme Court precedent and is unconstitutional.

## BACKGROUND

### I.   Texas Law Requires Those Who Want To Practice Law To Join The Bar.

The State Bar of Texas is a public corporation and an administrative agency of the judicial department, operating under the administrative control of the Supreme Court of Texas. *See* Tex. Gov't Code § 81.011. Individuals who wish to practice law in Texas are compelled to join the Bar in order to engage in their profession. *See* Tex. Gov't Code § 81.051(b) ("Each person licensed to practice law in this state shall, not later than the 10th day after the person's admission to practice, enroll in the

---

[1]   All exhibits refer to the Adkisson Declaration.

state bar by registering with the clerk of the supreme court."). Failure to join the Bar makes an individual ineligible to practice law in Texas. An attorney who is eligible to practice law in Texas but is not currently practicing may move to "inactive" status. *See* Tex. Gov't Code §§ 81.052, 81.053. Inactive members must remain members of the Bar, and continue to pay dues, in order to preserve their eligibility to return to active status in the future.

All attorneys licensed to practice law in Texas must pay dues to the Bar. *See* Tex. Gov't Code § 81.054. Those dues are currently $68 for attorneys licensed 0 to 3 years, $148 for attorneys licensed 4 to 5 years, and $235 for attorneys licensed more than 5 years. Ex. A. Dues for inactive members are currently $50 per year. Ex. D. In the year ending on May 31, 2017, the Bar collected more than $20 million in mandatory dues, plus another $25 million in revenue from its other activities. Ex. E. Texas law also imposes an additional $65 "legal services fee" on certain attorneys as a condition of their practicing law. Tex. Gov't Code § 81.054(j). This fee is imposed only on certain attorneys in active private practice in Texas. It is not imposed on attorneys over 70 years old or on inactive status; those who work in state, federal, or local government; those who work for certain non-profit organizations; and those who reside out of state and do not practice law in Texas. *Id.* § 81.054(k).

## II.   The Bar's Use Of Compelled Dues For Ideological And Political Activities.

Under existing precedent, compelled bar dues can be used only for the limited purpose of attorney regulation—*i.e.*, "proposing ethical codes and disciplining bar members." *Harris*, 573 U.S. at 655. But the Bar does not limit its spending to this narrow category. Instead, it engages in extensive political and ideological spending that extends far beyond any regulatory functions.

***Legislative Program.*** It is difficult to imagine a more quintessentially "political" activity than advocating for the passage of legislation. Yet the Bar uses compelled dues to do just that. The Bar maintains a Governmental Relations department that "serves as the State Bar's liaison to the Texas Legislature and other state and federal governmental entities." Ex. B. This department "reviews

thousands of bills each legislative session for their potential impact on the State Bar and the legal profession." *Id.* The Bar's 2019 legislative program includes proposed legislation on wide-ranging matters including construction law, family law, LGBT law, poverty law, real estate law, trust law, and probate law. Ex. C.

The Bar is currently advocating for the passage of forty-seven proposed bills in these areas. *Id.* One of these bills would amend the definition of marriage in the Texas Constitution. Exs. C, X (SJR 9). Another would amend the Texas Code to create civil unions, "intended as an alternative to marriage" for both sexes. Ex. C, Y (HB 978). Other bills would modify the procedures used by grandparents to gain access to grandchildren over parental objections, Exs. C, Z (HB 575); substantively amend Texas trust law, Exs. C, AA (HB 2782); and impose notification requirements on parents wishing to take summer weekend possession of a child under a court order, Exs. C, BB (HB 553). The Bar also publishes a weekly newsletter during the legislative session, called the *Friday Update*, which is "intended to keep members up to date on legislation of interest to the legal profession." Ex. J.

*Diversity Initiatives.* The Bar has an "Office of Minority Affairs." The goals of this office include "serv[ing] minority, women, and LGBT attorneys and legal organizations in Texas" and "enhanc[ing] employment and economic opportunities for minority, women, and LGBT attorneys in the legal profession." Ex. F. The Office of Minority Affairs engages in "Minority Initiatives," which are "ongoing forums, projects, programs, and publications dedicated to our diversity efforts." *Id.* These initiatives include the Texas Minority Counsel Program, Texas Minority Attorney Program, Minority Attorneys at the Podium Project, Diversity Forum, Diversity Summit, LeadershipSBOT, Pipeline Program, Texas Spectrum (a diversity newsletter), and the Ten Minute Mentor Program. *Id.*

All of the Bar's "diversity" initiatives are premised on the assumption that is appropriate to offer certain services targeted at individuals of a particular race, gender, or sexual orientation. The

Texas Minority Counsel Program, for example, is a "client development, networking, and CLE event for diverse attorneys in Texas," which are defined as "minority, women, and LGBT attorneys." Ex. G. This annual program allows "diverse lawyers" to "meet one-on-one to discuss potential outside counsel opportunities," and offers "incomparable networking events." Ex. I. The Bar also operates a host of diversity committees and sections. Ex. H.

*Access to Justice Division and Programs.* The Bar maintains a "Legal Access Division" that "offers support, training, publications, resource materials, and more to legal services programs and pro bono volunteers." Ex. M. During the 2018-2019 budgetary year, the Bar spent over $1 million on Legal Access Division programs. Ex. L. In 2019-2020, the Bar plans to spend over $1.5 million on these activities. Ex. K. The Bar spent an additional $827,000 in 2018-2019 funding an "Access to Justice Commission," and it intends to spend a similar amount during the 2019-2020 fiscal year. *See* Exs. L, K. The Access to Justice Commission engages in a variety of political and ideological activities, including lobbying. *See* Ex. R.

In connection with its pro bono and "access to justice efforts," the Bar maintains a directory of "volunteer and resource opportunities." Ex. O. That directory "provides a comprehensive list of training, volunteer, and donation opportunities for attorneys who would like to assist with migrant asylum and family separation cases." *Id.* Every one of the relevant entries promotes a group that seeks to assist undocumented immigrants in remaining in the United States. Moreover, the directory links to a June 28, 2018 article published by Defendant Joe K. Longley, President of the Bar. In that article Longley says he "traveled to the border to learn how we can promote access to justice and the rule of law related to the separation of immigrant families" and decided to create the volunteer opportunities webpage as a result. Ex. P. Even though Longley was expressly encouraging Bar members to oppose immigration policies being implemented by the federal government, Longley claimed that "[t]his is not about politics. It's about access to justice." *Id.*

***Legal Services Fee.*** As noted above, Texas law requires certain attorneys to pay a $65 legal services fee. Tex. Gov't Code § 81.054(j). This fee is imposed only on a subset of attorneys in active private practice in Texas. The $65 legal services fee has nothing to do with regulating the profession or ensuring ethical conduct by attorneys. Its *sole* purpose is to fund legal services for certain groups. Half of the fees are allocated to the Supreme Court Judicial Fund, which provides civil legal services to the poor, and the other half goes to the Fair Defense Account of the State's general reserve fund for indigent criminal defense. *See id.* § 81.054(c). This fee is effectively a compelled charitable contribution that is imposed on certain Texas attorneys as a condition of practicing their chosen profession.

***Other Impermissible Activities.*** The Bar spends attorneys' compelled dues on countless other activities that extend far beyond the regulation of attorneys. The Bar hosts an annual Convention at which political and ideological activities are rampant. During the 2018 Convention, for example, topics included "Diversity and Inclusion: The Important Role of Allies"; "Current Issues Affecting the Hispanic Community"; "LGBT Pathways to the Judiciary: Impact of Openly LGBT Judges in Texas"; "Implicit Bias"; "Texas Transgender Attorneys: A View from the Bar"; and a "Legislative Update [on] Proposed Rulemaking Under the Trump Administration." Ex. Q at 10-32.

The Bar also funds ideologically-charged Continuing Legal Education programs. *See, e.g.*, Ex. N ("The Paradox of Bodily Autonomy: Sex Confirming Surgeries and Circumcision"; "Intersectionality: The New Legal Imperative"). It spends over half-a-million dollars in advertising each year. *See* Ex. L ($761,000 in FY 2018-2019). It publishes and exercises editorial control over its "official publication," the *Texas Bar Journal*, on which it spends over $1.5 million each year. Exs. S, L. And to support these and other impermissible activities, the Bar spends millions on administrative staff, technology, and facilities. *See* Exs. L, K.

### III.     The Bar's Constitutionally Inadequate Opt-Out Procedures.

To the extent a bar association engages in political or ideological activities—as the Bar plainly does, *see supra*—it must implement appropriate procedures to ensure that individuals are not compelled to support and associate with activities with which they disagree. Supreme Court precedent mandates the use of procedures by which members must *opt in* before their compelled funds are used to subsidize political and ideological activities, rather than *opt out* of having their funds used for these purposes. Yet the President of the Bar recently admitted that the Bar "has had an 'opt out' refund procedure for decades." Ex. T.

The Bar's opt-out procedures are convoluted and burdensome. If an individual wants to opt out of paying for political and ideological activities, he must first pay his dues in full. He can then "object" and "seek a refund of a pro rata portion of his or her dues expended." Exs. W, EE. The executive director of the Bar has the sole "discretion" to issue refunds. *Id.* If the executive director declines to do so, the objector is out of luck. Refunds are given only for "the convenience of the Bar," not because "the challenged activity was or would not have been within the purposes of or limitations on the State Bar." *Id.* Thus, even if a member shows that certain political or ideological expenditures are non-chargeable, the Bar continues charging all members *except the single objector*.

Moreover, the Bar provides nothing resembling a *Hudson* notice, whereby members can see which portions of the dues are paying for regulatory functions, and which portions are paying for non-chargeable political and ideological activities. *See Chicago Teachers Union v. Hudson*, 475 U.S. 292 (1986). This puts the entire burden of identifying non-chargeable expenses on potential objectors. And, in an apparent effort to minimize the use of even its inadequate opt-out procedures, the Bar's main dues webpages fail to mention the opt-out procedures at all. *See* Exs. A, U, V. They instead state that "[a]ll Texas lawyers *must* pay" the enumerated dues or face suspension. Ex. A (emphasis added). The Bar recently posted a video to the front page of its website under "How to Pay Dues Online." Ex. CC.

The seven-and-a-half-minute video fails to mention the Bar's opt-out policy even once. *See* State Bar, *How To Make Online Payments*, https://pbvideo.vids.io/videos/a09ddcb41d1be3c428/sbot-how-to-make-online-payments, accessed March 18, 2019.

## ARGUMENT

Plaintiffs are entitled to partial summary judgment on liability.[2] Courts must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, the material facts are undisputed; all of the facts needed to support this motion are a matter of public record and based on the Bar's own statements and documents. *See MGD Partners LLC v. First Am. Title Ins. Co.*, 440 Fed. Appx. 368, 370 (5th Cir. 2011) (granting summary judgment where there was "no factual dispute about the contents of the public records"). And the resolution of this case turns on three fundamental questions of law: *First*, whether the State can compel association with a bar organization when that bar engages in political and ideological activities. *Second*, whether the State can compel support for Bar activities that extend beyond the regulation of attorneys and legal services. And *third*, whether a state bar organization can use an opt-out rather than opt-in policy to charge members for political and ideological activities. Because the case turns on the Court's resolution of these three legal questions, one side or the other is entitled to judgment as a matter of law. As explained below, the Court should grant summary judgment to Plaintiffs, as the Bar's policies violate the First Amendment.

---

[2] Because the appropriate remedy, if any, will necessarily turn on the scope of the Court's holding on liability, Plaintiffs will submit additional briefing on remedies if the Court finds that they are entitled to summary judgment on liability. *See, e.g.*, Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense — *or the part of each claim or defense* — on which summary judgment is sought.") (emphasis added); Wright & Miller § 2736 (4th ed.) ("[I]f the court establishes the existence of liability, the case then will proceed for a determination of the damage issue."); *id.* n.5 (collecting cases); *Cooper v. Brown*, 156 F. Supp. 3d 818, 830 (N.D. Miss. 2016); *In re Vazquez Laboy*, 647 F.3d 367, 375 (1st Cir. 2011) (collecting cases).

I.      **Plaintiffs Are Entitled To Summary Judgment On Liability On All Of Their Claims.**

      A.     **The First Amendment prohibits compelled membership in the Bar because it engages in political and ideological activities.**

Texas law requires all attorneys to join the Bar as a condition of practicing law. This is unconstitutional. "The right to eschew association for expressive purposes" is protected by the First Amendment. *Janus*, 138 S. Ct. at 2463. All citizens have the constitutional "freedom not to associate." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984). And "compelling individuals to mouth support for views they find objectionable," including by compelled association, "violates that cardinal constitutional command." *Janus*, 138 S. Ct. at 2463. No government interest justifies compelled membership in bar organizations that engage in ideological and political activities.

Compelled membership in state bar organizations infringes Plaintiffs' First Amendment rights, *see Janus*, 138 S. Ct. at 2463-64, and cannot be justified by the State's narrow interest in regulating the legal profession, *Harris*, 573 U.S. at 655. Nearly twenty states regulate the legal profession without resorting to compulsory bar membership. *See In re Petition for a Rule Change to Create a Voluntary State Bar*, 841 N.W.2d 167, 171 (Neb. 2013). Plaintiffs acknowledge that the Supreme Court upheld compulsory state bars (with strict limitations) in *Keller v. State Bar of California*, 496 U.S. 1 (1990). But that decision relied heavily on *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209 (1977), which the Supreme Court explicitly overruled in *Janus*, 138 S. Ct. at 2478-79. To the extent this Court believes *Keller* still binds with respect to Plaintiffs' challenge to compelled membership, Plaintiffs preserve the issue and their right to challenge the broader constitutionality of unified bars before the Supreme Court.

But Plaintiffs should prevail on this issue even if *Keller* remains good law, as nothing in *Keller* holds that a state can compel bar membership when the bar engages in political or ideological activities. To the contrary, the Supreme Court expressly declined to address that question, explaining that because the lower courts "did not address this claim," it would not "do so in the first instance." *Keller*, 496 U.S. at 17. The Supreme Court noted that "[t]he state courts remain[ed] free ... to consider this

9

issue on remand." *Id.* In the nineteen years since *Keller*, the Supreme Court has not addressed the question. It is now squarely before this Court, and the answer is clear: Plaintiffs cannot be compelled to associate with a state bar that engages in political or ideological activities.

The Supreme Court has held that compelled bar membership burdens First Amendment rights even if the bar merely *regulates* attorneys. *See Keller*, 496 U.S. at 13-17. But the situation here is far worse. Texas compels association with a bar organization that pervasively engages in political and ideological activities. The Bar lobbies for the passage of legislation; funds numerous diversity initiatives; sponsors ideologically-driven CLE, pro bono opportunities, and panels; compels charitable contributions to pay for legal services; requires its members to fund an ideological magazine; and much more. *See supra* at 3-6. Since the First Amendment always protects "[t]he right to eschew association for expressive purposes," there can be no doubt that compelled membership in the Bar burdens Plaintiffs' constitutional rights. *Janus*, 138 S. Ct. at 2463.

The question then becomes whether that burden is justified. When considering whether compelled membership in a bar organization that engages in ideological activities violates the First Amendment, "generally applicable First Amendment standards" apply. *Harris*, 573 U.S. at 647.[3] The relevant standard here is strict scrutiny, which requires narrow tailoring and a compelling government interest. *See Citizens United v. FEC*, 558 U.S. 310, 340 (2010). But even if this Court applies "exacting scrutiny" instead of strict scrutiny, compulsory association with an ideological bar still must "serve a compelling state interest that cannot be achieved through means significantly less restrictive of

---

[3]      The Supreme Court applied a lower standard of scrutiny in *Abood*, 431 U.S. 209. The lower *Abood* threshold does not apply here for two reasons. First, the Supreme Court expressly overruled *Abood* in *Janus*, so this Court is prohibited from expanding it to any new areas. Applying it to compelled association with a bar association that engages in political and ideological activities— a scenario the Supreme Court expressly declined to reach in *Keller*—would be a novel and unwarranted application of *Abood*. Second, even before overruling *Abood*, the Supreme Court had cautioned against applying *Abood*'s standard in "new situation[s]." *Harris*, 573 U.S. at 645-46.

associational freedoms." *Janus*, 138 S. Ct. at 2465; *Harris*, 573 U.S. at 648-49; *Knox v. Services Emps. Int'l Union*, 567 U.S. 298, 310. The Supreme Court has not yet decided whether strict or exacting scrutiny is the appropriate standard of review in the context of compelled association with unions and bar organizations, specifically leaving the question open. *Janus*, 138 S. Ct. at 2465. Strict scrutiny is most consistent with the Supreme Court's First Amendment jurisprudence, which subjects all government action constraining association "to the closest scrutiny." *See NAACP v. Alabama*, 357 U.S. 449, 460-61 (1958).

But whatever level of scrutiny this Court applies, compelled membership in the Bar fails it. The only compelling interests the Supreme Court has recognized in the context of bar organizations are "regulating the legal profession" and "improving the quality of legal services." *Keller*, 496 U.S. at 13-14. These interests are limited to activities such as "proposing ethical codes and disciplining bar members." *Harris*, 573 U.S. at 655. Furthering these limited interests does not require compelled membership in a bar that engages in political and ideological activities.

Texas has at least three alternatives that are "significantly less restrictive of associational freedoms." *Janus*, 138 S. Ct. at 2465. *First*, the Bar could stop engaging in political and ideological activities. This would significantly reduce the First Amendment harms inflicted on Plaintiffs. Since the Bar has no right to compel members to support ideological activities in the first instance, this is an easy solution. *Keller*, 496 U.S. at 14, *infra* at 12-14. *Second*, the Bar could continue engaging in political and ideological activities as long as attorneys are not compelled to join. Nearly twenty states do this, *see In re Petition*, 841 N.W.2d at 171, and there is no evidence that the regulation of lawyers or the quality of legal services is inferior in these states. *Third*, the Bar could be split into two components— a compulsory section that regulates attorneys and a voluntary foundation supported by non-coerced

contributions that engages in all other activities.[4] This would allow the State to capture the supposed regulatory benefits of a mandatory bar, while still allowing those interested in supporting the Bar's ideological activities to do so. In light of these significantly less-restrictive alternatives, Texas cannot compel attorneys to join the Bar at all since it engages in political and ideological activities.

> **B.      In the alternative, the First Amendment prohibits compelled support for the Bar's activities beyond the regulation of attorneys.**

"[F]reedom of speech includes both the right to speak freely and the right to refrain from speaking at all," and compelled subsidization of speech "seriously impinges on First Amendment rights." *Janus*, 138 S. Ct. at 2463-64. In the context of mandatory bar associations, the only compelling interests that the Supreme Court recognizes are "regulating the legal profession" and "improving the quality of legal services." *Keller*, 496 U.S. at 13-14. In practice, the Supreme Court has explained, this means state bars may use coerced dues only to fund activities "*connected with proposing ethical codes and disciplining bar members.*" *Harris*, 573 U.S. at 655 (emphasis added); *Keller*, 496 U.S. at 16. Instead of respecting these limits, the Bar treats Texas attorneys as little more than a piggy bank to fund a wide range of programs, services, initiatives, lobbying, and other activities that extend far beyond regulatory and disciplinary functions.

As explained above, *supra* at 3-6, 9-12, the Bar uses compelled dues to engage in in extensive political and ideological activities that have no plausible connection to regulatory or disciplinary functions. For example, the Bar runs a lobbying program that advocates for substantive changes to Texas law. Exs. B, C, J; *supra* at 3-4. The Bar's legislative agenda ranges from the State's definition of marriage and civil unions to child custody arrangements and trust law. *See* Exs. C, X, Y, Z, AA, BB;

---

[4]      Plaintiffs propose these as alternatives that are significantly less restrictive of associational freedom than the status quo of compulsory membership in a bar that engages in political and ideological activities. But Plaintiffs do not believe that compulsory bar membership is *ever* constitutional. *See supra* at 9.

*supra* at 3-4. Yet lobbying is the paradigmatic example of what mandatory bar associations *cannot* do. *See Janus*, 138 S. Ct. at 2481 ("reject[ing] ... out of hand" the argument that "costs of lobbying" are chargeable); *see also Keller*, 496 U.S. at 15-16 (finding it "clear" that "compulsory dues may not be expended to endorse or advance a gun control or nuclear weapons freeze initiative").

The Bar also uses compelled dues to fund extensive "diversity initiatives" and has an entire "Office of Minority Affairs." Exs. F, G, H, I, K, L; *supra* at 4-5. It hosts an annual convention featuring ideologically charged sessions, such as "Diversity and Inclusion: The Important Role of Allies" and "Texas Transgender Attorneys: A View from the Bar." Ex. Q; *supra* at 6. It also hosts ideologically-slanted CLE sessions like "Intersectionality: The New Legal Imperative" and "The Paradox of Bodily Autonomy: Sex Confirming Surgeries and Circumcision." Ex. N. These are precisely the sort of "sensitive political topics" of "profound value and concern" that the state cannot compel private individuals to subsidize. *Janus*, 138 S. Ct. at 2476.

Moreover, the Bar's Access to Justice Division, Access to Justice Commission, and Texas's $65 Legal Services Fee are effectively compelled charitable contributions, often with a strong ideological bent. *See supra* at 5-6; Exs. O, P. This "compulsion ... plainly violates the Constitution." *Janus*, 138 S. Ct. at 2464. While pro bono efforts are important, they have nothing to do with the *regulation* of attorneys or legal services. And there is surely no compelling interest in forcing attorneys to subsidize charitable causes of the State's choosing as a condition of practicing their profession. Finally, the Bar forces attorneys to spend over $1.5 million funding its "official" magazine. Exs. K, L, S. This is also unconstitutional under *Keller*, as it strays far beyond attorney regulation. *Id.*; *see also United States v. United Foods*, 533 U.S. 405, 411 (2001) ("First Amendment values are at serious risk if the government can compel a particular citizen, or a discrete group of citizens, to pay special subsidies for speech on the side that it favors.").

13

The Supreme Court has recognized that drawing a precise line between permissible and impermissible expenditures often seems "impossible." *Janus*, 138 S. Ct. at 2481. Indeed, that is why the Court overruled *Abood*. But by strictly limiting bar expenditures from coerced dues to attorney discipline and regulatory functions, this Court can enforce a workable rule that is grounded in Supreme Court precedent. In all events, to the extent the line is unclear between permissible and impermissible uses of compelled dues, the side that "should bear [the] risk" is the one "whose constitutional rights are not at stake"—the Bar. *Knox*, 567 U.S. at 321.[5] Because the Bar's pervasive use of compelled dues to fund extensive activities unrelated to the regulation of attorneys and legal services is unconstitutional, the Court should grant Plaintiffs' motion for summary judgment on this count as well.

### C.    The Bar's opt-out procedures for identifying non-chargeable expenses violate the First Amendment.

Finally, independent of the two arguments raised above, the Bar's procedures for separating chargeable and non-chargeable expenses are woefully inadequate to protect the important constitutional rights at stake. When identifying chargeable and non-chargeable expenses, the First Amendment requires the Bar to use procedures that are "carefully tailored to minimize impingement on First Amendment rights." *Knox*, 567 U.S. at 316. Yet the Bar instead uses opt-out procedures that place the burden on objecting members to identify and challenge non-chargeable activities through an opaque and convoluted administrative process. These procedures are constitutionally inadequate to ensure that members are not coerced into funding the Bar's many political and ideological activities.

---

[5]    Although this issue can be addressed comprehensively in the remedial phase if this Court enters judgment for Plaintiffs on liability, it would be straightforward to limit the Bar's use of compelled dues to regulatory and disciplinary functions. Based on its financial statements, the Bar appears to spend approximately $10.5 million on discipline-related efforts. Exs. K, L.

***Opt-Out Policy.*** The President of the Bar concedes that the Bar "has had an 'opt out' refund procedure for decades." Ex. T. That type of procedure flouts Supreme Court precedent. In *Knox*, the Supreme Court explained that "the difference between opt-out and opt-in schemes is important." *Knox*, 567 U.S. at 312. Opt-out systems "create[] a risk that the fees paid by [those who object to certain activities] will be used to further political and ideological ends with which they do not agree." *Id.* The Supreme Court thus held that opt-out schemes are unconstitutional. Bar organizations, like unions, "may not exact any funds" in the absence of "affirmative consent." *Id.* at 322. In *Janus*, the Supreme Court reaffirmed this teaching: "clear[]," "free[]," and "affirmative[]" consent is needed before an association can use an individual's coerced fees or dues to support its political and ideological activities. *Janus*, 138 S. Ct. at 2486.

The Bar's opt-out procedures violate the clear teachings of *Janus* and *Knox*.[6] The Bar requires attorneys to pay their dues in full each year. Exs. W, EE. Failure to do so means an attorney is suspended from the practice of law. Ex. A. After paying their dues, attorneys can object to political and ideological expenditures and then seek a refund through a convoluted administrative process. This procedure is flatly contrary to *Janus* and *Knox*, as the Bar neither seeks nor obtains attorneys' clear and affirmative consent before exacting compelled dues for political and ideological purposes. And it certainly is not "carefully tailored to minimize impingement on First Amendment rights." *Knox*, 567 U.S. at 316.

Even if the Bar were permitted to use an opt-out process—and it is not—its procedures would still be wholly inadequate. Bar organizations cannot "adopt procedures that have the effect of requiring objecting nonmembers to lend the union money to be used for political [and] ideological ... purposes."

---

[6]     Although the Eighth Circuit recently upheld the North Dakota Bar's opt-out procedures, the Supreme Court vacated the decision and ordered the Eighth Circuit to reconsider it in light of *Janus. See Fleck v. Wetch*, 139 S. Ct. 590 (Dec. 3, 2018).

*Knox*, 567 U.S. at 303. If members are required to first pay dues and then seek refunds, "there is at least a risk that, at the end of the year, unconsenting nonmembers will have paid either too much or too little." *Id.* at 321. Objectors should never have to "bear this risk" because of the "constitutional rights ... at stake." *Id.* Indeed, a bar organization "cannot be allowed to commit dissenters' funds to improper uses even temporarily." *Id.* "By exacting and using full dues, then refunding months later the portion that it was not allowed to exact in the first place, the [Bar] effectively charges the employees for activities that are" unconstitutional. *Ellis v. Bhd. of Ry., Airline & S.S. Clerks*, 466 U.S. 435, 444 (1984). Yet the Bar has adopted exactly this sort of impermissible refund policy. It charges all attorneys full-freight upfront and says that attorneys may then "object" and "seek a *refund* of a pro rata portion of his or her dues *expended.*" Exs. W, EE (emphasis added).[7] This makes lending the Bar money for its political and ideological activities the default option. *See Knox*, 567 U.S. at 303, 321.

Moreover, even if an attorney objects to an expense, the Executive Director of the Bar is vested with complete "discretion" to resolve the issue. Exs. W, EE. If the Executive Director does not agree, the objector is out of luck. The Bar's opt-out procedures provide for no appeal. *Id.* On top of this, if the Executive Director does decide to issue a refund, the Bar claims that the refund is only "for the convenience of the Bar" and cannot "be construed as an admission that the challenged activity was [impermissible]." *Id.* This process provides for no Bar-wide relief and would require each individual attorney who thinks an expenditure is unconstitutional to challenge it separately. The only reason for the Bar to adopt such a policy is to permit it to continue exacting payments, regardless of the constitutionality of its expenditures. This process is not "carefully tailored" to minimize

---

[7]     To be sure, the Bar suggests that attorneys might "object" to "proposed expenditure[s]," too. Ex. W. But this is constitutionally inadequate. The Bar eventually suspends an attorney's license to practice law if he does not pay his dues *in full*, and the Bar's expenditure protest policy provides no timeline for the resolution of prospective disputes. Exs. A, W, EE. No lawyer is going to risk his law license to wage an uncertain challenge over a portion of his bar dues.

constitutional burdens on the First Amendment. *Knox*, 567 U.S. at 313. Instead, the procedures are flatly unconstitutional because they do "not provide for a reasonably prompt decision by an impartial decisionmaker." *Harris*, 475 U.S. at 307 ("such a requirement is necessary").

*Failure to Provide* **Hudson** *Notice.* Finally, compounding the constitutional flaws of its opt-out procedures, the Bar also fails to provide Plaintiffs with a constitutionally sufficient breakdown of its spending. In *Keller*, the Supreme Court explained that mandatory bar associations must provide breakdowns of their chargeable and non-chargeable expenditures so that attorneys can decline to fund political and ideological activities. *Keller*, 496 U.S. at 17. In particular, the Court indicated that the procedures outlined in *Hudson*, 475 U.S. 292, could form the basis of a constitutionally sufficient disclosure and reserved for the future whether other procedures might also suffice. Here, the Bar's disclosures fall well short of the standard outlined in *Hudson*; its practices instead mirror the *unconstitutional* disclosures made in *Knox* and *Janus*.

In *Hudson*, the Supreme Court held that "potential objectors [must] be given sufficient information to gauge the propriety of" the portion of dues they are compelled to pay. *Hudson*, 475 U.S. at 306. This means bar organizations must disclose how they calculate the chargeable and non-chargeable portions of their dues. *Id.* at 306-07. The Bar wantonly disregards this requirement. It treats 100% of its expenses as chargeable, even though it engages in activities that are self-evidently political or ideological. For example, the Bar cannot argue with a straight face that its legislative advocacy and diversity initiatives are not "political" or "ideological." Yet the Bar does not even attempt to segregate its chargeable and non-chargeable expenditures. This is a black-letter violation of *Keller* and *Hudson*.

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment on liability on all counts.

Respectfully submitted,

Dated: March 25, 2019                    _/s/ Cameron T. Norris_

William S. Consovoy (VA 47704)
Jeffrey M. Harris (VA 93883)
Cameron T. Norris (VA 91624)
Samuel D. Adkisson (VA 93362)
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, VA 22201
(703) 243-9423
cam@consovoymccarthy.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on March 25, 2019, I electronically submitted the following document with the Clerk of the Court for the U.S. District Court for the Western District of Texas, using the electronic case filing system of the Court. The electronic case filing system sent "Notice of Electronic Filing" to individuals who have consented in writing to accept this notice of service by electronic means. I also certify that I sent a copy of this document to counsel for Defendants by first-class and electronic mail:

> Thomas S. Leatherbury
> Vinson & Elkins
> Trammell Crow Center
> 2001 Ross Avenue, Suite 3900
> Dallas, TX 75201
> tleatherbury@velaw.com

March 25, 2019

*/s/ Cameron T. Norris*
CAMERON T. NORRIS
*Counsel for Plaintiffs*
