# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

TONY K. MCDONALD, JOSHUA B. HAMMER, and MARK S. PULLIAM,

Plaintiffs,

v.

JOE K. LONGLEY, et al.,

Defendants.

Civil Action No. 1:19-cv-00219-LY

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY

Joshua S. Johnson (admitted *pro hac vice*)
State Bar No. 24070002
Morgan A. Kelley (admitted *pro hac vice*)
State Bar No. 1617261
VINSON & ELKINS LLP
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
Tel: (202) 639-6623
Fax: (202) 879-8934
joshjohnson@velaw.com
mkelley@velaw.com

Thomas S. Leatherbury
State Bar No. 12095275
VINSON & ELKINS LLP
2001 Ross Avenue
Suite 3700
Dallas, TX 75201
Tel: (214) 220-7792
Fax: (214) 999-7792
tleatherbury@velaw.com

Patrick W. Mizell
State Bar No. 14233980
Deborah C. Milner
State Bar No. 24065761
VINSON & ELKINS LLP
1001 Fannin Street
Suite 2500
Houston, TX 77002
Tel: (713) 758-2932
Fax: (713) 615-5912
pmizell@velaw.com
cmilner@velaw.com

*Counsel for Defendants*

# TABLE OF CONTENTS

Table of Authorities ......................................................................................................... ii

Background ........................................................................................................................ 5

    I.    The State Bar of Texas ................................................................................. 5

    II.   Texas Law and State Bar Policy Require All Bar Expenditures to Comply
        With *Keller*, and Provide Ample Opportunities for Members to Object If
        They Believe Particular Expenditures Do Not Satisfy That Requirement ............ 7

    III.  The Bar's Activities Further the State's Interests in Regulating the Legal
        Profession and Improving the Quality of Legal Services ..................................... 11

Argument .......................................................................................................................... 14

    I.    Mandatory Membership in, and Financial Support for, the Texas State Bar
        Is Constitutional Under Binding Supreme Court Precedent ................................. 14

        A.    *Lathrop* and *Keller* Foreclose Plaintiffs' Claim That Mandatory
               Bar Membership Violates the First Amendment ...................................... 15

        B.    *Janus* Did Not Overrule *Lathrop* and *Keller* ............................................ 18

        C.    *Keller* Authorizes State Bars to Engage in Activities That Some
               Might View as "Political or Ideological" in Nature, as Long as
               They Are Germane to the State's Interests in Professional
               Regulation or Legal-Service Quality ........................................................ 22

    II.   The State Bar Expenditures Plaintiffs Challenge Satisfy *Keller* ......................... 23

    III.  Plaintiffs' Challenge to the Bar's Protest Policy Is Meritless.............................. 32

    IV.  Alternatively, Plaintiffs' Summary-Judgment Motion Should Be Denied
        Because This Court Lacks Subject-Matter Jurisdiction to Grant Plaintiffs'
        Requested Relief .................................................................................................. 34

Conclusion ....................................................................................................................... 35

i

# TABLE OF AUTHORITIES

**Cases**

*Abood v. Detroit Board of Education*,
431 U.S. 209 (1977) ............................................................ 18, 19, 20, 23

*Bishop v. State Bar of Tex.*,
791 F.2d 435 (5th Cir. 1986) .................................................. 19

*Brosterhous v. State Bar*,
906 P.2d 1242 (Cal. 1995) ..................................................... 23

*Chicago Teachers Union v. Hudson*,
475 U.S. 292 (1986) ............................................................. 33

*De Leon v. City of El Paso*,
353 S.W.3d 285 (Tex. App.–El Paso 2011, no pet.) ................. 30

*De Leon v. Perry*,
No. SA-13-CA-00982-OLG (W.D. Tex. July 7, 2015) ............. 30

*Diaz v. Stephens*,
731 F.3d 370 (5th Cir. 2013) .................................................. 3

*Ellis v. Bhd. of Ry., Airline & S.S. Clerks*,
466 U.S. 435 (1984) ............................................................. 29, 33

*Fleck v. Wetch*,
139 S. Ct. 590 (2018) ........................................................... 3

*Gardner v. State Bar of Nev.*,
284 F.3d 1040 (9th Cir. 2002) ............................................... 23, 32

*Glickman v. Wileman Bros. & Elliott, Inc.*,
521 U.S. 457 (1997) ............................................................. 21

*Grievance Comm. State Bar of Tex. v. Coryell*,
190 S.W.2d 130 (Tex. App.–Austin 1945, writ ref'd w.o.m.) .... 1

*Gruber v. Oregon State Bar*,
No. 3:18-cv-1591-JR (D. Or. Apr. 1, 2019) ........................... 3, 18, 34

*Grutter v. Bollinger*,
539 U.S. 306 (2003) ............................................................. 31

*Harris v. Quinn*,
573 U.S. 616 (2014) ............................................................. 3, 20, 21, 24

*In re Snyder*,
472 U.S. 634 (1985) ............................................................. 1

*Janus v. American Federation of State, County, & Municipal Employees*,
138 S. Ct. 2448 (2018) ................................................... passim

*Johanns v. Livestock Mktg. Ass'n*,
544 U.S. 550 (2005) ............................................................. 19

*Keller v. State Bar of California*,
496 U.S. 1 (1990).............................................................. passim

*Kingstad v. State Bar of Wis.*,
622 F.3d 708 (7th Cir. 2010) ................................. 6, 22, 32

*Knox v. Serv. Emps. Int'l Union*,
567 U.S. 298 (2012)............................................... 21, 33

*Lathrop v. Donohue*,
367 U.S. 820 (1961)............................................... passim

*Lawrence v. Texas*,
539 U.S. 558 (2003).............................................. 30

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*,
999 F.2d 831 (5th Cir. 1993) ................................ 31

*Lehnert v. Ferris Faculty Ass'n*,
500 U.S. 507 (1991).............................................. 28

*Liberty Counsel v. Fla. Bar Bd. of Governors*,
12 So. 3d 183 (Fla. 2009) ..................................... 30

*Mallard v. U.S. Dist. Ct. for S. Dist. of Iowa*,
490 U.S. 296 (1989).............................................. 27

*Morrow v. State Bar of Cal.*,
188 F.3d 1174 (9th Cir. 1999) ......................... 18, 23

*Nath v. Tex. Children's Hosp.*,
446 S.W.3d 355 (Tex. 2014).................................. 1

*Obergefell v. Hodges*,
135 S. Ct. 2584 (2015).......................................... 30

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009).............................................. 19

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979).............................................. 24

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*,
490 U.S. 477 (1989).............................................. 19

*Sweatt v. Painter*,
339 U.S. 629 (1950).............................................. 31

*Texas v. United States*,
798 F.3d 1108 (D.C. Cir. 2015) ........................... 3

*United States v. United Foods, Inc.*,
533 U.S. 405 (2001).............................................. 22

*United States v. Woods*,
571 U.S. 31 (2013)................................................ 24

**Statutes**

Tex. Educ. Code Ann. § 7.002 ........................................................................ 10

Tex. Gov't Code Ann. § 22.108(c) ............................................................. 13, 28

Tex. Gov't Code Ann. § 22.109(c) ............................................................. 13, 28

Tex. Gov't Code Ann. § 81.003 .................................................................... 29

Tex. Gov't Code Ann. § 81.011(a) ......................................................... 1, 5, 19

Tex. Gov't Code Ann. § 81.011(c) ............................................................... 1, 5

Tex. Gov't Code Ann. § 81.012 ............................................................... 2, 6, 8

Tex. Gov't Code Ann. § 81.019(b) ............................................................... 2, 6

Tex. Gov't Code Ann. § 81.020(b) ............................................................... 2, 6

Tex. Gov't Code Ann. § 81.022 ............................................................... 6, 34

Tex. Gov't Code Ann. § 81.022(a-3) ............................................................... 6

Tex. Gov't Code Ann. § 81.022(a-4) ............................................................... 6

Tex. Gov't Code Ann. § 81.022(b)-(c) ........................................................... 10

Tex. Gov't Code Ann. § 81.034 ........................................................... 8, 17, 26

Tex. Gov't Code Ann. § 81.051 ................................................................... 1, 6

Tex. Gov't Code Ann. § 81.052 ..................................................................... 6

Tex. Gov't Code Ann. § 81.054 ................................................................... 1, 6

Tex. Gov't Code Ann. § 81.054(a) ................................................................. 6

Tex. Gov't Code Ann. § 81.054(c) ................................................................. 7

Tex. Gov't Code Ann. § 81.054(c)-(d) ......................................................... 7, 27

Tex. Gov't Code Ann. § 81.054(d) ............................................................. 8, 17

Tex. Gov't Code Ann. § 81.054(j) ......................................................... 5, 27, 34

Tex. Gov't Code Ann. § 81.054(j)-(k) ............................................................. 7

Tex. Gov't Code Ann. § 81.0878 ................................................................... 2

Tex. Gov't Code Ann. § 81.102 ................................................................... 1, 6

Tex. Gov't Code Ann. ch. 81 ....................................................................... 5

Tex. Gov't Code Ann. § 325.011 ................................................................... 7

Tex. Penal Code Ann. § 21.06 ..................................................................... 30

**Rules**

Am. Bar Ass'n, Model R. Prof'l Conduct 6.1 ................................................... 27

Fed. R. Civ. P. 12(b)(1) ............................................................................... 14

Fed. R. Civ. P. 56(a) ........................................................................... passim

Fed. R. Civ. P. 56(c) ............................................................................................ 18

State Bar R. art. IX .............................................................................................. 13

State Bar R. art. XII, § 6 ................................................................................ 13, 27

Tex. Disciplinary R. Prof'l Conduct 1.01 cmt. 8 ............................................ 13, 28

Tex. Disciplinary R. Prof'l Conduct 6.01 cmt. 3 .................................................. 27

Tex. Disciplinary R. Prof'l Conduct 6.01 cmt. 4 .................................................. 25

Tex. Disciplinary R. Prof'l Conduct 6.01 cmt. 5 .................................................. 27

Tex. Disciplinary R. Prof'l Conduct, preamble ........................................ 1, 26, 27, 29

Tex. R. Disciplinary P. 6.07 ............................................................................ 13, 28

**Other Authorities**

Alejandra Matos, *Attorney General Ken Paxton Won't Defend Texas Ethics Commission as His Allies Try to Gut It*, Hous. Chron., Aug. 16, 2018, http://bit.ly/30chzRB .................................. 5

Duties & Responsibilities, Office of Attorney General of Texas, Ken Paxton, http://bit.ly/2PCGPM4 .................................................................................................. 4

Empower Texans, Tony McDonald, https://empowertexans.com/tony-mcdonald/ ...................... 5

Find Your Pro Bono, Pro Bono Texas, https://probonotexas.org/find-your-pro-bono ................ 12

Governmental Relations, Texas Education Agency, http://bit.ly/2vqcWWd .............................. 10

Leo Brewster, *The State Bar*, 22 Tex. B.J. 113 (1959) .................................................. 19

S.B. No. 302 (2017), http://bit.ly/2Gbq46m ................................................................ 7

State Bar Act, *reprinted in* 2 Tex. B.J. 128 (1939) ...................................................... 5

Tex. Const. art. II, § 1 ............................................................................................. 5

Tex. Sunset Advisory Comm'n, *Sunset Licensing and Regulation Model* (Oct. 2017), http://bit.ly/2vJfFtR ................................................................................................ 7

A mandatory bar is different than a public-sector labor union. "Membership in the bar is a privilege burdened with conditions." *In re Snyder*, 472 U.S. 634, 644 (1985) (citation omitted). Licensed attorneys "enjoy[] singular powers that others do not possess." *Id.* They "share a kind of monopoly" because individuals lacking law licenses cannot "appear in court and try cases" or "counsel clients" on legal matters. *Id.* The principal justification for the restrictions on competition that redound to licensed lawyers' benefit is that licensing improves the quality of legal services, protecting the public from would-be attorneys who are unscrupulous or lack sufficient training and experience. *See, e.g.*, *Grievance Comm. State Bar of Tex. v. Coryell*, 190 S.W.2d 130, 131 (Tex. App.–Austin 1945, writ ref'd w.o.m.); Tex. Disciplinary R. Prof'l Conduct, preamble ¶ 8. In exchange for the extraordinary benefits a law license offers, attorneys—who are "officer[s] of the court"—are expected to submit to certain requirements to ensure that the licensing system attains its objective of furthering "the administration of justice." *In re Snyder*, 472 U.S. at 644-45; *see also Nath v. Tex. Children's Hosp.*, 446 S.W.3d 355, 367 (Tex. 2014).

In furtherance of the goals of regulating the practice of law and improving the quality of legal services in the state, Texas—like the overwhelming majority of states nationwide—requires all lawyers licensed to practice in the state to enroll in, and pay annual membership fees to, a statewide bar. *See* Tex. Gov't Code Ann. §§ 81.051, 81.054, 81.102. The State Bar of Texas "is a public corporation and an administrative agency of the judicial department" of the Texas government, and is subject to "administrative control" by the Texas Supreme Court. *Id.* § 81.011(a), (c). The Bar engages in a wide array of regulatory and administrative activities with the principal objectives of "advanc[ing] the quality of legal services," "aid[ing] the courts in carrying on and improving the administration of justice," and "foster[ing] and maintain[ing]" among lawyers "high ideals and integrity, learning, competence in public service, and high

standards of conduct." *Id.* § 81.012. Mandatory Bar membership ensures that Texas lawyers have an opportunity to have a say in how the Bar carries out its regulatory and administrative authorities and on the disciplinary rules governing the practice of law. *See, e.g.*, *id.* §§ 81.019(b), 81.020(b), 81.0878 (providing for election of Bar officers and directors and voting on proposed disciplinary rules). But for lawyers uninterested in such matters, Texas law requires no more than registration with the Bar and annual fee payments. No Bar member is required to participate in any Bar section, committee, or activity, or to endorse any actions or positions taken by the Bar or anyone else.

To carry out its regulatory and administrative functions, the Bar necessarily engages in some expressive activities. In Plaintiffs' view, certain of those activities are unduly "political or ideological" in nature. *E.g.*, Pls.' Mot. for Summ. J. 2 (Mar. 25, 2019), ECF No. 6 ("Mot."). Based on the limited subset of Bar activities to which Plaintiffs object, they contend that the First Amendment precludes the Texas legislature's chosen system of requiring Texas lawyers to enroll in, and pay membership fees to, the Bar. Plaintiffs would foist on Texas and the 30 other jurisdictions with mandatory, unified bars the distinct minority approach of "regulat[ing] the legal profession without … compulsory bar membership." Mot. 9.

Binding Supreme Court precedent forecloses Plaintiffs' claims. In *Lathrop v. Donohue*, 367 U.S. 820 (1961), the Court held that mandatory bar membership does not violate attorneys' First Amendment right to freedom of association. *Id.* at 843 (plurality op.); *accord id.* at 848-51 (Harlan, J., and Frankfurter, J., concurring in judgment); *id.* at 865 (Whittaker, J., concurring in judgment). And in *Keller v. State Bar of California*, 496 U.S. 1 (1990), the Court unanimously held that mandatory bar fees do not violate the First Amendment's free-speech guarantee when the fees are used for expenditures "necessarily or reasonably incurred for the purpose of regulating the

legal profession or 'improving the quality of the legal service available to the people of the State.'"
*Id.* at 14 (quoting *Lathrop*, 367 U.S. at 843 (plurality op.)).

Plaintiffs' principal argument is that *Janus v. American Federation of State, County, & Municipal Employees*, 138 S. Ct. 2448 (2018), which addressed the distinct issue of public-sector union "agency fees," somehow overruled *Keller* and *Lathrop*. *See* Mot. 9. But as Magistrate Judge Jolie Russo recently recognized in recommending rejection of a similar challenge to the mandatory Oregon State Bar, *Janus* has no effect on the precedential value of *Keller* and *Lathrop*.[1] Ex. 1, Findings & Recommendation at 17-26, *Gruber v. Oregon State Bar*, No. 3:18-cv-1591-JR (D. Or. Apr. 1, 2019) ("*Gruber* slip op.").[2] The Court's opinion in *Janus* mentioned neither *Keller* nor *Lathrop*, and the principal dissent cited *Keller* only to emphasize that the majority opinion did "not question" that decision. *Janus*, 138 S. Ct. at 2498 (Kagan, J., dissenting). Furthermore, in *Harris v. Quinn*, 573 U.S. 616, 655-56 (2014)—the immediate precursor to *Janus*—Justice Alito, who also authored *Janus*, made clear that *Keller* "is wholly consistent with" and "fits comfortably within the [legal] framework applied" in *Harris* (and later carried forward in *Janus*). *Janus*'s reassessment of whether the state's interests in maintaining labor peace and avoiding nonmember free riding on unions' collective-bargaining efforts justify compelled payments from nonmembers does not undermine the Supreme Court's endorsement of the very different state interests in professional regulation and legal-service quality served by integrated bars.

---

[1] The Supreme Court's post-*Janus* "grant, vacate, and remand"—or "GVR"—order in *Fleck v. Wetch*, 139 S. Ct. 590 (2018) (mem.), does not affect *Keller*'s status as binding precedent. *See, e.g.*, *Texas v. United States*, 798 F.3d 1108, 1116 (D.C. Cir. 2015) ("well-settled that a GVR has no precedential weight and does not dictate how the lower court should rule on remand"); *Diaz v. Stephens*, 731 F.3d 370, 378 (5th Cir. 2013) ("A GVR makes no decision as to the merits of a case."). *Contra* Att'y Gen. Amicus Br. 7 n.4 (Apr. 26, 2019), ECF No. 28-1.

[2] "Ex." refers to exhibits attached to the declaration of Joshua S. Johnson.

Unable to escape *Keller*'s and *Lathrop*'s precedential force, Plaintiffs alternatively try to reinterpret those decisions as imposing a flat prohibition on mandatory bars' engagement in any activities that some might view as "political or ideological." Mot. 9. But that is not what *Keller* and *Lathrop* held. *Lathrop* held that Wisconsin could compel the plaintiff's association with the Wisconsin Bar "to further the State's legitimate interests in raising the quality of professional services," even though the Bar "participated in political activities." 367 U.S. at 835-43 (plurality op.). Building on *Lathrop*, *Keller* held that a state bar may use "mandatory dues" to "fund activities germane" to "the State's interest in regulating the legal profession and improving the quality of legal services." 496 U.S. at 13-14. *Keller* does *not* prohibit a bar from engaging in activities merely because some might label them as "political or ideological" in nature. Instead, *Keller* merely prevents state bars from using mandatory fees to "fund activities of an ideological nature *which fall outside of th[e] areas of activity*" *Keller* approved—i.e., "regulating the legal profession and improving the quality of legal services." *Id.* (emphasis added).

Plaintiffs' scattershot, undeveloped challenges to particular Bar programs are meritless. The Bar has adopted robust safeguards to ensure that all of its activities comply with *Keller*, and the challenged programs are no exception. Because Plaintiffs' claims all rest on the erroneous legal arguments that *Keller* and *Lathrop* have been overruled or that the particular Bar programs Plaintiffs have challenged do not comply with the standards set forth in those decisions, the Court should deny Plaintiffs' summary-judgment motion.[3] In addition, the jurisdictional defects

---

[3] The arguments asserted in the *amicus* brief of Texas Attorney General Ken Paxton (ECF No. 28-1) essentially track Plaintiffs' legal arguments. The Attorney General is charged with "[d]efending the State of Texas and its duly enacted laws by providing legal representation to the State, its officials and agencies." Duties & Responsibilities, Office of Attorney General of Texas, Ken Paxton, http://bit.ly/2PCGPM4 (last visited May 11, 2019). But here, he has chosen to side with private plaintiffs asserting constitutional challenges to a Texas administrative agency. He has done so even though the Texas legislature has vested "administrative control over the state bar" in the

addressed in Defendants' separate motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) preclude entry of summary judgment for Plaintiffs on their Count I challenge to mandatory Bar membership and Plaintiffs' claims for relief from the $65 legal services fee under Tex. Gov't Code Ann. § 81.054(j).

## BACKGROUND

### I. The State Bar of Texas

Defendants are members of the State Bar of Texas Board of Directors sued only in their official capacities. *See* Compl. ¶ 15 (Mar. 6, 2019), ECF No. 1. Plaintiffs are active or inactive members of the State Bar. *Id.* ¶¶ 8-9.

In 1939, the Texas legislature created the State Bar of Texas as "an administrative agency of the Judicial Department of the State." State Bar Act § 2, *reprinted in* 2 Tex. B.J. 128, 128 (1939). Today, the State Bar Act (Tex. Gov't Code Ann. ch. 81) continues to provide that the State Bar "is a public corporation and an administrative agency of the judicial department of government," subject to the Texas Supreme Court's "administrative control." Tex. Gov't Code Ann. § 81.011(a), (c). The State Bar Act specifies the Bar's purposes:

> (1) to aid the courts in carrying on and improving the administration of justice;
> (2) to advance the quality of legal services to the public and to foster the role of the legal profession in serving the public;
> (3) to foster and maintain on the part of those engaged in the practice of law high ideals and integrity, learning, competence in public service, and high standards of conduct;
> (4) to provide proper professional services to the members of the state bar;

---

Texas Supreme Court, not in the Attorney General or any other Executive Department official. Tex. Gov't Code Ann. § 81.011(c); *cf.* Tex. Const. art. II, § 1 ("[N]o person, … being of one … department[], shall exercise any power properly attached to either of the others . . . ."). And the Attorney General has not disclosed that Plaintiff Tony K. McDonald is General Counsel of Empower Texans, an organization with which the Attorney General has substantial ties. *See* Alejandra Matos, *Attorney General Ken Paxton Won't Defend Texas Ethics Commission as His Allies Try to Gut It*, Hous. Chron., Aug. 16, 2018, http://bit.ly/30chzRB; Empower Texans, Tony McDonald, https://empowertexans.com/tony-mcdonald/ (last visited May 11, 2019). The Attorney General's *amicus* brief deserves no weight.

(5) to encourage the formation of and activities of local bar associations;
(6) to provide forums for the discussion of subjects pertaining to the practice of law, the science of jurisprudence and law reform, and the relationship of the state bar to the public; and
(7) to publish information relating to the subjects listed in Subdivision (6).

*Id.* § 81.012.

Consistent with the approach taken by 30 other states (including the District of Columbia), the Texas State Bar is a "mandatory," "integrated," or "unified" bar. Apffel Decl. ¶ 34. That means that to practice law in Texas, attorneys must enroll in the Bar and pay annual membership fees. *See* Tex. Gov't Code Ann. §§ 81.051, 81.054, 81.102; *see also Keller*, 496 U.S. at 4-5; *Kingstad v. State Bar of Wis.*, 622 F.3d 708, 713 & n.3 (7th Cir. 2010). On May 1, 2019, the Bar had 103,561 active and 17,949 inactive members. Apffel Decl. ¶ 16; *see also* Tex. Gov't Code Ann. § 81.052 (membership classes). The Bar's members elect the Bar's officers and the overwhelming majority of the members of the Bar's Board of Directors. Tex. Gov't Code Ann. §§ 81.019(b), 81.020(b).

Almost half of the Bar's annual revenue comes from membership fees.[4] Ex. 2 at 7, 9. The Texas Supreme Court and the Bar's Board of Directors share responsibility for setting the fee amount. *See* Tex. Gov't Code Ann. §§ 81.022, 81.054(a). The Board may increase fees by up to 10% once every six years. *Id.* § 81.022(a-4). All other fee increases are subject to a referendum vote by the Bar's members. *Id.* § 81.022(a-3). The annual membership fees are currently $68 for active members licensed less than 3 years; $148 for active members licensed between 3 and 5 years; $235 for active members licensed for at least five years; and $50 for inactive members. Mot., Ex. EE, Board Policy Manual § 3.01.01 ("Policy Manual"). Members 70 years of age and

---

[4] The Bar's second most significant revenue source is sales of continuing legal education programs. Ex. 2 at 9. The Bar is entirely self-funded; it does not receive funds from the legislative appropriations process. *See* Compl. ¶ 29; Apffel Decl. ¶ 32.

older are exempt from paying membership fees. *Id.* The State Bar has not raised annual membership fees since 1991. Apffel Decl. ¶ 31. Texas's bar fees are among the lowest in states with integrated bars. *Id.* ¶ 35.

In 2003, the Texas legislature amended the State Bar Act to require non-exempt Texas lawyers to pay a $65 legal services fee in addition to their membership fees. Tex. Gov't Code Ann. § 81.054(c)-(d), (j)-(k). The Bar does not receive or control that fee. *Id.* § 81.054(c)-(d). Instead, the Texas Supreme Court distributes the legal services fees to the Comptroller, who allocates half to the Supreme Court Judicial Fund to fund civil legal services for the indigent, and the other half to the Fair Defense Account of the state's general revenue fund for indigent criminal defense programs. *Id.* § 81.054(c).

As it does with other Texas government agencies, the Texas legislature periodically conducts "sunset" reviews of the State Bar to determine "whether a public need exists" for the Bar's continued existence, including "whether less restrictive or alternative methods of performing any function that the agency performs could adequately protect or provide service to the public." Tex. Gov't Code Ann. § 325.011; *see also* Tex. Sunset Advisory Comm'n, *Sunset Licensing and Regulation Model* 1 (Oct. 2017), http://bit.ly/2vJfFtR ("Only the least stringent level of regulation needed to protect the public should be implemented."). The Bar has undergone sunset review four times, the last being in 2017, when the Texas legislature voted overwhelmingly to continue the Bar's existence until the next sunset review in 2029. *See* S.B. No. 302 (2017), http://bit.ly/2Gbq46m; Apffel Decl. ¶ 9.

## II. Texas Law and State Bar Policy Require All Bar Expenditures to Comply With *Keller*, and Provide Ample Opportunities for Members to Object If They Believe Particular Expenditures Do Not Satisfy That Requirement

Texas law and State Bar policy require that all of the State Bar's expenditures further the state's interests in regulating the legal profession and improving the quality of legal services in

Texas.  The State Bar Act provides that membership fees "may be used only for administering the public purposes" provided for in the Act.  Tex. Gov't Code Ann. § 81.054(d).  The Act prohibits the State Bar from using any funds "for influencing the passage or defeat of any legislative measure unless the measure relates to the regulation of the legal profession, improving the quality of legal services, or the administration of justice and the amount of the expenditure is reasonable and necessary."  *Id.* § 81.034.

Similarly, the State Bar Board's Policy Manual provides: "The purpose of the State Bar of Texas is to engage in those activities enumerated at § 81.012 of the State Bar Act.  The expenditure of funds by the State Bar of Texas is limited both as set forth at § 81.034 of the State Bar Act and in *Keller v. State Bar of California*, 496 U.S. 1 (1990)."  Policy Manual § 3.14.01.  The Policy Manual contains detailed procedures to ensure that the Bar complies with this requirement.  The Bar also holds "orientation session[s] for incoming section chairs and treasurers" in which it instructs them on the "restrictions imposed by *Keller*."  *Id.* § 5.01.14.  In total, the Policy Manual emphasizes the Bar's obligation to comply with *Keller* no less than seven different times.  *See id.* §§ 3.14.01, 3.14.05, 5.01.02(B)(8), 5.01.07(E), 5.01.14, 5.04.05(E), 8.01.03(G).

Legislative activities constitute a miniscule portion of the Bar's operations.  The proposed 2019-2020 budget for the Bar's Governmental Relations Department is just $173,238—0.34% of the Bar's $50.4 million total proposed combined budget.  Mot., Ex. K.  Nevertheless, *nine pages* of the Board's 93-page Policy Manual are devoted to detailing the Bar's procedures for determining whether to take a position on legislative proposals, and ensuring that its legislative activities comply with *Keller*.  Policy Manual § 8.01.  Subject to a narrow exception not at issue

here,[5] the Policy Manual prohibits the Bar from taking a position on a legislative proposal unless

it "conforms in all material respects to the following criteria":

> (A) The proposed legislation or legislative action falls within the purposes, expressed or implied, of the State Bar as provided in the State Bar Act.
> (B) Adequate notice and opportunity has been afforded for the presentation of opposing opinions and views.
> (C) The proposed legislation or legislative action does not carry the potential of deep philosophical or emotional division among a substantial segment of the membership of the bar.
> (D) The proposed legislation or legislative action is in the public interest.
> (E) The primary purpose of the proposed legislation or legislative action is not to provide economic benefit to the members of the State Bar.
> (F) The proposed legislation or legislative action is not designed to promote or impede the political candidacy of any person or party or to promote a partisan political purpose.
> (G) The proposed legislation cannot be construed to advocate political or ideological positions.  See, e.g. *Keller v. The State Bar of California*, 496 U.S. 1 (1990).

Policy Manual § 8.01.03.

Although the Board has approved taking a position on certain legislative proposals during

the 2019 Texas legislative session, *see* Mot., Ex. C, the Bar's Governmental Relations Department

is *not* directly involved in lobbying in support of those proposals.  Laney Decl. ¶¶ 29-30.  Instead,

members of the Bar's *voluntary* subject-matter sections, such as the Family Law Section and the

Real Estate, Probate & Trust Law Section, are coordinating any lobbying activities.  *Id.* ¶ 29.  The

Bar does not compensate those section members for their efforts.  *Id.* ¶ 30.  A principal focus of

the Bar's Governmental Relations Department during the 2019 legislative session—as in all

---

[5] *See* Policy Manual § 8.01.03 ("Nothing herein shall prohibit the State Bar's support of or opposition to legislation relating to the selection, tenure, compensation, staffing, equipping, and housing of the federal or state judiciary.").

legislative sessions—is responding to requests from legislators for information related to the legal profession.[6] *Id.* ¶¶ 9-11.

Bar members have the opportunity to object to expenditures they believe violate *Keller*. Members can present their objections to the Board or to the responsible Bar committee or section before the proposed activity is approved. *See, e.g.*, Policy Manual §§ 8.01.03(B), 8.01.06(B), 8.01.08(B), 8.01.09(D). They can also present their objections at the annual public hearing on the Bar's proposed budget. Tex. Gov't Code Ann. § 81.022(b)-(c). They can vote for officers and directors who share their views regarding the proper scope of the Bar's activities, or can run for leadership positions themselves. And they can file a written objection to any actual or proposed Bar expenditure and seek a *pro rata* refund of a portion of their membership fees, plus interest, on the ground that the expenditure allegedly violates *Keller.* Policy Manual § 3.14. Notice of the protest procedure is published on the Bar's website and in conjunction with the Bar's annual budget. *See, e.g.*, Mot., Ex. K. The Bar has no record of any person—including Plaintiffs—raising an objection under the protest procedure from the time of its adoption in 2005 until the filing of Plaintiffs' complaint.[7] Apffel Decl. ¶ 81.

---

[6] Other Texas agencies have governmental relations departments that serve functions substantially similar to those of the State Bar's Governmental Relations Department. For example, the Texas Education Agency, established by Tex. Educ. Code Ann. § 7.002, has a governmental relations team that "manages the agency's communications and interactions with the Texas Legislature, . . . . handles all legislative inquiries, monitors legislative hearings . . . . [and] tracks and analyses [sic] all education related legislation from bill introduction through implementation." Governmental Relations, Texas Education Agency, http://bit.ly/2vqcWWd (last visited May 11, 2019); *see also* Laney Decl. ¶ 14.

[7] A Bar member not involved in this lawsuit has since filed a protest, citing the allegations in Plaintiffs' complaint. Apffel Decl. ¶ 82.

### III. The Bar's Activities Further the State's Interests in Regulating the Legal Profession and Improving the Quality of Legal Services

The Bar engages in a wide variety of activities that further the state's interests in regulating the legal profession and improving the quality and availability of legal services. For example:

- The Bar serves as a clearinghouse for legal information and resources during natural disasters. Ex. 3 at 1; McAllister Decl. ¶ 32. After Hurricane Harvey, the Bar's disaster hotline connected disaster survivors with legal aid programs, and the Bar's Legal Access Division matched more than 2,000 volunteer attorneys with legal aid programs in need of assistance. Ex. 3 at 2; McAllister Decl. ¶ 35. The State Bar has also taken a lead role in coordinating the preparation and periodic updating of a resource manual for attorneys assisting survivors of natural disasters. McAllister Decl. ¶ 37. That manual has been used as a model in other states. *Id.*

- The Bar administers a Client Security Fund "to protect the integrity of the legal profession through discretionary grants to clients who have been harmed by their lawyers' dishonest conduct." Policy Manual § 3.08.02.

- The Bar provides staff and financial support for, and appoints a minority of the members of, the Texas Access to Justice Commission, which the Texas Supreme Court established in 2001 to serve as a statewide umbrella organization for efforts to expand low-income Texans' access to legal services. Ex. 4; McAllister Decl. ¶¶ 49-50, 52-53. The Access to Justice Commission "focuses on cutting-edge initiatives and pilot projects that promote access to justice." Ex. 5 at 162. The Bar's Legal Access Division complements the Commission's work by "support[ing] the day-to-day needs" of legal-aid and *pro bono* providers, such as Westlaw access, malpractice insurance, funding for interpreters, and scholarships for continuing legal education programs. *Id.* at 154-55, 162; *see also* McAllister Decl. ¶¶ 16-26. The Legal Access Division also helps connect attorneys willing to provide *pro bono* services with legal-services organizations in

need of assistance. As part of that effort, and in response to widespread expressions of interest in the issue by Bar members, the Legal Access Division published on the State Bar website a "list of training, volunteer, and donation opportunities for attorneys who would like to assist with migrant asylum and family separation cases." Mot., Ex. O; *see also* McAllister Decl. ¶¶ 38-39. That list is just one example of the numerous resources the Bar provides to Texas attorneys seeking to serve the public. For example, the State Bar's Texas Lawyers for Texas Veterans program has helped connect thousands of veterans in need of legal assistance with volunteer attorneys. Lawrence Decl. ¶¶ 13-14. The Bar also maintains a website called *Pro Bono Texas* that allows attorneys to search hundreds of *pro bono* opportunities in a wide variety of practice areas, including criminal law, tax law, and veterans law, among others. *See* Find Your Pro Bono, Pro Bono Texas, https://probonotexas.org/find-your-pro-bono (last visited May 11, 2019).

- In accordance with Chapter 467 of the Texas Health and Safety Code, the Bar administers the Texas Lawyers' Assistance Program to assist lawyers, judges, and law students with mental-health or addiction issues. That program not only helps save lives and careers, but "also protects the public, reduces ethical violations, and promotes the integrity and reputation of the legal profession." Ex. 5 at 125.

- Recognizing that historical and continuing discrimination on the basis of race, sex, and sexual orientation can impede the career opportunities of Texas attorneys and their ability to provide quality legal services to clients, the Bar's Office of Minority Affairs implements and carries out initiatives to further the Bar's "commitment toward creating a fair and equal legal profession for minority, women, and LGBT attorneys." Mot., Ex. F; *see also* Henning Decl. ¶¶ 3-4; Krasney Decl. ¶ 5. All Texas attorneys interested in furthering diversity, equity, and inclusion in the legal profession are welcome and encouraged to participate in the Office's programs,

regardless of their race, sex, or sexual orientation.  *See* Apffel Decl. ¶ 68; Henning Decl. ¶ 4.  The proposed 2019-2020 budget for the Office is $498,601, just 1% of the Bar's total budgeted expenditures.  Mot., Ex. K.

• The Bar publishes the *Texas Bar Journal*, which provides information and articles regarding "legal matters and the affairs of the State Bar and its members."  Ex. 6, State Bar R. art. IX.  The Bar is required to publish in the *Journal* certain information of interest to the legal profession, such as notices of disciplinary actions and amendments to evidentiary and procedural rules.  *See, e.g.*, Tex. R. Disciplinary P. 6.07; Tex. Gov't Code Ann. §§ 22.108(c), 22.109(c); *see also* Apffel Decl. ¶ 60.  The *Journal* aims to "report [on] matters objectively" and to feature articles expressing "[v]arious viewpoints," including the "opinions of people differing with the State Bar and/or Bar leaders."  Policy Manual § 7.05.02.  Each issue of the *Journal* includes a disclaimer making clear that "[p]ublication of any article or statement is not to be deemed an endorsement of the views expressed therein."  Ex. 7; *see also* Apffel Decl. ¶ 61.

• When the Texas legislature is in session, the Bar's "Friday Update" provides objective information on the status of "legislation of interest to the legal profession."  Mot., Ex. J; Laney Decl. ¶ 13.

• The Bar and its sections sponsor continuing legal education programs on a wide variety of topics.  These programs assist Bar members with satisfying their minimum continuing legal education requirement in furtherance of their professional duty to maintain the requisite knowledge of a competent practitioner.  *See* State Bar R. art. XII, § 6; Tex. Disciplinary R. Prof'l Conduct 1.01 cmt. 8.  The programs' fees also help fund the Bar's operations.  Absent the revenue from these programs, the Bar would likely need to increase its membership fees.  Apffel Decl. ¶ 56.  The Bar regularly publishes disclaimers that opinions expressed by speakers in continuing

legal education programs "do not necessarily reflect opinions of the State Bar of Texas, its sections, or committees." Ex. 8; *accord* Mot., Ex. Q at 8; *see also* Apffel Decl. ¶ 53.

## ARGUMENT

Plaintiffs' claims fail as a matter of law, such that there is no need for the Court to resolve any material factual disputes. Because *Lathrop* and *Keller* foreclose Plaintiffs' claims, the Court should deny Plaintiffs' summary-judgment motion (and should also grant Defendants' separate cross-motion for summary judgment). Alternatively, even if the Court concludes that *Lathrop* and *Keller* do not foreclose Plaintiffs' claims as a matter of law, Plaintiffs are not entitled to summary judgment on the current record because they have failed to show that challenged Bar activities are "political" or "ideological."[8] In addition, for the reasons set forth in Defendants' separate motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), Plaintiffs are not entitled to summary judgment to the extent they seek relief barred by Article III standing rules or Eleventh Amendment sovereign-immunity principles.

## I.     Mandatory Membership in, and Financial Support for, the Texas State Bar Is Constitutional Under Binding Supreme Court Precedent

Plaintiffs' first claim is that "compelling them to join, associate with, and financially support the State Bar violates the First and Fourteenth Amendments." Compl. ¶ 70; *accord* Mot. 1. That claim fails because the Supreme Court in *Lathrop* and *Keller* squarely held that the First Amendment permits states to adopt integrated bars supported by compulsory membership fees to

---

[8] As explained below, *see infra* pp. 22-23, Defendants contend that *Keller* authorizes Bar expenditures that some might view as "political" or "ideological," as long as those expenditures are germane to the state's interests in professional regulation or improving legal-service quality. But to the extent the Court concludes that the only relevant inquiry is whether an activity is "political" or "ideological" in nature, Defendants argue in the alternative that Plaintiffs have failed to present sufficient evidence to establish the absence of disputed factual issues material to the question of whether the Bar activities they challenge are "political" or "ideological." *See* Fed. R. Civ. P. 56(a).

further the state's interests in "regulating the legal profession or 'improving the quality of the legal service available to the people of the State.'" *Keller*, 496 U.S. at 14 (quoting *Lathrop*, 367 U.S. at 843 (plurality op.)). Contrary to Plaintiffs' contentions, *Janus* did not overrule *Keller*, and integrated bars may engage in activities that some members may view as "political or ideological" in nature as long as they advance the legitimate state interests recognized in *Keller*.

A.    ***Lathrop* and *Keller* Foreclose Plaintiffs' Claim That Mandatory Bar Membership Violates the First Amendment**

In *Lathrop*, the plaintiff claimed that Wisconsin's establishment of an integrated bar with compulsory membership fees violated his First Amendment rights of freedom of association and free speech. 367 U.S. at 821-23 (plurality op.). The plaintiff contended that he could not "constitutionally be compelled to join and give support to an organization" that expressed "opinion[s] on legislative matters" and "utilize[d] its property, funds and employees for the purposes of influencing legislation and public opinion toward legislation." *Id.* at 827. The four-Justice plurality opinion concluded that Wisconsin's integrated bar did not violate the First Amendment's guarantee of freedom of association. *Id.* at 842-43. The plurality explained that a state may constitutionally require attorneys to pay dues to the state bar "in order to further the State's legitimate interests in raising the quality of professional services." *Id.* at 843. This is true even when an integrated bar "engages in some legislative activity," as long as "the bulk of State Bar activities serve the function . . . of elevating the educational and ethical standards of the Bar to the end of improving the quality of the legal service available to the people of the State." *Id.*

Concluding that the record was insufficiently developed to provide a "sound basis" for deciding whether the integrated bar violated the plaintiff's right to free speech, the *Lathrop* plurality declined to resolve that question. *Id.* at 845-48. Three Justices concurring in the judgment—Justices Harlan, Frankfurter, and Whittaker—would have gone further, concluding

that the integrated bar and compulsory membership fees did not violate the plaintiff's free-speech rights. *Id.* at 849-50 (Harlan, J., and Frankfurter, J., concurring in judgment); *id.* at 865 (Whittaker, J., concurring in judgment). Warning against "fall[ing] prey to … alluring abstractions on rights of free speech and association" lacking "any solid basis," Justices Harlan and Frankfurter rejected the constitutional arguments asserted against integrated bars as "specious" and "chimerical." *Id.* at 849, 864-65. Justice Whittaker agreed that "the State's requirement that a lawyer pay … an annual fee … as a condition of its grant … of the special privilege … of practicing law … does not violate any provision of the United States Constitution." *Id.* at 865.[9]

In its unanimous decision in *Keller*, the Court resolved the free-speech issue left open in *Lathrop*. The *Keller* plaintiffs claimed, among other things, that the integrated California State Bar's "use of their compulsory dues to finance political and ideological activities … with which they disagree violates their rights of free speech." 496 U.S. at 9. Addressing that claim, the Court held that lawyers "may be required to join and pay dues to the State Bar," and the Court articulated "the scope of permissible dues-financed activities in which the State Bar may engage." *Id.* at 4. The Court concluded that integrated bars "are justified by the State's interest in regulating the legal profession and improving the quality of legal services." *Id.* at 13. *Keller* held that state bars may use mandatory membership fees to "fund activities germane to those goals," but may not use mandatory fees to "fund activities of an ideological nature which fall outside of those areas of activity." *Id.* at 14. Therefore, under *Keller*, integrated state bars' use of membership fees complies with the First Amendment if the "expenditures are necessarily or reasonably incurred for the purpose of regulating the legal profession or 'improving the quality of the legal service

---

[9] *Lathrop* squarely forecloses *amicus* Goldwater Institute's contention that integrated state bars violate members' First Amendment right to freedom of association. *See* Goldwater Institute Amicus Br. (Apr. 25, 2019), ECF No. 24-1.

available to the people of the State.'" *Id.* (quoting *Lathrop*, 367 U.S. at 843 (plurality op.)). *Keller* acknowledged that determining on which side of that constitutional line a particular expenditure falls "will not always be easy," but the Court explained that "the extreme ends of the spectrum are clear": While mandatory fees may not be used for advancing "gun control or nuclear weapons freeze" initiatives, they may be used for "activities connected with disciplining members of the Bar or proposing ethical codes for the profession." *Id.* at 15-16.

*Lathrop* and *Keller* foreclose Plaintiffs' challenge to Texas's requirement that "all attorneys … join the Bar as a condition of practicing law" in the state. Mot. 9. As explained above, *see supra* pp. 7-8, the State Bar Act and the Bar's Policy Manual limit the Bar's expenditures to the objectives authorized in *Keller*—regulating the legal profession and improving the quality of legal services in Texas. *See, e.g.*, Tex. Gov't Code Ann. §§ 81.034, 81.054(d); Policy Manual §§ 3.14.01, 3.14.05, 5.01.02(B)(8), 5.01.07(E), 5.01.14, 5.04.05(E), 8.01.03(G). The Bar carefully complies with those limitations in practice. *See, e.g.*, *infra* pp. 23-32. Therefore, Plaintiffs have not established any First Amendment violation.

Even if Plaintiffs managed to identify a few instances in which the Bar has transgressed *Keller*'s limitations, *Lathrop* makes clear that those improper expenditures would not render Texas's integrated-bar framework *as a whole* unconstitutional. Here, as in *Lathrop*, Plaintiffs' "compulsory enrollment [in the bar] imposes only the duty to pay" fees. 367 U.S. at 827-28 (plurality op.). Like the *Lathrop* plaintiffs, Plaintiffs here are not required to associate with other Bar members in any way, such as by attending meetings or voting in elections. *Id.* at 828. Under those circumstances, *Lathrop* rejected the plaintiff's freedom of association claim because "*the bulk* of State Bar activities" there advanced legitimate state interests, even though a plurality of Justices reserved judgment on whether *particular* bar expenditures might violate members' free-

speech rights.  *Id.* at 843-48 (emphasis added).  The same reasoning defeats Plaintiffs' compelled association claim here, even if the Court were to conclude that certain Bar expenditures violate *Keller*.  *See Morrow v. State Bar of Cal.*, 188 F.3d 1174, 1177 (9th Cir. 1999) (*Lathrop* foreclosed plaintiffs' claim that they could not be forced to associate with integrated bar that engaged in political activities).  Isolated misjudgments regarding particular expenditures' compliance with *Keller* would not compel the strong medicine of invalidating the integrated Bar and requiring its reconfiguration as a voluntary organization.[10]  *Cf.* Mot. 11-12.

### B. *Janus* Did Not Overrule *Lathrop* and *Keller*

*Janus* did nothing to disturb the binding holdings of *Lathrop* and *Keller*.  *See Gruber* slip op. at 19-21.  *Contra* Mot. 9.  In *Janus*, the Supreme Court held that a public employer violates the First Amendment by compelling an employee to contribute financially to a union that acts as the exclusive collective bargaining agent of the employee.  *See Janus*, 138 S. Ct. at 2459-60.  *Janus* overruled *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977), which held that such "agency fee" arrangements were permissible under the First Amendment because they served the state's compelling interests in maintaining labor peace and avoiding free riders.  *See Janus*, 238 S. Ct. at 2478; *Abood*, 431 U.S. at 221-22, 242.  In overruling *Abood*, *Janus* concluded that those two interests (which are not at issue here) were insufficient to justify an agency fee arrangement (also not at issue here).  *Janus*, 238 S. Ct. at 2465-69.  Justice Alito's opinion for the Court in *Janus* did

---

[10] Although Plaintiffs assert "there is no evidence that the regulation of lawyers or the quality of legal services is inferior" in the minority of states without integrated bars, Mot. 11, the mere fact that an overwhelming majority of states have adopted and maintain integrated bars is strong evidence of the important role that integrated bars play in furthering states' interests in regulating attorneys and improving legal-service quality.  In any event, Plaintiffs provide no evidence based on which this Court could conduct the sensitive and complex task of comparing the quality of regulation and legal services in states with and without integrated bars.  Therefore, if the Court concludes that factual issue is material to its resolution of this case, it is not a proper subject of summary judgment on this record.  *See* Fed. R. Civ. P. 56(a), (c).

not even mention—much less overrule—*Lathrop* or *Keller*. The only mention of either case in *Janus* appears in the principal dissent, which emphasized that the Court's decision "does not question" *Keller*. *Janus*, 138 S. Ct. at 2498 (Kagan, J. dissenting). This Court remains bound by *Lathrop* and *Keller*. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

Although Plaintiffs contend that *Keller* "relied heavily on *Abood*," Mot. 9, *Keller* did so principally in the context of rejecting the contention that the California State Bar's "status as a regulated state agency exempted it from any constitutional constraints on the use of its dues"—an argument that, if accepted, would have obviated the plaintiffs' First Amendment challenge.[11] 496 U.S. at 10. *Keller* merely drew an "analogy" between integrated state bars and labor unions. *Id.* at 12. *Janus*'s reassessment of the state interests that *Abood* concluded justified agency fee arrangements (maintaining labor peace and avoiding free riding) in no way undermines *Keller*'s recognition of the very different state interests in professional regulation and legal-service quality served by integrated bars. *See id.* at 13-14; *cf.* Leo Brewster, *The State Bar*, 22 Tex. B.J. 113, 114 (1959) (while "a bar is state-organized to enable the profession to discharge its duty to the public

---

[11] Although *Keller* binds this Court, Defendants disagree with *Keller*'s refusal to treat the California State Bar as a state agency for purposes of First Amendment analysis. Defendants thus preserve for potential appellate review the issue of whether the speech of the Texas State Bar, which is "an administrative agency of the judicial department of government," Tex. Gov't Code Ann. § 81.011(a), should be free of First Amendment Free Speech Clause restrictions under the government speech doctrine. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) ("The Free Speech Clause . . . does not regulate government speech."); *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 562 (2005) ("Citizens . . . have no First Amendment right not to fund government speech."); *cf. Bishop v. State Bar of Tex.*, 791 F.2d 435, 438 (5th Cir. 1986) ("[T]he State Bar of Texas is a state agency such that an action for damages is barred by the eleventh amendment.").

to maintain the high standards of practice and conduct," the "primary purpose of a labor union is to bargain collectively for its members with management in the matter of wages, hours and working conditions").

*Janus* also indicated that public unions raise particular First Amendment concerns that are not raised by integrated state bars. *Janus* noted that collective bargaining by public unions has a special "political valence" that the Court in *Abood* did not appreciate at the time. *Janus*, 138 S. Ct. at 2483. According to *Janus*, the "ascendance of public-sector unions has been marked by a parallel increase in public spending," giving rise to political debate over public spending and debt. *Id.* Indeed, *Janus* emphasized that "[u]nsustainable collective-bargaining agreements have . . . been blamed for multiple municipal bankruptcies." *Id.*; *cf.* Att'y Gen. Amicus Br. 7 (noting "inherently political nature of public sector collective bargaining"). Here, by contrast, there is no similar claim that the member-funded activities of the State Bar burden the public fisc in Texas or have led to the accumulation of significant government debt for which taxpayers would be liable. Mandatory bar fees thus represent much less of a threat to First Amendment interests than the risk that the Court perceived and sought to address in *Janus*.

The Court's decision in *Harris v. Quinn*, 573 U.S. 616 (2014), confirms that *Keller* fits within the "exacting scrutiny" framework applied in *Janus*. *Cf.* Mot. 10-11 (discussing "exacting scrutiny" standard). *Harris* was decided just four years before *Janus*, and the Court's opinion in *Harris* was written by Justice Alito, who also authored the Court's decision in *Janus*. *Harris* refused to extend *Abood* to home-care personal assistants after concluding that the personal assistants were not public employees. 573 U.S. at 645-46. Foreshadowing *Abood*'s demise, *Harris* applied "exacting scrutiny" in holding that states could not constitutionally charge non-public employees agency fees. *See id.* at 648-51. As later explained by *Janus*, which applied the

exacting-scrutiny standard in overruling *Abood*, exacting scrutiny requires that a compelled subsidy "serve a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms." *Janus*, 138 S. Ct. at 2465 (quoting *Knox v. Serv. Emps. Int'l Union*, 567 U.S. 298, 310 (2012)).

The Court in *Harris* explicitly considered whether the exacting-scrutiny framework would disturb its prior holding in *Keller* that states may require lawyers to pay fees to fund bar activities furthering the "State's interest in regulating the legal profession and improving the quality of legal services." *Harris*, 573 U.S. at 655 (quoting *Keller*, 496 U.S. at 14). Answering that question in the negative, the Court stated that *Keller* "fits comfortably within [the exacting-scrutiny] framework" applied in *Harris*, and that its decision in *Harris* was "wholly consistent with [the Court's] holding in *Keller*." *Id.* at 656. In reaching that conclusion, the Court emphasized that licensed attorneys are "subject to detailed ethics rules, and the bar rule [at issue in *Keller*] requiring the payment of dues was part of this regulatory scheme." *Id.* at 655-56; *cf. Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 469, 472 (1997) ("mandatory funding of expressive activities" does not "constitute[] compelled speech in violation of the First Amendment" where the speech is merely part of a "broader … regulatory scheme"). The Court also noted that states have a "strong interest in allocating to the members of the bar, rather than the general public, the expense of ensuring that attorneys adhere to ethical practices." *Harris*, 573 U.S. at 655-56. Given the Court's express statement in *Harris* that *Keller*'s holding "is wholly consistent" with the exacting-scrutiny framework later applied in *Janus*, *id.* at 656, there is no basis for concluding that *Janus* overruled *Keller*.

**C.** ***Keller* Authorizes State Bars to Engage in Activities That Some Might View as "Political or Ideological" in Nature, as Long as They Are Germane to the State's Interests in Professional Regulation or Legal-Service Quality**

Unable to escape *Keller*, Plaintiffs attempt to recast the decision as prohibiting an integrated bar from engaging in any activities that a bar member might view as "political or ideological" in nature. *E.g.*, Mot. 9. But the question under *Keller* is *not* whether the challenged activity is "political or ideological" in the abstract.[12] Instead, the question is whether the challenged activity is "germane to" the state interests that justify integrated bars' establishment— "regulating the legal profession and improving the quality of legal services." *Keller*, 496 U.S. at 13-14; *see also United States v. United Foods, Inc.*, 533 U.S. 405, 414 (2001) (under *Keller*, lawyers can "be required to pay moneys in support of activities . . . germane to the reason justifying the compelled association"); *Kingstad*, 622 F.3d at 716 (question is "whether challenged expenditures … are reasonably related to the constitutionally relevant purposes of [the mandatory] association"). *Keller* only prohibits state bars from using mandatory fees to "fund activities of an ideological nature *which fall outside of those areas of activity*." 496 U.S. at 14 (emphasis added); *see also id.* at 15 (referencing "activities having political or ideological coloration *which are not reasonably related to the advancement of [the] goals*" justifying integrated bars (emphasis added)). Thus, even if a State Bar expenditure has some political or ideological features, it is constitutional as long as it is germane to a permissible *Keller* purpose. *See, e.g.*, *Kingstad*, 622 F.3d at 718 (integrated bar may use mandatory fees to fund activities "reasonably related to the State Bar's dual purpose of regulating the profession and improving the quality of legal services, whether or not those same expenditures are also non-ideological and non-political"); *Gardner v.*

---

[12] To the extent that the labels might matter, the scanty record Plaintiffs have presented is insufficient to establish that particular Bar activities are "political" or "ideological" in nature; therefore, Plaintiffs have not established the absence of genuine issues of material fact on that issue. *See* Fed. R. Civ. P. 56(a); *see also supra* note 8.

*State Bar of Nev.*, 284 F.3d 1040, 1043 (9th Cir. 2002) ("[W]hat *Keller* found objectionable was not political activity but partisan political activity as well as ideological campaigns unrelated to the bar's purpose."). Plaintiffs' contention that they "cannot be compelled to associate with a state bar that engages in political or ideological activities" of any kind (Mot. 10) ignores the plain language of the constitutional standard set forth in *Keller*.[13]

## II.    The State Bar Expenditures Plaintiffs Challenge Satisfy *Keller*

Plaintiffs' second claim is that the Bar violates the First Amendment by using mandatory fees to fund certain activities allegedly falling outside the Bar's "attorney discipline and regulatory functions." Mot. 14; *accord* Compl. ¶ 52 (seeking to limit Bar expenditures to "core regulatory functions"). Once again, Plaintiffs misread *Keller*. *Keller* authorizes integrated bars to use mandatory fees "for the purpose of regulating the legal profession *or* improving the quality of the legal service available to the people of the State." 496 U.S. at 14 (emphasis added) (citation omitted). *Keller*'s use of the disjunctive means that an integrated-bar expenditure complies with the First Amendment if it was "necessarily or reasonably incurred" to advance *either* the objective

---

[13] Because the lower court in *Keller* had applied the wrong standard, the Supreme Court remanded for further proceedings. In doing so, the Court recognized that "[i]n addition to their claim for relief based on [the California State Bar's] use of their mandatory dues," the plaintiffs also appeared to assert a "broader freedom of association claim." 496 U.S. at 17. Accordingly, the Court noted that the lower courts "remain[ed] free … to consider" whether the plaintiffs could "be compelled to associate with an organization that engages in political or ideological activities *beyond those for which mandatory financial support is justified under the principles of Lathrop and Abood*." *Id.* (emphasis added). The italicized language—which Plaintiffs omit from their brief—makes clear that the freedom-of-association claim that *Keller* "declined to address" in the first instance (Mot. 9-10) was limited to state bar political or ideological activities unrelated to the state's legitimate interests in professional regulation or legal-service quality. Ultimately, it appears that post-*Keller* amendments to the California State Bar's rules obviated the need for further proceedings on remand. *See Brosterhous v. State Bar*, 906 P.2d 1242, 1244-45 (Cal. 1995); *see also Morrow*, 188 F.3d at 1177 (applying *Lathrop*, and rejecting contention that "*Keller* leaves open the question whether membership alone may cause the public to identify plaintiffs with State Bar positions in violation of plaintiffs' First Amendment rights").

of professional regulation *or* the objective of improving the quality of legal services. *Id.*; *see also United States v. Woods*, 571 U.S. 31, 45-46 (2013) (under "ordinary us[age]," "or" indicates phrases have "separate meanings" (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979))). In urging the Court to "limit[] bar expenditures … to attorney discipline and regulatory functions," Mot. 14, Plaintiffs ignore half of the "guiding standard" set forth in *Keller*, 496 U.S. at 14.

Plaintiffs err in suggesting that *Harris* limits state bars to using mandatory fees "only to fund activities '*connected with proposing ethical codes and disciplining bar members.*'" Mot. 12 (quoting *Harris*, 573 U.S. at 655 (emphasis added)). *Harris* reaffirmed both prongs of the *Keller* standard. It expressly noted *Keller*'s holding that mandatory bar fees are justified by the "State's interest in regulating the legal profession *and improving the quality of legal services*." 573 U.S. at 655 (emphasis added) (quoting *Keller*, 496 U.S. at 14). And *Harris* then confirmed that *Keller* is "wholly consistent" with the Court's decision in *Harris*. *Id.* at 656.

Under the test *actually* set forth in *Keller*, Plaintiffs' scattershot, factually undeveloped challenges to particular Bar expenditures fail. Each expenditure complies with the First Amendment because it was "necessarily or reasonably incurred for the purpose of regulating the legal profession or improving the quality of … legal service[s]." *Keller*, 496 U.S. at 14 (citation omitted).

***Access to Justice.*** Plaintiffs do not seriously dispute that the Bar's support of legal-aid organizations, *pro bono* efforts, and the Texas Access to Justice Commission improves the quality of legal services in Texas. Indeed, many Texans would lack any access to vital legal services without the initiatives that the Bar supports. As the Texas Judicial Council recently explained, "more than 5.6 million Texans qualify for civil legal aid," and "Texas ranks 47th in access to legal aid lawyers, with approximately one legal aid lawyer for every 8,000 Texans who qualify for legal

aid services." Ex. 9; *see also* McAllister Decl. ¶¶ 5-6. The lack of access to lawyers not only harms individuals in need of legal representation; it also places serious burdens on the courts, which must devote additional time and resources to overseeing litigation by *pro se* parties unschooled in the law and procedural rules.

The Bar's Legal Access Division attempts to reduce the justice gap by providing such critical assistance as funding for interpreters for attorneys handling cases *pro bono* and Westlaw access and subsidized malpractice insurance for legal-aid organizations. *See* Ex. 5 at 154-55; McAllister Decl. ¶¶ 16-25. It also assists in connecting *pro bono* volunteers with legal-services organizations in need of assistance. *See* McAllister Decl. ¶¶ 27-31. Although these efforts occasionally touch on headline-grabbing topics, such as immigration, the initiatives' objective is not to further a political agenda; it is to help ensure that individuals receive "access to justice" and "due process." Mot., Ex. P; *see also* McAllister Decl. ¶ 33. Just as "a lawyer's representation of a client … does not constitute an endorsement of the client's political, economic, social or moral views or activities," Tex. Disciplinary R. Prof'l Conduct 6.01 cmt. 4, the Bar's mere facilitation of private attorneys' representation of low-income individuals in need of legal assistance does not constitute an endorsement of particular viewpoints on political or ideological issues.

The Texas Supreme Court established the Texas Access to Justice Commission in 2001 in response to findings by a statewide planning group that "many poor people in Texas are underrepresented" and "many gaps exist in developing a comprehensive, integrated statewide civil legal-services delivery system in Texas."[14] Ex. 4 at 1. Subject to the Texas Supreme Court's

---

[14] Plaintiffs suggest that access-to-justice issues should be left to private organizations, without any involvement by the Bar or the Commission. McDonald Decl. ¶ 5, ECF No. 6-33; Hammer Decl. ¶ 5, ECF No. 6-34; Pulliam Decl. ¶ 5, ECF No. 6-35. The Texas Supreme Court, however, created the Commission in response to findings that "well-intentioned but uncoordinated efforts"

supervision, the Commission "develop[s] and implement[s] policy initiatives designed to expand access to and enhance the quality of justice in civil legal matters for low-income Texas residents." *Id.* at 2. Although Plaintiffs assert that the Commission "engages in a variety of political and ideological activities, including lobbying," Mot. 5, they ignore that the Texas Supreme Court's order creating the Commission (Ex. 4) expressly provides that it is subject to Tex. Gov't Code Ann. § 81.034's prohibition against using Bar funds "for influencing the passage or defeat of any legislative measure unless the measure relates to the regulation of the legal profession, improving the quality of legal services, or the administration of justice and the amount of the expenditure is reasonable and necessary." Tex. Gov't Code Ann. § 81.034. Plaintiffs come nowhere close to establishing that the Commission's legislative activities—such as "[s]upport[ing] the Texas Supreme Court's Legislative Appropriations Request for Basic Civil Legal Services" and endorsing a State Bar Act amendment "to allow the Texas Supreme Court to promulgate rules permitting inactive members to [provide] pro bono legal services," Mot., Ex. R—violate *Keller*. *See* McAllister Decl. ¶¶ 57-58.

Although Plaintiffs' disregard of *Keller*'s improving-legal-services prong alone dooms their challenge to the Bar's access-to-justice programs, Plaintiffs are also wrong in contending that "pro bono efforts … have nothing to do with the *regulation* of attorneys or legal services." Mot. 13. The preamble to the Texas Disciplinary Rules of Professional Conduct urges attorneys to be "mindful of deficiencies in the administration of justice and of the fact that the poor, and sometimes persons who are not poor, cannot afford adequate legal assistance." Tex. Disciplinary R. Prof'l Conduct, preamble ¶ 5. Accordingly, the preamble provides that a "lawyer should render

---

by the "many organizations throughout the state shar[ing] a commitment to improving access to justice" were insufficient to ensure an "integrated civil legal-services delivery system." Ex. 4 at 1.

public interest legal service" and that the "provision of free legal services to those unable to pay reasonable fees is a moral obligation of each lawyer as well as the profession generally." *Id.*, preamble ¶ 6; *accord id.* R. 6.01 cmt. 3; Am. Bar Ass'n, Model R. Prof'l Conduct 6.1; *see also Mallard v. U.S. Dist. Ct. for S. Dist. of Iowa*, 490 U.S. 296, 310 (1989) ("[L]awyers' ethical obligation to volunteer their time and skills *pro bono publico* is manifest."). The Bar advances the state's interest in professional regulation by taking steps to assist lawyers with fulfilling their "ethical responsibility to provide public interest legal service." Tex. Disciplinary R. Prof'l Conduct 6.01 cmt. 5.

The $65 legal services fee imposed under Tex. Gov't Code Ann. § 81.054(j), *see* Mot. 6, 13, is not subject to *Keller* because it is not used to fund any Bar expenditures. Instead, it is used by the Texas Supreme Court and the Texas Indigent Defense Commission to promote legal services for the indigent. *See* Tex. Gov't Code Ann. § 81.054(c)-(d). But even if *Keller* applied, the fee would satisfy *Keller* because—like the Bar's access-to-justice programs—promoting legal services for the indigent is "germane to" the state's interests in regulating the legal profession and improving the quality of legal services. *Keller*, 496 U.S. at 13-14.

***Continuing Legal Education and Annual Meeting.*** Plaintiffs challenge the Bar's sponsorship of allegedly "ideologically-charged Continuing Legal Education programs," including at its Annual Meeting. Mot. 6, 13. But far from harming Plaintiffs, the Bar's continuing legal education programs generate significant revenue, which in turn helps the Bar keep membership fees low. *See* Ex. 2 at 9; Apffel Decl. ¶¶ 54-56. In any event, sponsoring programs to assist Bar members with satisfying their minimum continuing legal education requirement, *see* State Bar R. art. XII, § 6, and keeping up-to-date with developments in the law and the legal profession is central to the state's interests in regulating the legal profession and improving the

quality of legal services. *See Lathrop*, 367 U.S. at 843 (plurality op.) ("cannot be denied" that "elevating the educational and ethical standards of the Bar" is "a legitimate end of state policy"); Tex. Disciplinary R. Prof'l Conduct 1.01 cmt. 8 ("To maintain the requisite knowledge and skill of a competent practitioner, a lawyer should engage in continuing study and education."). The programs thus satisfy *Keller*, even if Plaintiffs may view some of them as "ideological" in nature. *See supra* pp. 22-23. The Bar further reduces any risk of First Amendment harm—and, in fact, advances the free-speech values that Plaintiffs purport to espouse—by sponsoring educational programs reflecting a wide variety of subject matters and viewpoints, while at the same time making clear that the programs' speakers "do not necessarily reflect opinions of the State Bar." Ex. 8; *accord* Mot., Ex. Q at 8; *see also* Apffel Decl. ¶¶ 47, 53. Regardless, because Plaintiffs merely rely on the titles of certain Bar programs to prove their purportedly "ideological" nature— without providing *any* other evidence of the programs' content—Plaintiffs have failed to present sufficient facts to show that the Bar's continuing legal education programs do not satisfy *Keller*. *See* Fed. R. Civ. P. 56(a).

**Texas Bar Journal.** Plaintiffs' challenge to the *Texas Bar Journal* (Mot. 6, 10, 13) is meritless. The *Journal* regularly publishes information directly related to the regulation of the legal profession, such as notices of disciplinary actions and amendments to evidentiary and procedural rules. *See, e.g.*, Tex. R. Disciplinary P. 6.07; Tex. Gov't Code Ann. §§ 22.108(c), 22.109(c); *see also* Apffel Decl. ¶ 60. Like continuing legal education programs, the *Journal*'s articles also advance the interests of professional regulation and improving legal-service quality by helping Bar members stay up-to-date on developments in the law and the legal profession. *Cf. Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 529 (1991) (rejecting First Amendment challenge to expenditures on union's statewide journal); *Ellis v. Bhd. of Ry., Airline & S.S. Clerks*, 466 U.S.

435, 456-57 (1984) (similar).  Indeed, the *Journal* advances First Amendment values by featuring articles expressing "[v]arious viewpoints," including the "opinions of people differing with the State Bar and/or Bar leaders," Policy Manual § 7.05.02, while at the same time making clear that the Bar does not necessarily "endorse[] … the views expressed" in all *Journal* articles, Ex. 7; *see also* Apffel Decl. ¶ 61.  The *Journal* thus furthers the state's legitimate interests under *Keller*. And, even if the "political" or "ideological" nature of the State Bar's activities were the only relevant inquiry under *Keller*, *see supra* note 8, Plaintiffs have presented *no facts* that show the *Journal* is "political" or "ideological" in nature.  *See* Fed. R. Civ. P. 56(a).

**Governmental Relations.**  Plaintiffs assert that "lobbying is the paradigmatic example of what mandatory bar associations *cannot* do."  Mot. 13.  *Keller*, however, only precludes use of mandatory bar fees for lobbying activities that do *not* further the state's legitimate interests in professional regulation or improving legal-service quality—e.g., endorsing "a gun control or nuclear weapons freeze initiative."  *Keller*, 496 U.S. at 15-16.  *Keller* authorizes lobbying that advances those legitimate state interests, such as lobbying in favor of adopting "propos[ed] ethical codes."  *Id.*  Prohibiting the Bar from engaging in *any* legislative activities would be absurd, as it would preclude the Bar even from advocating in support of its continued existence during the sunset-review process.  *See* Tex. Gov't Code Ann. § 81.003.  It would also hamstring the legislative process.  The legislature benefits from the Bar's response to information requests regarding the legal profession, *see* Laney Decl. ¶ 10, and the Bar's facilitation of attorney involvement in technical legislative matters that can benefit from specialized legal expertise, *cf.* Tex. Disciplinary R. Prof'l Conduct, preamble ¶ 5 (lawyers "should seek improvement of the law" and "employ [their] knowledge in reform of the law").

Plaintiffs cannot establish any ongoing First Amendment harm with respect to the particular legislative proposals they cite. *See* Mot. 4. Members of the Bar's voluntary subject-matter sections are coordinating all lobbying activities for those proposals, without compensation from the Bar for their efforts. *See* Laney Decl. ¶¶ 29-30; *see also Liberty Counsel v. Fla. Bar Bd. of Governors*, 12 So. 3d 183, 188 n.11 (Fla. 2009) (voluntary bar section's *amicus* brief did not "raise[] the First Amendment concerns set forth in *Keller*"). State Bar employees have not lobbied on behalf of *any* legislative proposal included in the Bar's "2019 Legislative Program" (Mot., Ex. C). *See* Laney Decl. ¶ 29.

As explained above, *see supra* pp. 8-10, the Bar follows a detailed, multi-step deliberative process to ensure that its legislative activities comply with the requirements of the State Bar Act and *Keller*. The Bar subjected the legislative proposals Plaintiffs cite to that rigorous scrutiny, and the Bar's expression of support for each satisfies *Keller*. For example, on LGBT issues, the Bar's 2019 Legislative Program supports amending Texas law to conform to *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), and *Lawrence v. Texas*, 539 U.S. 558 (2003), as well as the final judgment in *De Leon v. Perry*, No. SA-13-CA-00982-OLG (W.D. Tex. July 7, 2015) (Ex. 10), which declared unconstitutional and enjoined enforcement of "[a]ny Texas law denying same-sex couples the right to marry, including Article I, §32 of the Texas Constitution" and "any related provisions in the Texas Family Code." Amending or repealing unconstitutional laws benefits the legal profession and improves the quality of legal services because it reduces the risk that lawyers, their clients, members of the public, or government officials will rely on laws that judicial decisions have rendered invalid. *Cf. De Leon v. City of El Paso*, 353 S.W.3d 285, 288-89 (Tex. App.–El Paso 2011, no pet.) (seeking injunction against threatened enforcement of Tex. Penal Code Ann. § 21.06, the statute *Lawrence* invalidated). The remaining legislative proposals, which Plaintiffs

mention only in passing, address evidentiary and notice requirements in family-law cases and technical changes to the Estates Code.  *See* Mot., Exs. Z, AA, BB.  They have no apparent "political or ideological coloration" that might raise First Amendment concerns.  *Keller*, 496 U.S. at 15.

*Diversity-Related Initiatives.*  Texas has a long and well-documented history of discrimination in the legal profession and legal education.  *See, e.g.*, *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 866 (5th Cir. 1993) (en banc) (noting "Texas' long history of discrimination against its black and Hispanic citizens in all areas of public life"); *see also Sweatt v. Painter*, 339 U.S. 629, 631 (1950) (University of Texas Law School in 1946 rejected Heman Marion Sweatt "solely because he [was] a Negro").  The lingering effects of that history, as well as continuing, present-day discrimination, can impede the career opportunities of Texas attorneys and their ability to provide quality legal services to clients.  The diversity-related initiatives that Plaintiffs challenge seek to reduce those barriers and promote "a fair and equal legal profession for minority, women, and LGBT attorneys."  Mot., Ex. F.  In turn, initiatives that promote fairness and equity among lawyers help to build and maintain the public's trust in the legal profession and the judicial process as a whole.  And fostering diversity in the legal profession helps lawyers and courts bring a wide range of viewpoints and life experiences to bear on the legal problems faced by Texas's diverse population.  *Cf. Grutter v. Bollinger*, 539 U.S. 306, 330 (2003) ("[T]he skills needed in today's increasingly global marketplace can only be developed through exposure to widely diverse people, cultures, ideas, and viewpoints.").  The diversity-related initiatives, which account for just 1% of the Bar's budget, Mot., Ex. K, thus advance the state's interests in professional regulation and improving the quality of legal services.  *See* Henning Decl. ¶¶ 6-11; Krasney Decl. ¶¶ 6-10.  And, because Plaintiffs fail to present facts showing that the programs offered by the Office of Minority Affairs—which are open to *all* Texas attorneys,

regardless of race, sex, or sexual orientation, Apffel Delc. ¶ 68—are "political" or "ideological" in nature, Plaintiffs are not entitled to summary judgment on their claim that the work of the Office of Minority Affairs fails to satisfy *Keller*, even under the narrow, incorrect interpretation of the governing legal standard that they endorse.[15]  *See* Fed. R. Civ. P. 56(a); *see also supra* note 8.

## III.    Plaintiffs' Challenge to the Bar's Protest Policy Is Meritless

Plaintiffs claim that the protest policy set forth in Policy Manual § 3.14 violates pre-*Janus* precedent regarding the procedures unions had to implement to ensure that nonmembers were not charged for union activities unrelated to collective bargaining.  *See* Mot. 14-17.  Plaintiffs are ill-positioned to challenge the adequacy of the protest policy, given that they have never even attempted to invoke it.  Apffel Decl. ¶ 87.  But even putting that issue aside, Plaintiffs are wrong in suggesting that their challenge to the protest policy is "independent" of their other claims. Mot. 14.  Like their other claims, Plaintiffs' challenge to the protest policy is predicated on the contention that the Bar has "non-chargeable" expenditures (*id.*)—i.e., expenditures that were not "necessarily or reasonably incurred for the purpose of regulating the legal profession or improving the quality of … legal service[s]," *Keller*, 496 U.S. at 14 (citation omitted).

As explained above, however, the Bar has robust procedures in place to ensure that *all* of its expenditures comply with *Keller*, and Plaintiffs have not identified a single Bar expenditure that violates the *Keller* standard.  *See supra* pp. 23-32.  Because the Bar does not have "non-chargeable expenses," Mot. 14, cases addressing the procedures that must be implemented by organizations that do engage in both "chargeable" and "non-chargeable" expenditures are

---

[15] To the extent that Plaintiffs challenge the Bar's advertising expenditures, *see* Mot. 6, *Keller* authorizes expenditures to inform lawyers and the public regarding the Bar's programs and the Bar's role in regulating the legal profession and advancing the quality of legal services.  *See Kingstad*, 622 F.3d at 718-19 (upholding state bar public image campaign); *Gardner*, 284 F.3d at 1043 (similar).

inapposite.  *Cf. Keller*, 496 U.S. at 7, 15 (describing California State Bar's allegedly non-chargeable activities, including "election campaigning").   Since the Bar's activities are all "germane to" the legitimate state interests recognized in *Keller*, *id.* at 13-14, and are therefore "chargeable," the Bar has no need to "provide breakdowns of … chargeable and non-chargeable expenditures," Mot. 17.  Nor does the Bar "'effectively charge[] [members] for activities that are' unconstitutional," as the Bar only engages in activities authorized by *Keller*.  *Id.* at 16 (quoting *Ellis*, 466 U.S. at 444).

Under these circumstances, the First Amendment imposes no obligation on the Bar to provide *any* protest procedure for Bar members.  *A fortiori*, Plaintiffs are wrong in arguing that the First Amendment requires the Bar to implement a protest policy with more rigorous procedural protections than the one that the Bar in its discretion has chosen to adopt to informally settle claims by members who—perhaps erroneously—"*feel[]* that any actual or proposed expenditure is not within [the] purposes of, or limitations on, the State Bar."  Policy Manual § 3.14.01 (emphasis added); *see also id.* § 3.14.04 ("Refund[s] … shall be for the convenience of the Bar, and shall not be construed as an admission . . . .").

In any event, even if the First Amendment requires the Bar to afford some procedural mechanism for objecting to particular Bar expenditures as non-chargeable under *Keller*, the Supreme Court has indicated that integrated bars may not be required to provide the full panoply of procedural protections required in the union context.  *See Keller*, 496 U.S. at 17 (leaving open whether integrated bars could adopt "alternative procedures" to those specified in *Chicago Teachers Union v. Hudson*, 475 U.S. 292 (1986)).[16]   The Bar is a state agency subject to

---

[16] Even in the union context, Plaintiffs err in suggesting that *Knox* disapproved of *all* opt-out arrangements.  *See* Mot. 15.  *Knox* only proscribed opt-out arrangements for special assessments and irregular (non-annual) union dues increases, which are not at issue here.  *See Knox*, 567 U.S.

transparency requirements and policies. It provides ample notice of its proposed budget and of many of its proposed activities, including proposals to take positions on legislation. *See* Tex. Gov't Code Ann. § 81.022; Policy Manual §§ 8.01.03(B), 8.01.08(B), 8.01.09(D); *see also* Mot., Exs. C, K, L. As explained above, *see supra* p. 10, Bar members have multiple opportunities to present their objections to proposed activities, from attending Bar meetings at which proposed legislative activities are debated, to participating in the Bar's annual budget hearings, to invoking the protest procedure under Policy Manual § 3.14, among others. The Bar's exhaustive procedures for ensuring compliance with *Keller* more than satisfy any First Amendment requirements. *Cf. Gruber* slip op. at 22-25 (upholding Oregon Bar's protest procedure against First Amendment challenge).

## IV. Alternatively, Plaintiffs' Summary-Judgment Motion Should Be Denied Because This Court Lacks Subject-Matter Jurisdiction to Grant Plaintiffs' Requested Relief

As explained in Defendants' separate motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), under Article III's "case or controversy" requirement and the sovereign-immunity principles embodied in the Eleventh Amendment, this Court lacks subject-matter jurisdiction over Plaintiffs' Count I challenge to mandatory Bar membership and Plaintiffs' claims for relief from the $65 legal services fee under Tex. Gov't Code Ann. § 81.054(j). Because Defendants neither imposed nor enforce the requirements that Plaintiffs enroll and maintain membership in the State Bar and pay the legal services fee, the Count I claim and Plaintiffs' challenge to the legal services fee run afoul of Article III standing rules and sovereign-immunity

---

at 321-22. It otherwise left intact *Hudson*'s approval of opt-out procedures. *See id.* at 318. In any event, *Keller*—not *Knox* and *Janus*—controls Plaintiffs' claims. *See supra* pp. 18-21. Because all of the Bar's expenditures comply with *Keller*, Plaintiffs' assertion that the Bar must obtain members' "affirmative consent" before collecting mandatory fees is incorrect. Mot. 15 (citation omitted).

principles. Therefore, as to those claims, the Court lacks subject-matter jurisdiction to grant Plaintiffs relief, and should deny Plaintiffs' summary-judgment motion.

## CONCLUSION

The Court should deny Plaintiffs' Motion for Partial Summary Judgment on Liability (and should also grant Defendants' separate Cross-Motion for Summary Judgment). Alternatively, the Court should dismiss Plaintiffs' claims for lack of subject-matter jurisdiction for the reasons set forth in Defendants' separate motion to dismiss under Federal Rule of Civil Procedure 12(b)(1).

Dated: May 13, 2019

Respectfully submitted,

*/s/ Thomas S. Leatherbury*

Joshua S. Johnson (admitted *pro hac vice*)
State Bar No. 24070002
Morgan A. Kelley (admitted *pro hac vice*)
State Bar No. 1617261
VINSON & ELKINS LLP
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
Tel: (202) 639-6623
Fax: (202) 879-8934
joshjohnson@velaw.com
mkelley@velaw.com

Thomas S. Leatherbury
State Bar No. 12095275
VINSON & ELKINS LLP
2001 Ross Avenue
Suite 3700
Dallas, TX 75201
Tel: (214) 220-7792
Fax: (214) 999-7792
tleatherbury@velaw.com

Patrick W. Mizell
State Bar No. 14233980
Deborah C. Milner
State Bar No. 24065761
VINSON & ELKINS LLP
1001 Fannin Street
Suite 2500
Houston, TX 77002
Tel: (713) 758-2932
Fax: (713) 615-5912
pmizell@velaw.com
cmilner@velaw.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on May 13, 2019, I electronically filed the foregoing with the Clerk of the

Court for the U.S. District Court for the Western District of Texas by using the Court's CM/ECF

system, which will send notification of such filing to the following:

William S. Consovoy
Jeffrey M. Harris
Cameron T. Norris
Samuel D. Adkisson
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Blvd., Suite 700
Arlington, VA 22201
Tel: (703) 243-9423
Fax: (703) 243-9423
will@consovoymccarthy.com

*Counsel for Plaintiffs Tony K. McDonald,*
*Joshua B. Hammer, and Mark S. Pulliam*

Dated: May 13, 2019                          */s/ Thomas S. Leatherbury*
                                             Thomas S. Leatherbury
                                             *Counsel for Defendants*