# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| TONY K. MCDONALD, | § | |
| JOSHUA B. HAMMER, and | § | |
| MARK S. PULLIAM, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | Civil Action No. 1:19-CV-00219-LY |
| | § | |
| JOE K. LONGLEY, et al., | § | |
| | § | |
| **Defendants.** | § | |

## TEXAS LEGAL ETHICS COUNSEL'S
## AMICUS CURIAE BRIEF

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………iii

INTRODUCTION AND INTEREST OF AMICUS CURIAE…………………....1

ARGUMENT…………………………………………………………………....3

STATE BAR EDUCATIONAL AND PREVENTATIVE PROGRAMS………...3

ASSISTANCE FOR IMPAIRED LAWYERS……………………………………5

LEGAL SERVICES…………………………………………………………..... 6

ADMINISTRATIVE AND LEGISLATIVE ADVOCACY………………………...7

CONCLUSION………………………………………………………………...11

CERTIFICATE OF SERVICE…………………………………………………..12

# **TABLE OF AUTHORITIES**

Cases

*Fleck v. Wetch, et al.*, Case No. 16-1564, U.S. Court of Appeals,
Eighth Circuit…………………………………………………………………...2, 6

*In re American Airlines Inc.*, 972 F.2d 605 (5th Cir. 1992),
*cert denied*, 113 S.Ct. 1262 (1992)……………………………………………...3

*In re Proeducation Intl., Inc.*, 587 F.3d 296, 299 (5th Cir. 2009)…………………………3

*Keller v. State Bar of California*, 496 U.S. 1 (1990)………………..……1, 3, 8, 10, 11

*Mallard v. United States Dist. Ct.*, 490 U.S. 296 (1989)…………………………….6

Rules and Statutes

ABA Model Rules: Preamble ¶6……………………………………………..…7

ABA Model Rule 1.1……………………………………………………………4

ABA Model Rule 6.1……………………………………………………………6

ABA Model Rule 8.4(g) ……………………………………………..…8, 9

Texas Rules: Preamble ¶¶5-6……………………………………..……….7

Tex. Disciplinary Rules Prof'l Conduct R. 1.01……………………………4

Tex. Disciplinary Rules Prof'l Conduct R. 1.15(a)(2) …………………………5

Tex. Disciplinary Rules Prof'l Conduct R. 5.08(a) …………………………8, 9

Tex. Disciplinary Rules Prof'l Conduct R. 8.04(a)(9) …………………………8

Tex. Gov't Code §§ 82.065-.651 ………………………………………8

Tex. Penal Code § 38.12…………………………………………………...8

Other Authorities

Judith L. Maute, *Changing Conceptions of Lawyers' Pro Bono Responsibilities: From Chance Noblesse Oblige to Stated Expectations*, 77 Tul. L. Rev. 91, 97, 106 (2002) ..................................... 6

Roscoe Pound, *The Lawyer From Antiquity to Modern Times* 51-52 (1953) .................................................................................. 6

William G. Ross, *The Honest Hour* 9-10 (1996) .................................................. 6

State Bar of Texas, Board of Directors Policy Manual § 8.01 ........................................................................................................ 10

## INTRODUCTION AND INTEREST OF AMICUS CURIAE

*Keller v. State Bar of California*[1] recognized that an "integrated" or "mandatory" state bar association may use compulsory bar dues to "constitutionally fund activities *germane to* [the] goals" of (1) "regulating the legal profession," and (2) "improving the quality of legal services."[2] However, *Keller* acknowledged that determining which activities are "germane" to those permissible goals and which activities may have an impermissible "political or ideological coloration" can be difficult.[3] *Janus* did not overrule *Keller*, nor do we think it should—particularly in light of the unique ethical rules and professional responsibilities that apply to the legal profession.

Amici curiae are Texas lawyers who practice "the law of lawyering," including advising lawyers on legal ethics issues, and representing lawyers in disciplinary and professional-liability matters.[4] We respectfully offer this amicus brief to provide our legal-ethics perspective concerning the scope of some of the activities that mandatory bar associations may permissibly fund with compulsory dues.

The State Bar of Texas ("SBOT") is the largest mandatory bar association in the nation, with over 100,000 members. But the rulings in the present case will potentially

---

[1] 496 U.S. 1 (1990).

[2] *Id.* at 13-14 ("The compelled association and integrated bar are justified by the State's interest in *regulating the legal profession* and *improving the quality of legal services.* The State Bar may therefore constitutionally fund activities *germane to* those goals out of the mandatory dues of all members.") (emphasis added).

[3] *Id.* at 15-16.

[4] The signatories to this brief are Charles Herring, Jr., James M. McCormack, Amon Burton, Gaines West, and Robert P. Schuwerk. Amici are acting in their personal capacities and not as representatives of any organizations with which they are affiliated.

affect all mandatory state bar associations nationwide, including those beyond Texas. For example, the State Bar Association of North Dakota is now subject to a lawsuit in the 8th Circuit Court of Appeals that raises some of the same issues as this case.[5]

In sum, we submit and explain below the following specific examples of the broad categories of bar-funded activities that are germane to the permissible goals of "regulating the profession" and "improving the quality of legal services":

1. Educating bar members through Continuing Legal Education (CLE) programs, bar journals, and other publications.

2. Providing counseling and support programs for lawyers with chemical-dependency or psychological conditions that can impair their ability to represent clients.

3. Providing legal services to assist those who cannot afford legal representation.

4. Engaging in administrative and legislative advocacy concerning issues that are germane to the permissible goals of regulating the profession and improving the quality of legal services.

We focus our discussion on the relevant legal-ethics rules of Texas—the Texas Disciplinary Rules of Professional Conduct ("the Texas Rules")—and the American Bar Association—the Model Rules of Professional Conduct ("the Model Rules").[6]

---

[5] *Fleck v. Wetch, et al.*, Case No. 16-1564 in the U.S. Court of Appeals for the Eighth Circuit, currently on remand from the United States Supreme Court (hereinafter "*Fleck*"). Amici have filed an amicus brief in *Fleck* (Doc# 4775889); that brief makes essentially the same points as the present brief.

Finally, we note that while some opponents of bar expenditures argue that *Keller* is impractical in light of the logistical burdens that it raises, Texas has had a detailed administrative *Keller* procedure to allow bar members to object to particular SBOT expenditures and obtain proportionate refunds for almost 15 years. Yet with apparently only one recent exception, no lawyer has ever attempted to file a *Keller* objection to any SBOT expenditures. Whether or not that constitutes a waiver of the challenges in this case, the complete absence of complaints demonstrates that Texas lawyers have not viewed SBOT expenditures as a significant problem. The asserted logistical problems and burdens have not materialized in Texas.

## ARGUMENT

### State Bar Educational and Preventative Programs

Opponents of compulsory dues charged by state bar associations sometimes narrowly define permissible bar expenditures as being limited to "proposing ethical codes and disciplining bar members."[7] That is too restrictive. It is also fundamentally inconsistent with the *Keller* standard's authorization of expenditures for activities that are "germane" to regulating the profession.

---

[6] Federal courts in Texas have considered both the Texas Rules and the Model Rules when deciding certain legal-ethics issues. *See, e.g., In re American Airlines Inc.*, 972 F.2d 605 (5th Cir. 1992), *cert denied*, 113 S.Ct. 1262 (1992); *In re Proeducation Intl., Inc.*, 587 F.3d 296, 299 (5th Cir. 2009) (following *American Airlines* in noting that the Texas Rules are not the sole authority governing a motion to disqualify, that a reviewing court should consider the motion governed by "the ethical rules announced by the national profession in light of the public interest and the litigants' rights," and should also consider the Model Rules).

[7] *See, e.g.,* Plaintiffs' Mot. for Sum. J., at 2.

For example, ABA Model Rule 1.1,[8] entitled "Competence," sets out a basic ethical standard for all lawyers:

> A lawyer shall provide *competent representation* to a client. Competent representation requires the *legal knowledge*, skill, thoroughness and preparation reasonably necessary for the representation.

(Emphasis added.) Competence requires legal knowledge—which in turn requires education and study. As Comment 8 to Model Rule 1.1 provides,

> To maintain the requisite knowledge and skill, *a lawyer should keep abreast of changes in the law and its practice*, including the benefits and risks associated with relevant technology, *engage in continuing study and education and comply with all continuing legal education requirement*s to which the lawyer is subject.

(Emphasis added.)

Thus, to comply with the ethical rule, lawyers must engage in "continuing study" and fulfill all CLE requirements.[9] Bar associations commonly provide extensive CLE programming to assist lawyers in complying with the obligations created by the competence rules. Many bar associations offer live and online courses, webcasts, practice guides, online libraries, bar journals, practice guides, ethics help lines, pattern jury charges, and similar materials to assist lawyers to meet those competence requirements.[10] All of those activities, and the associated expenditures, are germane to regulating the legal profession and improving the quality of legal services. Those activities also directly

---

[8] *Cf.* Tex. Disciplinary Rules Prof'l Conduct R. 1.01 ("Competent and Diligent Representation").

[9] In Texas, Article XII of the State Bar Rules sets out the "Minimum Continuing Legal Education" requirements.

[10] A listing of the Texas CLE program offerings is available at: http://www.texasbarcle.com/CLE/Home.asp.

serve the same vital interests: to assist lawyers to comply with their ethical obligations set out in the disciplinary rules and therefore to help protect clients and the public.

Assistance For Impaired Lawyers

A lawyer's mental or physical impairment also can prevent competent representation, and therefore put at risk clients, the public, and even other lawyers. Thus, Model Rule 1.16(a)(2) generally requires that a lawyer "shall withdraw from the representation of a client if . . . the lawyer's physical or mental condition materially impairs the lawyer's ability to represent the client . . . ."[11] Recognizing the unfortunate prevalence of mental illness and chemical dependency, bar associations often operate and fund counseling and peer-assistance programs to assist lawyers.

For instance, the SBOT sponsors and funds the Texas Lawyers' Assistance Program (TLAP) to provide exactly that type of assistance.[12] Similarly, Texas provides an option for lawyers who become aware of another lawyer's serious misconduct and who suspect that the other lawyer is "impaired by chemical dependency on alcohol or drugs or by mental illness," to report the lawyer to an "approved peer assistance program," instead of to disciplinary authorities.[13] Again, while that type of bar expenditure is not "discipline" per se, it clearly serves important professional and public interests to improve lawyer competence and protect clients and the public.

---

[11] *See* Tex. Disciplinary Rules Prof'l Conduct R. 1.15(a)(2) (requiring withdrawal when the lawyer's "physical, mental or psychological condition materially impairs the lawyer's fitness to represent the client").
[12] *See* https://www.tlaphelps.org.
[13] *See* Tex. Disciplinary Rules Prof'l Conduct Rs. 8.03(a), (c).

<u>Legal Services</u>

Plaintiffs have also attacked access-to-justice and legal-services funding designed to assist persons who cannot pay for legal representation. But as we previously argued in our amicus brief in *Fleck* and as the SBOT now agrees,[14] those expenditures are well-grounded in the ethical standards and traditions of the legal profession.

The legal profession has a long and rich tradition of providing and advocating such services, tracing back to ancient Rome.[15] In the first formal legal Code of Ethics adopted in the United States, in 1887 the Alabama State Bar recognized the profession's commitment to pro bono service by providing that a client's inability to pay for legal services "may require a less charge in many circumstances, and sometimes none at all."[16]

Bringing that tradition forward, ABA Model Rule 6.1 provides that "[e]very lawyer has a professional responsibility to provide legal services to those unable to pay" and that each lawyer should aspire to rendering at least 50 hours per year of pro bono legal services.[17]

---

[14] *See* footnote 5, above; Defendants' Opp. To Plaintiffs' Mot. for Sum. J., at 26-27.

[15] *See, e.g.*, Roscoe Pound, *The Lawyer From Antiquity to Modern Times* 51-52 (1953) (noting that in ancient Rome, "when regular advocacy arose the assistance rendered to suitors in the forum was gratuitous," and the *Lex Cincia* statute in 204 B.C. "forbade anyone from accepting money or a gift on account of pleading a case"); William G. Ross, *The Honest Hour* 9-10 (1996); Judith L. Maute, *Changing Conceptions of Lawyers' Pro Bono Responsibilities: From Chance Noblesse Oblige to Stated Expectations*, 77 Tul. L. Rev. 91, 97, 106 (2002) (noting that patrician jurisconsults provided legal advice to clients who were often poor, dependent household members, and that Roman rules limited payment to nominal compensation).

[16] Judith L. Maute, *Changing Conceptions of Lawyers' Pro Bono Responsibilities: From Chance Noblesse Oblige to Stated Expectations*, 77 Tul. L. Rev. 91, 108-109 (2002).

[17] *See also Mallard v. United States Dist. Ct.*, 490 U.S. 296, 310 (1989) ("We do not mean to question, let alone denigrate, lawyers' ethical obligation to assist those who are too poor to afford counsel, or to suggest that requests made pursuant to § 1915(d) may be lightly declined

Moreover, that ethical obligation includes not only personal service, but also using the profession's influence to ensure equal access to justice:

> A lawyer should be mindful of deficiencies in the administration of justice and of the fact that the poor, and sometimes persons who are not poor, cannot afford adequate legal assistance. Therefore, *all lawyers should* devote professional time and resources and *use civic influence to ensure equal access to our system of justice* for all those who because of economic or social barriers cannot afford or secure adequate legal counsel. A lawyer should aid the legal profession in pursuing these objectives and should help the bar regulate itself in the public interest.[18]

Accordingly, bar association expenditures to promote and assist in fulfilling these ethical standards are necessarily germane to both regulating the profession and improving the quality of legal services.

## Administrative and Legislative Advocacy

As the foregoing quote from the Preamble to the Model Rules indicates, the profession's ethical standards and traditions can require more than simply providing legal representation to individual clients. Paragraph 6 in the ABA Preamble recognizes that "[a]s a member of a learned profession, a lawyer should cultivate knowledge of the law beyond its use for clients [and] employ that knowledge *in reform of the law . . . .*"

---

because they give rise to no ethical claim. On the contrary, in a time when the need for legal services among the poor is growing and public funding for such services has not kept pace, *lawyers' ethical obligation to volunteer their time and skills pro bono publico is manifest.*") (emphasis added).
[18] Model Rules: Preamble ¶ 6 (emphasis added); *see also* Texas Rules: Preamble ¶¶ 5-6.

However, opponents of bar expenditures often make overbroad statements like this: "It is difficult to imagine a more quintessentially 'political' activity than advocating for the passage of legislation."[19] That argument has two flaws.

First, the *Keller* standards allow expenditures germane to regulating the profession and improving the quality of legal services. Statutes can address those same issues, and thus can directly affect lawyer discipline and the quality of legal services. Two examples:

- The Texas Rules prohibit "barratry," but do not define barratry.[20] Instead, Texas criminal law provides the functional definitions of barratry, and civil statutes create private remedies against barratrous misconduct.[21] The SBOT has a direct interest in monitoring proposed changes to those statutes and their potential effects on discipline, and providing appropriate information, input, and "influence" on the legislature to protect against the possible adverse effects of proposed changes in the law.

- ABA Model Rule 8.4(g) and the Texas counterpart, Texas Rule 5.08, prohibit lawyers from engaging in various types of discriminatory activities. The Texas Rule generally prohibits a lawyer from manifesting "by words or conduct, bias or prejudice based on race, color, national origin, religion, disability, age, sex, or sexual orientation towards any person involved in" an adjudicatory proceeding.[22] Many Texas statutes address and in some instances define those and closely

---

[19] Plaintiffs' Mot. for Sum. J., at 3.
[20] Tex. Disciplinary Rules Prof'l Conduct R. 8.04(a)(9).
[21] *See* Tex. Penal Code § 38.12; Tex. Gov't Code §§ 82.065-.651.
[22] Tex. Disciplinary Rules Prof'l Conduct R. 5.08(a).

related terms, and thus changes to those statutes may affect, for better or worse, discipline under the relevant ethics rules. To protect both lawyers and the public, bar associations therefore have a strong interest to be actively involved in monitoring and potentially attempting to influence that legislation.

Second, the MR 8.4(g)-Texas Rule 5.08 example above illustrates another oversimplification in the opponents' argument. Do rules and statutes that address "sexual orientation" have "political" or "ideological" content? Of course they do. But does that mean that a bar association must completely ignore potential legislative activity that would affect disciplinary rules predicated on that content? Of course not.

Reform and improvement of the law is a broad mandate that certainly does not require any ideological or political motivation. Legal reforms often develop because existing law has failed to meet its objectives. Further, the legal profession's first-hand experience with the operation of certain laws and rules may indicate that refinement of a statutory scheme or a different legal codification would better serve intended goals.

For example, family law and criminal statutes regularly require clarification and correction, particularly in response to new court decisions. A mandatory bar association, often operating through its specialized sections and committees, may be particularly well-positioned to organize study groups and fund legislative advocacy in these areas to inform and educate the legislature concerning the need—or lack of need—for particular legal reforms. Thus, legislative "advocacy" is sometimes simply serving as a learned resource to advise legislators on legal history, new obstacles to achieving the law's intended objectives, and how to improve the law to better serve the public's interests.

Like many mandatory bar associations, the SBOT has carefully designed, detailed procedures and requirements that must be met before the Bar can support any proposed legislation.[23] For example, the Bar must determine in advance that the legislative proposal meets seven specific criteria designed to ensure compliance with *Keller*, including that the proposal "falls within the purposes" prescribed in the State Bar Act; "does not carry the potential of deep philosophical or emotional division among a substantial segment of" the Bar; is "in the public interest"; and does not advocate "political or ideological positions."[24]

Note also that while Texas has had a detailed *Keller* procedure for some 14 years (since 2005) to allow bar members to object to particular SBOT expenditures and obtain proportionate refunds,[25] not a single Bar member had ever lodged an objection under that that procedure until this lawsuit was filed.[26] Opponents of bar expenditures, at best, vastly exaggerate the seriousness and prevalence of the supposed logistical burdens under the existing *Keller* procedures.

At what point would a bar association's activities, including monitoring or even advocating legislative changes, become impermissible "political" or "ideological" activity? We do not presume to propose a comprehensive answer to that question. We merely submit that as the Supreme Court wisely recognized in *Keller*, the answer should

---

[23] *See* State Bar of Texas, Board of Directors Policy Manual § 8.01, available at: https://www.texasbar.com/AM/Template.cfm?Section=Governing_Documents1&Template=/CM/ContentDisplay.cfm&ContentID=42429.

[24] *Id.* § 8.01.03.

[25] *Id.* § 3.14.

[26] Apparently a Bar member not involved in this lawsuit recently filed a protest. *See* Defendants' Opp. To Plaintiffs' Mot. for Sum. J., at 10, n. 7; Apffel Decl. ¶ 82.

depend upon the particular facts, including the concepts and issues involved and the potential effects on lawyer discipline and the quality of legal services.

The Plaintiffs' position, if adopted, would destroy or at least fundamentally transform the nature and operations of a valued, traditional, and highly successful model for the legal profession's self-governance—and do so without any demonstration of constitutional requirement or practical necessity. We submit that the Constitution does not require that radical, disruptive, and counterproductive result.

## CONCLUSION

We submit that legal-ethics rules and traditional lawyer-regulation standards are a necessary and appropriate part of applying *Keller* or any similar analytical framework to evaluate the propriety of expenditures of compulsory dues by a mandatory bar association.

Respectfully submitted,

Jason M. Panzer
Texas State Bar No. 00797198
jason@herringpanzer.com

Lauren Ross
Texas State Bar No. 24092001
lauren@herringpanzer.com

**HERRING & PANZER, L.L.P.**
1411 West Avenue, Suite 100
Austin, Texas 78701
(512) 320-0665
(512) 519-7580 (Facsimile)

**ATTORNEYS FOR AMICUS**

## CERTIFICATE OF SERVICE

I certify that on May 15, 2019, I served the foregoing via U.S. first class mail to all counsel of record:

William S. Consovoy
Jeffrey M. Harris
Cameron T. Norris
Samuel D. Adkisson
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Blvd., Suite 700
Arlington, VA 22201
will@consovoymccarthy.com

*Counsel for Plaintiffs Tony K. McDonald, et al.*

Joshua S. Johnson
Morgan A. Kelley
VINSON & ELKINS LLP
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
joshjohnson@velaw.com
mkelley@velaw.com

Thomas S. Leatherbury
VINSON & ELKINS LLP
2001 Ross Avenue
Suite 3700
Dallas, TX 75201
tleatherbury@velaw.com

Patrick W. Mizell
Deborah C. Milner
VINSON & ELKINS LLP
1001 Fannin Street
Suite 2500
Houston, TX 77002
pmizell@velaw.com
cmilner@velaw.com

*Counsel for Defendants Joe K. Longley, et al.*

Matthew Robert Miller
Goldwater Institute
500 E. Coronado Road
Phoenix, AZ 85004-1543
mmiller@goldwaterinstitute.org

*Counsel for Goldwater Institute*

Cynthia A. Morales
Office of the Texas Attorney General
P.O. Box 12548, Mail Code 009
Austin, TX 78711-2548
Cynthia.morales@oag.texas.gov

*Counsel for the Attorney General*

Jason M. Panzer