# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| TONY K. MCDONALD, JOSHUA B. HAMMER, and MARK S. PULLIAM,<br><br>    *Plaintiffs*,<br><br>v.<br><br>JOE K. LONGLEY, et al.,<br><br>    *Defendants*. | Case No. 1:19-cv-219-LY |

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
## PARTIAL SUMMARY JUDGMENT ON LIABILITY

William S. Consovoy
Jeffrey M. Harris
Cameron T. Norris
Samuel D. Adkisson
CONSOVOY MCCARTHY PLLC
3033 Wilson Boulevard, Suite 700
Arlington, VA 22201
(703) 243-9423
cam@consovoymccarthy.com

*Counsel for Plaintiffs*

May 31, 2019

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION ................................................................................................................................. 1

ARGUMENT .......................................................................................................................................... 2

I.      Precedent Does Not Foreclose Plaintiffs' First Amendment Challenge To Compulsory Membership In The Bar. ................................................................................................... 2

II.     Compulsory Support For The Bar's Non-Regulatory Political And Ideological Expenditures Violates The First Amendment. ............................................................ 5

        A.     The Bar Misinterprets Supreme Court Precedent Regarding Coerced Funding of Political and Ideological Activities. .................................................................... 5

        B.     The Bar Engages In Extensive Political And Ideological Activities That Extend Far Beyond Any Legitimate Regulatory Function. ............................................ 7

III.    The Bar's Objection Procedures Are Inconsistent With The First Amendment And Supreme Court Precedent. ............................................................................................. 10

IV.    The Bar's Jurisdictional Arguments Are Meritless And Have Been Fully Addressed By Plaintiffs' Amended Complaint. ................................................................................ 13

CONCLUSION ................................................................................................................................... 14

# TABLE OF AUTHORITIES

**Cases**

*Abood v. Detroit Bd. of Ed.*,
　431 U.S. 209 (1977) ............................................................................................... 2, 3, 6, 13

*Grutter v. Bollinger*,
　539 U.S. 306 (2003) ............................................................................................................ 9

*Harris v. Quinn*,
　573 U.S. 616 (2014) ........................................................................................... 3, 5-7, 10, 12

*Hatch v. Wal-Mart Stores Inc.*,
　200 Fed. Appx. 310 (5th Cir. 2006) ................................................................................... 4

*Janus v. AFSCME*,
　138 S. Ct. 2448 (2018) ............................................................................... 1, 2, 4, 6, 7, 10-13

*Johanns v. Livestock Marketing Ass'n*,
　544 U.S. 550 (2005) ........................................................................................................ 6, 7

*Keller v. State Bar of California*,
　496 U.S. 1 (1990) ............................................................................................... 1-3, 5, 9-13

*Lathrop v. Donohue*,
　367 U.S. 820 (1961) ........................................................................................................ 2, 3

*Lehnert v. Ferris Faculty Ass'n*,
　500 U.S. 507 (1991) .......................................................................................................... 10

*McCullen v. Coakley*,
　573 U.S. 464 (2014) ............................................................................................................ 4

*Okpalobi v. Foster*,
　244 F.3d 405, 419 (5th Cir. 2001) .................................................................................... 14

*Olivas v. Four Unknown United States Marshals*,
　EP-17-CV-278-PRM, 2018 WL 1899738 (W.D. Tex. 2018) ............................................ 14

*Patsy v. Board of Regents*,
　457 U.S. 496 (1982) .......................................................................................................... 11

*Roberts v. U.S. Jaycees*,
　468 U.S. 609 (1984) ............................................................................................................ 1

*Schuette v. Coalition to Defend Affirmative Action*,
   572 U.S. 291 (2014)..................................................................................................................9

*United States v. United Foods*,
   533 U.S. 405 (2001)..................................................................................................................1

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989)..................................................................................................................4

**Statutes**

Tex. Gov't Code § 81.054(c) ........................................................................................................9

Tex. Gov't Code § 81.054(j) .........................................................................................................9

**Other Authorities**

State Bar, *How To Make Online Payments*, http://bit.ly/2EwCRjV ............................................9

**INTRODUCTION**

The First Amendment protects the right to "eschew association for expressive purposes." *Janus v. AFSCME*, 138 S. Ct. 2448, 2463 (2018). It also prohibits the government from compelling individuals to "support speech by others," even if those individuals are not compelled to "utter the speech itself." *United States v. United Foods*, 533 U.S. 405, 413 (2001). Ignoring these inexorable constitutional commands, Defendants ("the Bar") insist that compelled association with and financial support for the Bar is constitutional even though it engages in extensive political and ideological activities with which many of its members disagree. *See* Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Opp.") 14-32. Indeed, the Bar asserts that *every last one of its activities*—including those involving some of the most hotly contested issues of the day, such as immigration, race- and gender-based programs, and legislation on LGBT and family-law issues—is related to attorney regulation or improving the quality of Texas lawyering and therefore can be funded through coerced dues. *Id.* at 23-32. The Bar then doubles down, claiming it has no obligation to provide *Hudson* notices or to adopt opt-in rather than opt-out policies because every dollar it spends comports with First Amendment limitations on the use of coerced dues. *Id.* at 32-34.

The Court should reject these arguments and grant Plaintiffs' Motion for Partial Summary Judgment (ECF No. 6) ("Mot."). Compelled membership in and financial support for the Bar is unconstitutional because the Bar engages in pervasive political and ideological activities to which many of its members object. Moreover, the Bar's current opt-out standards fall far short of what the Supreme Court held was necessary in *Keller*, *Knox*, and *Janus*. Compelled association with and subsidization of the Bar "seriously impinges on [Plaintiffs'] First Amendment rights." *Janus*, 138 S. Ct. at 2464; *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984). The Court's intervention is needed to address this ongoing violation of Plaintiffs' right not to associate with or fund highly political and ideological institutions and causes with which they disagree.

1

**ARGUMENT**

The Bar agrees that this dispute should be resolved "as a matter of law." Opp. 14. It disagrees about which party should prevail. *Id.*; *see also* ECF No. 35 (cross-motion for summary judgment). In support of its opposition to Plaintiffs' Motion for Partial Summary Judgment, the Bar raises four main arguments. First, the Bar argues that precedent forecloses Plaintiffs' challenge to compelled bar membership. Opp. 14-23. Second, it argues that every single penny of its expenditures—including its politically and ideologically charged activities such as immigration-related advocacy and lobbying—satisfies the Supreme Court's test for coerced funding. Opp. 23-32. Third, it claims that it has "no obligation" to provide a *Hudson* notice or adopt opt-in rather than opt-out procedures, even in the face of clear teachings to the contrary in *Keller* and *Janus*. Opp. 32-34. And, finally, it raises several jurisdictional challenges that fail as a matter of law but in all events have now been addressed in Plaintiffs' Amended Complaint. The Bar's arguments are each without merit, and accepting them would effectively eliminate any First Amendment constraints on the Bar's activities notwithstanding clear Supreme Court precedent recognizing the fundamental right to be free from coerced association.

**I.    Precedent Does Not Foreclose Plaintiffs' First Amendment Challenge To Compulsory Membership In The Bar.**

Contrary to the Bar's assertions, Opp. 14-23, *Keller v. State Bar of California*, 496 U.S. 1 (1990), and *Lathrop v. Donohue*, 367 U.S. 820 (1961), do not foreclose Plaintiffs' challenge to compelled bar membership in light of the Bar's extensive political and ideological activities.

Plaintiffs acknowledge—as they have from the outset of this case—that the Supreme Court upheld compulsory state bars (with strict limitations) in *Keller* and *Lathrop*. But those decision relied heavily on the logic of *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209 (1977), which the Supreme Court overruled in *Janus*, 138 S. Ct. at 2478-79. To the extent this Court nonetheless believes that *Keller* remains binding with respect to Plaintiffs' challenge to compelled membership, Plaintiffs preserve

the issue and their right to challenge the broader constitutionality of unified bars before the Supreme Court. Mot. 9.

But Plaintiffs should prevail even if *Keller* and *Lathrop* remain good law. Plaintiffs do not want to associate with or financially support an organization that lobbies for legislation, engages in race- and gender-based programs, and seeks to assist undocumented immigrants entering the United States. Nothing in either *Keller* or *Lathrop* holds that a state can compel bar membership *when a bar engages in political and ideological activities*. Indeed, the Supreme Court reserved that very question in *Keller*, declining to address "in the first instance" whether an individual can "be compelled to associate with an organization that engages in political or ideological activities beyond those for which mandatory financial support is justified under the principles of *Lathrop* and *Abood*." *Keller*, 496 U.S. at 17.

The Bar erroneously contends that *Lathrop* resolved this question. Opp. 17-18. It did not. The *Keller* majority explicitly noted that the question "implicate[s] a much broader freedom of association claim than was at issue in *Lathrop*." *Keller*, 496 U.S. at 17. *Lathrop* simply held that "[g]iven the character of the integrated bar" at issue—which was evaluated through the lens of pre-*Keller* First Amendment doctrine—the Court was "unable to find any impingement upon protected rights of association." *Lathrop*, 367 U.S. at 843. But the case would have presented an entirely different associational question if the Court had applied its later holding in *Keller* and concluded that the petitioners had been coerced to associate with a bar association that engaged in political or ideological activities. *See Keller*, 496 U.S. at 17.

Because precedent does not foreclose Plaintiffs' challenge to compulsory bar membership in these circumstances, the Court must apply "generally applicable First Amendment standards." *Harris v. Quinn*, 573 U.S. 616, 647. Mandatory membership in a Bar that engages in extensive political and ideological activities is unconstitutional under these standards because the State could adopt a number of alternatives that are "significantly less restrictive of associational freedoms." *Janus*, 138 S.

3

Ct. at 2465. Plaintiffs present three such alternatives in their motion for summary judgment: (1) the Bar could cease engaging in political and ideological activities; (2) the Bar could continue engaging in these activities but stop compelling attorneys to join; or (3) the Bar could split into two components—a compulsory section that regulates attorneys and a voluntary section that engages in political and ideological activities using voluntary contributions. Mot. 11-12.

To prevail, the Bar "must demonstrate that [these] alternative measures ... would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014).[1] The Bar cannot meet this burden. Approximately twenty states regulate the legal profession without resorting to compulsory bar membership, including Illinois, New York, Ohio, Pennsylvania, and Tennessee. Opp., Apffel Decl. ¶ 34. The Bar asserts that there is a genuine dispute of material fact about the viability of the non-integrated bar alternatives because thirty states "have adopted and maintain integrated bars." Opp. 18 n.10. But the simple fact that nearly half of all states manage to regulate the legal profession without imposing the inherent associational harms of a mandatory bar makes clear that there are, in fact, less-restrictive alternatives that can also ensure adequate protection of the public.

In all events, the Bar misstates the relevant burden. Once Plaintiffs have identified less-restrictive alternatives, it is the Bar's burden to show why those alternatives would *fail* to achieve its interests. *See McCullen*, 573 U.S. at 495. The Bar's "conclusory statements" cannot serve to create a genuine issue of material fact, *Hatch v. Wal-Mart Stores Inc.*, 200 Fed. Appx. 310, 312 (5th Cir. 2006), and summary judgment for the Plaintiffs remains appropriate in light of non-integrated bar alternatives, Mot. 11-12. Notably, the Bar also fails to address Plaintiffs' argument that the Bar could

---

[1] *McCullen* did not apply strict scrutiny but instead the lower form of scrutiny set forth in *Ward v. Rock Against Racism*, 491 U.S. 781 (1989). Forcing Plaintiffs to associate with the Bar is not narrowly tailored under either standard in light of the availability of less-restrictive alternatives, but the issue is not even close if the Court concludes that strict scrutiny is the proper standard of review.

cure any associational harms by no longer engaging in political and ideological activities at all. Mot. 11.

## II. Compulsory Support For The Bar's Non-Regulatory Political And Ideological Expenditures Violates The First Amendment.

The Bar engages in extensive political and ideological activities that Plaintiffs cannot be coerced to finance. The Bar does not dispute that it engages in such activities, but it urges this Court to adopt an astonishingly broad reading of *Keller* that would effectively give the Bar a blank check to compel attorneys to fund vast swaths of political and ideological activities they oppose. That argument is foreclosed by Supreme Court precedent and would eviscerate any meaningful First Amendment limits on the Bar's activities.

### A. The Bar Misinterprets Supreme Court Precedent Regarding Coerced Funding Of Political And Ideological Activities.

A mandatory bar may use coerced dues only for activities that are "necessarily or reasonably incurred for the purpose of regulating the legal profession or improving the quality of the legal service available to the people of the State." *Keller*, 496 U.S. at 14 (citation omitted). The Bar suggests that it can force attorneys to fund *any* activities that it deems "germane" to those interests, including political and ideological activities. Opp. 22. That is incorrect. Nothing in *Keller*, *Harris*, *Knox*, or *Janus* affirmatively grants bars the power to spend coerced dues on political and ideological activities. To the contrary, *Keller* expressly identifies "activities of an ideological nature" as an example of *non-germane* activities. As the Court explained:

> The State Bar may therefore constitutionally fund activities germane to those goals out of the mandatory dues of all members. It may not, however, in such manner fund activities of an ideological nature which fall outside of those areas of activity.

*Keller*, 496 U.S. at 14. The best reading of this language is that "activities of an ideological nature" necessarily "fall outside those areas" of permissible activity.

But even if *Keller* were open to multiple interpretations on this point, more recent Supreme Court precedent forecloses the Bar's interpretation. In *Harris*, decided in 2014, the Court explained that *Keller* "held that members of this bar *could not be required to pay the portion of bar dues used for political or ideological purposes* but that they could be required to pay the portion of the dues used for activities connected with proposing ethical codes and disciplining bar members." *Harris*, 573 U.S. at 655 (emphasis added). *Harris* makes clear that, even under *Keller*'s "germaneness" framework, activities of a "political or ideological" nature are non-chargeable to objectors. They are non-germane as a matter of law: full stop. This mirrors the Supreme Court's decision in *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550 (2005). There the Court explained that *Keller* had "invalidated the use of the compulsory fees to fund speech on political matters" and held that "Bar or union speech with such content ... was not germane to the regulatory interests that justified compelled membership." *Id.* at 557-58. *Keller* also held that "making those who disagreed with [that speech] pay for it violated the First Amendment." *Id.* Thus, even if there were some ambiguity about the scope of *Keller*, *Harris*, and *Johanns* resolve it decisively in Plaintiffs' favor.

This interpretation is further buttressed by the Supreme Court's recent decision in *Janus*. There, the Court similarly distinguished between speech that is "germane to collective bargaining" and speech that "instead concerns political or ideological issues." *Janus*, 138 S. Ct. at 2473. The Court never suggested that there was a third category of speech that concerned political or ideological issues but *was* germane to collective bargaining. And the Court further emphasized that even "under *Abood*"—the principal case upon which *Keller* relied—and other pre-*Janus* precedents, compulsory organizations are "flatly prohibited from permitting nonmembers to be charged" for speech that "concerns political or ideological issues." *Id.*

In the face of the Supreme Court's clear teachings to the contrary, the Bar asks this Court to radically reinterpret *Keller* and subsequent cases to permit it to use coerced dues for any political and

6

ideological activities so long as they bear some tangential connection to legal services or the legal profession. *See* Opp. 23-32. The Court should decline the invitation, as the Bar's theory would allow it to use coerced dues to fund expenditures far beyond the sorts of activities approved in *Keller*—"disciplining bar members" and "proposing ethical codes" for the profession. *See Harris*, 573 U.S. at 655. More fundamentally, the Bar's expansive view of its own authority and narrow view of the First Amendment is foreclosed by *Keller*, *Harris*, *Johanns*, and *Janus*.

### B. The Bar Engages In Extensive Political And Ideological Activities That Extend Far Beyond Any Legitimate Regulatory Functions.

Under the proper First Amendment standard, it is clear that the Bar engages in widespread non-regulatory activities that are highly political and ideological in nature. These activities cannot be financed through coerced dues.

***Legislative Program.*** The Bar insists that it can use coerced dues to engage in lobbying for proposed legislation that reflects its own view (but not Plaintiffs' view) of good policy. It boldly argues that every one of the forty-seven bills, Mot. 3-4, it supports is sufficiently related to attorney regulation or improving the quality of legal services to survive First Amendment scrutiny, Opp. 29-31. This despite the fact that many of the bills it supports are highly controversial and have nothing to do with regulating or improving the legal profession. *See* Mot. 3-4 & Ex. C. For example, the Bar claims that its support for a constitutional amendment changing Texas's definition of marriage is proper post-*Obergefell* because "amending or repealing unconstitutional laws ... improves the quality of legal services" by reducing "the risk that lawyers, their clients, members of the public, or government officials will rely on laws that judicial decisions have rendered invalid." Opp. 30. If that were actually the rule, then the Bar would have carte blanche to lobby for *any* measure it deems related to "the law" writ large. But the Supreme Court has never held—or even suggested—that bar organizations have a roving mandate to spend coerced dues on efforts to "amend or repeal" what they believe to be unconstitutional laws.

7

Moreover, the Bar does not even attempt to justify its use of coerced dues to lobby for forty-plus other bills that are pending before the Texas Legislature. For example, it has no explanation for its support of a bill that would create civil unions "as an alternative to marriage" for both sexes—something no decision of the U.S. Supreme Court or this State's courts has ever held is necessary. Mot. 4 & Exs. C, Y. The Bar maintains—with a straight face—that every single bill it supports has no "apparent political or ideological coloration." Opp. 30-31. But this argument is untenable. Legislation and lobbying are inherently political, as their core objective is to achieve policy goals through legislation—policy goals that are not shared by many of the Bar's members who strongly oppose its political advocacy.

Finally, the Bar suggests that there is no First Amendment harm to Plaintiffs because "Members of the Bar's voluntary subject-matter sections are coordinating all lobbying activities," and Bar employees have not been "directly" involved in lobbying in 2019, the year this suit was filed. Opp. 9, 30. This argument is unavailing. The Members of the Board (Defendants here) voted to approve lobbying efforts on these bills, Mot., Ex. C; the bills bear the imprimatur of being supported by the Bar; and the Bar does not deny that it has engaged in direct lobbying efforts in the past. The Bar's suggestion that it does not *itself* engage in lobbying is also incomplete, as the Access to Justice Commission—which the Bar funds though coerced dues—unabashedly engages in legislative activities. Opp., McAllister Decl. ¶¶ 56-58 (recounting legislative activities); Ex. JJ (Executive Director of the Access to Justice Commission thanking an employee for her "phenomenal work on [the Commission's] legislative initiatives during the 2019 legislative session" and discussing other lobbying efforts).

**Diversity Initiatives.** The Bar insists that its diversity initiatives are not ideological. Opp. 31-32. But the very notion of having programs targeted at certain individuals based on their race, gender, or sexual orientation is highly ideological and has been the subject of national controversy

for decades. *See, e.g.*, *Grutter v. Bollinger*, 539 U.S. 306 (2003). Indeed, people of good faith—including members of the Supreme Court—disagree sharply about the merits of such programs. *Compare Schuette v. Coalition to Defend Affirmative Action*, 572 U.S. 291, 315 (2014) (Roberts, C.J., concurring) *with id.* at 337 (Sotomayor, J., dissenting). The Bar's assertion that such programs are not ideological blinks reality and cannot justify compelling Plaintiffs to finance them.

**Access to Justice Division and Programs.** The Bar's Legal Access Division, Access to Justice Commission, and related programming are not chargeable activities under *Keller*. Mot. 5. Many of these programs seek to encourage pro bono work—a perfectly laudable goal, but one that sweeps beyond the Bar's permissible functions of regulating the profession and protecting the public from misconduct by lawyers. Moreover, much of the Bar's "access to justice" spending is designed to advance substantive ideological goals, such as opposing the federal government's immigration policies and lobbying the State to spend its funds in particular ways. *See* Mot. 5 & Exs. O, P, R.

**Legal Services Fee.** The Bar collects the State's legal services fee through its website. Ex. FF; State Bar, *How To Make Online Payments*, http://bit.ly/2EwCRjV (accessed May 27, 2019). This $65 fee funds civil legal services for the poor and indigent criminal defense. Tex. Gov't Code §§ 81.054(c); (j). The fee is effectively a compelled charitable contribution exacted as a condition of Plaintiffs practicing their chosen profession, and it cannot be justified by the Bar's interest in attorney regulation or improving the quality of Texas lawyering.

**Bar Journal.** The *Texas Bar Journal* is the Bar's "official publication," on which it spends over $1.5 million each year. Mot., Ex. L, S. It is distributed to every one of the Bar's 120,000-plus members, Opp., Apffel Decl. ¶¶ 16, 58. The Bar brazenly suggests that the *Journal* is not "'political' or 'ideological' in nature," Opp. 29, despite its ample ideological content, *see, e.g.*, Exs. HH & II. Putting this in stark relief, Plaintiffs were forced to subsidize the most recent issue of the *Bar Journal*, which criticizes this very suit. Ex. HH, 312.

9

***CLE and Convention.*** The Bar's ideologically charged CLE and Convention programming is neither necessary nor reasonably related to improving the quality of Texas lawyering. *See, e.g.*, Mot. 6 (citing Exs. N & Q); *see also* Opp. 27-28. While the Bar suggests that Plaintiffs have failed to prove the "purportedly ideological nature" of the Bar's programming, the programming is self-evidently ideological. *See, e.g.*, Mot., Ex. N ("The Paradox of Bodily Autonomy: Sex Confirming Surgeries and Circumcision"; "Intersectionality: The New Legal Imperative") & Ex. Q ("Diversity and Inclusion: The Important Role of Allies"; "Implicit Bias"; "Texas Transgender Attorneys: A View from the Bar"). Moreover, the Bar's claim that it is neutral and offers programming covering a "wide variety of ... viewpoints" is unavailing, because the only evidence the Bar cites is its general disclaimer that Bar programming does not necessarily reflect the Bar's views. *See* Opp. at 28 (citing Ex. 8 & Apffel Decl. ¶¶ 47, 53).

***Advertising.*** In a footnote, the Bar asks this Court to uphold its half a million dollars a year in advertising expenditures that are funded through coerced dues. *See* Opp. 32 n.15; Mot. 6. The Bar claims that *Keller* authorizes it "to inform lawyers and the public regarding the Bar's programs and the Bar's role in regulating the legal profession and advancing the quality of legal services." *Id.* But *Keller* approved no such expense, and the very next year the Supreme Court held that "[p]ublic relations expenditures designed to enhance the reputation of [a] profession" are not chargeable. *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 528 (1991).

### III.    The Bar's Objection Procedures Are Inconsistent With The First Amendment And Supreme Court Precedent.

The Bar's objection procedures violate the teachings of *Keller*, *Janus*, *Harris*, and *Knox*. *See* Mot. 14-17; Mot., Ex. EE, § 3.14. Clear Supreme Court precedent requires the Bar to provide a detailed breakdown of its expenditures, an appeal of all chargeability determinations to a neutral decision maker, an option to put funds into escrow pending resolution of objections, and opt-in rather than opt-out procedures when Bar funds are spent on political and ideological activities. *See*

*Keller*, 496 U.S. at 16-17; *Chicago Teachers Union v. Hudson*, 475 U.S. at 310. Flatly ignoring these requirements, the Bar fails to publish a sufficient breakdown of its expenditures, Mot. 17; does not provide for the placement of funds into escrow or offer an appeal to an impartial decision maker, Mot. 15-16; and admits to having used "an 'opt out' refund procedure for decades," Mot. 15-16 & Ex. T.

The Bar contends that its procedures comply with the First Amendment, but its arguments are not persuasive. At the outset, the Bar asserts that "Plaintiffs are ill-positioned to challenge the adequacy of the protest policy, given that they have never even attempted to invoke it." Opp. 32. But the Supreme Court has squarely held that there is no exhaustion requirement in the context of § 1983 suits. *See Patsy v. Board of Regents*, 457 U.S. 496, 516 (1982) ("[W]e conclude that exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983."). Plaintiffs are under no obligation to take part in the Bar's burdensome and unconstitutional opt-out process in order to challenge it under the First Amendment. Indeed, the Bar gets things exactly backwards when it boasts that it has "no record of any person ... raising an objection under the protest procedure from the time of its adoption in 2005 until the filing of Plaintiffs' complaint." Opp. 10 (citing Apffel Decl. ¶ 81). This strongly suggests that the Bar's "daunting" administrative process deters attorneys from seeking relief, *Janus*, 138 S. Ct. at 2482, as it is extraordinarily unlikely that the Bar's 120,000 members unanimously agree that every penny of its expenditures can be funded through coerced dues, *see* Opp., Apffel Decl. ¶ 16.

The Bar then makes a stunning claim. It says that it does not have to comply with the Supreme Court's objection procedures because it does not engage in any impermissible activities. In the Bar's view, "the First Amendment imposes no obligation on the Bar to provide *any* protest procedure for Bar members" because "the Bar's activities are all 'germane to' the legitimate state interests recognized in *Keller*." Opp. 33. This position is contradicted by *Keller* itself, which imposes

11

"constitutionally mandated procedure[s]" on all "integrated" bar associations. *Keller*, 496 U.S. at 16-17 (citation omitted); *see also Hudson*, 475 U.S. at 302-04 & n.12.

The Bar half-heartedly argues that this Court should distinguish *Keller* because the *Keller* majority struck down the California Bar's electioneering expenses and this Court has not yet struck down any of the Texas Bar's expenditures. Opp. 32-33. But the *Keller* decision never ties *post hoc* determinations about the permissibility of expenditures to *ex ante* procedural requirements. *See* 496 U.S. at 16-17. Indeed, the Bar cites no authority in support of its approach. *Keller*'s prophylactic approach is consistent with the Supreme Court's First Amendment jurisprudence, which imposes prophylactic guardrails in the context of union agency fees, obscenity, overbreadth, vagueness, public forum permits, and more. *Hudson*, 475 U.S. at 303 n.12. The Supreme Court does so to ensure "that the government treads with sensitivity in areas freighted with First Amendment concerns." *Id.* For these reasons, the Bar cannot avoid complying with *Keller*, *Janus*, *Harris*, and *Knox* merely by promising it will never violate the Constitution.[2]

In the alternative, the Bar argues that its existing procedures satisfy *Keller*. *See* Opp. 33-34; Mot., Ex. EE § 3.14. *Keller* held that "an integrated bar could certainly meet its [procedural] obligation by adopting the sort of procedures described in *Hudson*." *Keller*, 496 U.S. at 17. It left open the question "whether one or more alternative procedures would likewise satisfy that obligation." *Id.* Here, the Bar does not even attempt to argue that its procedures meet the requirements of *Hudson*, which include "an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending." 475 U.S. at 310; Opp. 33-34. Instead, the

---

[2] Accepting the Bar's argument on its own terms, the Bar would be required to comply with Supreme Court precedent requiring notice and opt-in procedures if it has or will engage in even one impermissible expenditure. It blinks reality to suggest that every dollar spent by the Bar is in perfect compliance with the First Amendment.

Bar asks this Court to conclude—as a matter of first impression—that a compulsory bar association can satisfy its procedural obligations using looser, alternative procedures. Opp. 33-34. The Bar does not explain what alternative standard the Court should adopt, but believes its current procedures "more than satisfy any First Amendment requirements." Opp. 34.

This Court should not adopt a looser standard than the one countenanced by the Supreme Court in *Keller*, 496 U.S. at 16-17, and *Harris*, 573 U.S. at 303-310. In the decades since *Keller* was decided, the Supreme Court has significantly tightened the requirements in this area of law, to ensure robust protection of First Amendment associational rights. *See, e.g.*, *Knox*, 567 U.S. at 314-15; *Harris*, 573 U.S. at 638-646; *Janus*, 138 S. Ct. at 2460-63. Adopting a looser standard would thus run counter to the Supreme Court's recent jurisprudence. Moreover, the Supreme Court has explicitly overruled *Abood*, the case at the heart of *Keller*'s opt-out regime. *See Janus*, 138 S. Ct. at 2460; *Keller*, 496 U.S. at 15-17. Adopting a looser standard would impermissibly "extend" *Abood*, a precedent the Supreme Court had "refused to extend" even before overruling it in *Janus*, 138 S. Ct. at 2463.

Finally, the Bar relegates to a footnote its response to Plaintiffs' argument that *Janus* and *Knox* require the Bar to adopt opt-in rather than opt-out policies. *Compare* Mot. 15-16 *with* Opp. 33 n.16. This may be because the President of the Bar concedes that the Bar "has had an 'opt out' refund procedure for decades." Mot., Ex. T. This directly contradicts the Supreme Court's teachings that "clear[]," "free[]," and "affirmative[]" consent is needed before an organization can use coerced dues to fund political or ideological activities. *Janus*, 138 S. Ct. at 2486. To the extent this Court concludes that the Bar has engaged in impermissible political or ideological activities, the Bar has clearly failed to obtain Plaintiffs' consent.

## IV. The Bar's Jurisdictional Arguments Are Meritless And Have Been Fully Addressed By Plaintiffs' Amended Complaint.

The Bar incorporated by reference its Motion to Dismiss (ECF No. 34) into its Opposition to Plaintiffs' motion for summary judgment. *See* Opp. 34-35. The arguments raised by the Bar in its

Motion to Dismiss are meritless.[3] Nevertheless, to avoid needless distractions and eliminate any doubt that the proper parties are included as Defendants, Plaintiffs filed an Amended Complaint on May 31, 2019, adding the parties that the Bar suggested Plaintiffs would need to sue to obtain relief. This includes the Bar's Chief Disciplinary Counsel and the Members of the Texas Commission for Lawyer Discipline. Because Plaintiffs' Amended Complaint fully addresses the Bar's arguments for dismissal, the Court should reject them. *See* Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss; *see also Olivas v. Four Unknown United States Marshals*, EP-17-CV-278-PRM, 2018 WL 1899738, at *1 (W.D. Tex. 2018).

## CONCLUSION

The Court should grant Plaintiffs' Motion for Partial Summary Judgment on Liability on all counts.

---

[3] The Bar's Article III "case or controversy" and Eleventh Amendment immunity arguments, *see* Opp. 34-35 & Mot. to Dismiss 1-7, lack any basis in precedent. *See* Plaintiffs' Opposition to Defendants' Motion to Dismiss. All that is required for a court to have jurisdiction in these circumstances is that there be "some enforcement power or act that can be enjoined—between the defendant official and the challenged statute." *Okpalobi v. Foster*, 244 F.3d 405, 419 (5th Cir. 2001). Here, that inquiry is simple. The State Bar Rules provide that "[t]he State Bar shall be *governed by* a Board which *shall enforce* the [State Bar] Act and these Rules." Ex. GG, Art. IV, § 1(A) (emphasis added). The existing named Defendants have significant responsibility for setting and collecting compulsory dues under the State Bar Act, Tex. Gov't Code § 81.054, and pursuant to the Bar's Policies and Procedures Manual, *see* Mot., Ex. EE, §§ 1.22, 3.01, 3.14. And, contrary to the Bar's assertion that it plays no role in collecting legal services fees, the Bar requires attorneys to pay the legal services fee through its website. Ex. FF.

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated: May 31, 2019 | <u>/s/ *Cameron T. Norris*</u> |
|  | William S. Consovoy (VA 47704)<br>Jeffrey M. Harris (VA 93883)<br>Cameron T. Norris (VA 91624)<br>Samuel D. Adkisson (VA 93362)<br>CONSOVOY MCCARTHY PLLC<br>3033 Wilson Boulevard, Suite 700<br>Arlington, VA 22201<br>(703) 243-9423<br>cam@consovoymccarthy.com |
|  | *Counsel for Plaintiffs* |

15

## CERTIFICATE OF SERVICE

I certify that on May 31, 2019, I electronically filed the foregoing reply with the Clerk of the Court for the U.S. District Court for the Western District of Texas by using the Court's CM/ECF system, which will send notification of the filing to the following:

Thomas S. Leatherbury
VINSON & ELKINS LLP
Trammell Crow Center
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
tleatherbury@velaw.com

Joshua S. Johnson
Morgan A. Kelley
VINSON & ELKINS LLP
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
joshjohnson@velaw.com
mkelley@velaw.com

Patrick W. Mizell
Deborah C. Milner
VINSON & ELKINS LLP
1001 Fannin Street, Suite 2500
Houston, TX 77002
pmizell@velaw.com
cmilner@velaw.com

*Counsel for Defendants*

May 31, 2019

*/s/ Cameron T. Norris*
CAMERON T. NORRIS
*Counsel for Plaintiffs*