# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

|  |  |
|---|---|
| TONY K. MCDONALD, JOSHUA B. HAMMER, and MARK S. PULLIAM, | |
| *Plaintiffs*, | |
| | Case No. 1:19-cv-219-LY |
| v. | |
| JOE K. LONGLEY, et al., | |
| *Defendants*. | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

William S. Consovoy
Jeffrey M. Harris
Cameron T. Norris
Samuel D. Adkisson
CONSOVOY MCCARTHY PLLC
3033 Wilson Boulevard, Suite 700
Arlington, VA 22201
(703) 243-9423
cam@consovoymccarthy.com

*Counsel for Plaintiffs*

May 31, 2019

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................................ii

INTRODUCTION ...............................................................................................................1

BACKGROUND ................................................................................................................2

I.      Texas Law Requires Those Who Want To Practice Law To Join The Bar...............................2

II.     The Bar's Use Of Compelled Dues For Ideological And Political Activities. ..........................2

III.    The Bar's Constitutionally Inadequate Opt-Out Procedures. ....................................................6

ARGUMENT ......................................................................................................................7

I.      Precedent Does Not Foreclose Plaintiffs' First Amendment Challenge To Compulsory
        Membership In The Bar. ...............................................................................................8

II.     Compulsory Support For The Bar's Non-Regulatory Political And Ideological
        Expenditures Violates The First Amendment. ................................................................12

        A.      The Bar Misinterprets Supreme Court Precedent Regarding Coerced Funding
                of Political and Ideological Activities. .................................................................12

        B.      The Bar Engages In Extensive Political And Ideological Activities That
                Extend Far Beyond Any Legitimate Regulatory Functions. .......................................14

III.    The Bar's Objection Procedures Are Inconsistent With The First Amendment And
        Supreme Court Precedent....................................................................................................18

CONCLUSION ................................................................................................................21

# TABLE OF AUTHORITIES

## Cases

*Abood v. Detroit Bd. of Ed.*,
  431 U.S. 209 (1977)............................................................................8, 9, 13, 21

*Chicago Teachers Union v. Hudson*,
  475 U.S. 292 (1986)..........................................................................1, 7, 8, 19, 20

*Citizens United v. FEC*,
  558 U.S. 310 (2010)......................................................................................9

*Grutter v. Bollinger*,
  539 U.S. 306 (2003)......................................................................................16

*Harris v. Quinn*,
  573 U.S. 616 (2014)............................................2, 7, 9, 10, 12-14, 18, 20, 21

*Hatch v. Wal-Mart Stores Inc.*,
  200 Fed. Appx. 310 (5th Cir. 2006)..............................................................11

*In re Petition for a Rule Change to Create a Voluntary State Bar*,
  841 N.W.2d 167 (Neb. 2013)........................................................................10

*Janus v. AFSCME*,
  138 S. Ct. 2448 (2018) ..........................................1, 8-10, 12-14, 18-21

*Johanns v. Livestock Marketing Ass'n*,
  544 U.S. 550 (2005)............................................................................13, 14

*Keller v. State Bar of California*,
  496 U.S. 1 (1990)......................................................1, 7-10, 12-14, 16, 18-21

*Knox v. Services Emps. Int'l Union*,
  567 U.S. 298 (2012)............................................................1, 9, 12, 18, 20, 21

*Lehnert v. Ferris Faculty Ass'n*,
  500 U.S. 507 (1991)......................................................................................18

*McCullen v. Coakley*,
  573 U.S. 464 (2014)......................................................................................11

*NAACP v. Alabama*,
  357 U.S. 449 (1958)......................................................................................10

*Patsy v. Board of Regents*,
  457 U.S. 496 (1982)......................................................................................19

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984)..................................................................................................................1

*Schuette v. Coalition to Defend Affirmative Action,*
    572 U.S. 291 (2014)................................................................................................................16

*United States v. United Foods,*
    533 U.S. 405 (2001)...........................................................................................................1, 17

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989)..............................................................................................................11

**Statutes**

Tex. Gov't Code § 81.051................................................................................................................2

Tex. Gov't Code § 81.052................................................................................................................2

Tex. Gov't Code § 81.053................................................................................................................2

Tex. Gov't Code § 81.054........................................................................................................2, 5, 17

**Other Authorities**

State Bar, *How To Make Online Payments*, http://bit.ly/2EwCRjV....................................................7, 17

## INTRODUCTION

The First Amendment protects the right to "eschew association for expressive purposes." *Janus v. AFSCME*, 138 S. Ct. 2448, 2463 (2018). It also prohibits the government from compelling individuals to "support speech by others," even if those individuals are not compelled to "utter the speech itself." *United States v. United Foods*, 533 U.S. 405, 413 (2001). Ignoring these inexorable constitutional commands, Defendants ("the Bar") insist that compelled association with and financial support for the Bar is constitutional even though it engages in extensive political and ideological activities with which many of its members disagree. *See* Defendants' Cross-Motion for Summary Judgment ("Mot.").

Indeed, the Bar asserts that *every last one of its activities*—including those involving some of the most hotly contested issues of the day, such as immigration, race- and gender-based programs, and legislation on LGBT and family-law issues—is related to attorney regulation or improving the quality of Texas lawyering and therefore can be funded through coerced dues. Mot. at 22-30. The Bar then doubles down, claiming it has no obligation to provide *Hudson* notices or to adopt opt-in rather than opt-out policies because every dollar it spends comports with First Amendment limitations on the use of coerced dues. *Id.* at 30-32.

The Court should reject these arguments, deny the Bar's Cross-Motion for Summary Judgment (ECF No. 35), and grant Plaintiffs' Motion for Partial Summary Judgment (ECF No. 6), because Plaintiffs are entitled to judgment as a matter of law. Compelled membership in and financial support for the Bar is unconstitutional because the Bar engages in pervasive political and ideological activities to which many of its members object. Moreover, the Bar's current objection procedures fall far short of what the Supreme Court held was necessary in *Keller*, *Knox*, and *Janus*. Compelled association with and subsidization of the Bar "seriously impinges on [Plaintiffs'] First Amendment rights." *Janus*, 138 S. Ct. at 2464; *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).

1

## BACKGROUND

### I.     Texas Law Requires Those Who Want To Practice Law To Join The Bar.

Individuals who wish to practice law in Texas are compelled to join the Bar in order to engage in their profession. *See* Tex. Gov't Code § 81.051(b) ("Each person licensed to practice law in this state shall, not later than the 10th day after the person's admission to practice, enroll in the state bar by registering with the clerk of the supreme court."). Failure to join the Bar makes an individual ineligible to practice law in Texas. An attorney who is eligible to practice law in Texas but is not currently practicing may move to "inactive" status. *See* Tex. Gov't Code §§ 81.052, 81.053. Inactive members must remain members of the Bar, and continue to pay dues, in order to preserve their eligibility to return to active status in the future.

All attorneys licensed to practice law in Texas must pay dues to the Bar. *See* Tex. Gov't Code § 81.054. Those dues are currently $68 for attorneys licensed 0 to 3 years, $148 for attorneys licensed 4 to 5 years, and $235 for attorneys licensed more than 5 years. Ex. A. Dues for inactive members are currently $50 per year. Ex. D. In the year ending on May 31, 2017, the Bar collected more than $20 million in mandatory dues, plus another $25 million in revenue from its other activities. Ex. E. Texas law also imposes an additional $65 "legal services fee" on certain attorneys as a condition of their practicing law. Tex. Gov't Code § 81.054(j). This fee is imposed only on certain attorneys in active private practice in Texas. It is not imposed on attorneys over 70 years old or on inactive status; those who work in state, federal, or local government; those who work for certain non-profit organizations; and those who reside out of state and do not practice law in Texas. *Id.* § 81.054(k).

### II.     The Bar's Use Of Compelled Dues For Ideological And Political Activities.

Under existing precedent, compelled bar dues can be used only for the limited purpose of attorney regulation and improving the quality of Texas lawyering—*i.e.*, "proposing ethical codes and disciplining bar members." *Harris v. Quinn*, 573 U.S. 616, 655 (2014). But the Bar does not limit its

spending to these narrow categories. Instead, it engages in extensive political and ideological spending that extends far beyond any regulatory functions.

**Legislative Program.** It is difficult to imagine a more quintessentially "political" activity than advocating for the passage of legislation. Yet the Bar uses compelled dues to do just that. The Bar maintains a Governmental Relations department that "serves as the State Bar's liaison to the Texas Legislature and other state and federal governmental entities." Ex. B. This department "reviews thousands of bills each legislative session for their potential impact on the State Bar and the legal profession." *Id.* The Bar's 2019 legislative program includes proposed legislation on wide-ranging matters including construction law, family law, LGBT law, poverty law, real estate law, trust law, and probate law. Ex. C.

The Bar is currently advocating for the passage of forty-seven proposed bills in these areas. *Id.* One of these bills would amend the definition of marriage in the Texas Constitution. Exs. C, X (SJR 9). Another would amend the Texas Code to create civil unions, "intended as an alternative to marriage" for both sexes. Ex. C, Y (HB 978). Other bills would modify the procedures used by grandparents to gain access to grandchildren over parental objections, Exs. C, Z (HB 575); substantively amend Texas trust law, Exs. C, AA (HB 2782); and impose notification requirements on parents wishing to take summer weekend possession of a child under a court order, Exs. C, BB (HB 553). The Bar also publishes a weekly newsletter during the legislative session, called the *Friday Update*, which is "intended to keep members up to date on legislation of interest to the legal profession." Ex. J.

**Diversity Initiatives.** The Bar has an "Office of Minority Affairs." The goals of this office include "serv[ing] minority, women, and LGBT attorneys and legal organizations in Texas" and "enhanc[ing] employment and economic opportunities for minority, women, and LGBT attorneys in the legal profession." Ex. F. The Office of Minority Affairs engages in "Minority Initiatives," which

are "ongoing forums, projects, programs, and publications dedicated to our diversity efforts." *Id.* These initiatives include the Texas Minority Counsel Program, Texas Minority Attorney Program, Minority Attorneys at the Podium Project, Diversity Forum, Diversity Summit, LeadershipSBOT, Pipeline Program, Texas Spectrum (a diversity newsletter), and the Ten Minute Mentor Program. *Id.*

All of the Bar's "diversity" initiatives are premised on the assumption that is appropriate to offer certain services targeted at individuals of a particular race, gender, or sexual orientation. The Texas Minority Counsel Program, for example, is a "client development, networking, and CLE event for diverse attorneys in Texas," which are defined as "minority, women, and LGBT attorneys." Ex. G. This annual program allows "diverse lawyers" to "meet one-on-one to discuss potential outside counsel opportunities," and offers "incomparable networking events." Ex. I. The Bar also operates a host of diversity committees and sections. Ex. H.

***Access to Justice Division and Programs.*** The Bar maintains a "Legal Access Division" that "offers support, training, publications, resource materials, and more to legal services programs and pro bono volunteers." Ex. M. During the 2018-2019 budgetary year, the Bar spent over $1 million on Legal Access Division programs. Ex. L. In 2019-2020, the Bar plans to spend over $1.5 million on these activities. Ex. K. The Bar spent an additional $827,000 in 2018-2019 funding an "Access to Justice Commission," and it intends to spend a similar amount during the 2019-2020 fiscal year. *See* Exs. L, K. The Access to Justice Commission engages in a variety of political and ideological activities, including lobbying. *See* Ex. R; Mot., McAllister Decl. ¶¶ 56-58 (recounting legislative activities); Ex. JJ (Executive Director of the Commission praising an employee's "phenomenal work on [the Commission's] legislative initiatives during the 2019 legislative session").

In connection with its pro bono and "access to justice efforts," the Bar maintains a directory of "volunteer and resource opportunities." Ex. O. That directory "provides a comprehensive list of training, volunteer, and donation opportunities for attorneys who would like to assist with migrant

asylum and family separation cases." *Id.* Every one of the relevant entries promotes a group that seeks to assist undocumented immigrants in remaining in the United States. *Id.* Moreover, the directory links to a June 28, 2018 article published by Defendant Joe K. Longley, President of the Bar. In that article Longley says he "traveled to the border to learn how we can promote access to justice and the rule of law related to the separation of immigrant families" and decided to create the volunteer opportunities webpage as a result. Ex. P. Even though Longley was expressly encouraging Bar members to oppose immigration policies being implemented by the federal government, Longley claimed that "[t]his is not about politics. It's about access to justice." *Id.* This showcases how the Bar's ostensibly neutral "access to justice" efforts are used to advance substantive political and ideological goals.

**Legal Services Fee.** As noted above, Texas law requires certain attorneys to pay a $65 legal services fee. Tex. Gov't Code § 81.054(j). This fee is imposed only on a subset of attorneys in active private practice in Texas. The $65 legal services fee has nothing to do with regulating the profession or ensuring ethical conduct by attorneys. Its *sole* purpose is to fund legal services for certain groups. Half of the fees are allocated to the Supreme Court Judicial Fund, which provides civil legal services to the poor, and the other half goes to the Fair Defense Account of the State's general reserve fund for indigent criminal defense. *See id.* § 81.054(c). This fee is effectively a compelled charitable contribution that is imposed on certain Texas attorneys as a condition of practicing their chosen profession.

**Other Non-Chargeable Activities.** The Bar spends attorneys' compelled dues on countless other activities that extend far beyond the regulation of attorneys. The Bar hosts an annual Convention at which political and ideological activities are rampant. During the 2018 Convention, for example, topics included "Diversity and Inclusion: The Important Role of Allies"; "Current Issues Affecting the Hispanic Community"; "LGBT Pathways to the Judiciary: Impact of Openly LGBT Judges in

Texas"; "Implicit Bias"; "Texas Transgender Attorneys: A View from the Bar"; and a "Legislative Update [on] Proposed Rulemaking Under the Trump Administration." Ex. Q at 10-32.

The Bar also funds ideologically-charged Continuing Legal Education programs. *See, e.g.*, Ex. N ("The Paradox of Bodily Autonomy: Sex Confirming Surgeries and Circumcision"; "Intersectionality: The New Legal Imperative"). It spends over half-a-million dollars in advertising each year. *See* Ex. L ($761,000 in FY 2018-2019). It publishes and exercises editorial control over its "official publication," the *Texas Bar Journal*, on which it spends over $1.5 million each year. Exs. S, L. It uses this publication to advance political and ideological positions, such as criticizing this very suit. *See* Ex. HH, 312. And to support these and other impermissible activities, the Bar spends millions on administrative staff, technology, and facilities. *See* Exs. L, K.

## III.    The Bar's Constitutionally Inadequate Opt-Out Procedures.

To the extent a bar association engages in political or ideological activities—as the Bar plainly does, *see supra*—it must implement appropriate procedures to ensure that individuals are not compelled to support and associate with activities with which they disagree. Supreme Court precedent mandates the use of procedures by which members must *opt in* before their compelled funds are used to subsidize political and ideological activities, rather than *opt out* of having their funds used for these purposes. Yet the President of the Bar recently admitted that the Bar "has had an 'opt out' refund procedure for decades." Ex. T.

The Bar's opt-out procedures are convoluted and burdensome. If an individual wants to opt out of paying for political and ideological activities, he must first pay his dues in full. He can then "object" and "seek a refund of a pro rata portion of his or her dues expended." Exs. W, EE. The executive director of the Bar has the sole "discretion" to issue refunds. *Id.* If the executive director declines to do so, the objector is out of luck. Refunds are given only for "the convenience of the Bar," not because "the challenged activity was or would not have been within the purposes of or limitations

on the State Bar." *Id.* Thus, even if a member shows that certain political or ideological expenditures are non-chargeable, the Bar continues charging all members *except the single objector*. The Bar does not allow for an appeal to a neutral decision maker and does not place funds into escrow while appeals are pending. *Id.*

Moreover, the Bar provides nothing resembling a *Hudson* notice, whereby members can see which portions of the dues are paying for regulatory functions, and which portions are paying for non-chargeable political and ideological activities. *See Chicago Teachers Union v. Hudson*, 475 U.S. 292 (1986). This puts the entire burden of identifying non-chargeable expenses on potential objectors. And, in an apparent effort to minimize the use of even its inadequate opt-out procedures, the Bar's main dues webpages fail to mention the opt-out procedures at all. *See* Exs. A, U, V. They instead state that "[a]ll Texas lawyers *must* pay" the enumerated dues or face suspension. Ex. A (emphasis added). The Bar recently posted a video to the front page of its website under "How to Pay Dues Online." Ex. CC. The seven-and-a-half-minute video fails to mention the Bar's opt-out policy even once. *See* State Bar, *How To Make Online Payments*, http://bit.ly/2EwCRjV (accessed May 27, 2019).

## ARGUMENT

Plaintiffs and Defendants agrees that this dispute should be resolved as a matter of law. They disagree about which party should prevail. *See* ECF No. 6 (Plaintiffs' Motion for Partial Summary Judgment on Liability); ECF No. 35 (Defendants' Cross-Motion for Summary Judgment).[1] The Bar raises three main arguments in support of its Cross-Motion for Summary Judgment. First, the Bar argues that precedent forecloses Plaintiffs' challenge to compelled bar membership. Mot. 14-21. Second, it argues that every single penny of its expenditures—including its politically and ideologically

---

[1] To the extent the Bar suggests—in briefing and in its attached declarations—that there may be a genuine dispute of material fact as to whether the Bar's expenditures are political or ideological, the Bar is incorrect. What constitutes a political or ideological expenditure is a pure question of law that may be appropriately resolved at the summary judgment stage. *See, e.g.*, *Keller*, 496 U.S. at 15-17 (treating chargeability determinations as questions of law); *Harris*, 573 U.S. at 636-40 (same).

charged activities such as immigration-related advocacy and lobbying—satisfies the Supreme Court's test for coerced funding. Mot. 21-30. And third, it claims that it has "no obligation" to provide a *Hudson* notice or adopt opt-in rather than opt-out procedures, even in the face of clear teachings to the contrary in *Keller* and *Janus*. Mot. 30-32. The Bar's arguments are each without merit, and accepting them would effectively eliminate any First Amendment constraints on the Bar's activities notwithstanding clear Supreme Court precedent recognizing the fundamental right to be free from coerced association. The Bar's motion for summary judgment should be denied.

**I.    Precedent Does Not Foreclose Plaintiffs' First Amendment Challenge To Compulsory Membership In The Bar.**

Contrary to the Bar's assertions, Mot. 14-22, *Keller v. State Bar of California*, 496 U.S. 1 (1990), and *Lathrop v. Donohue*, 367 U.S. 820 (1961), do not foreclose Plaintiffs' challenge to compelled bar membership in light of the Bar's extensive political and ideological activities.

Plaintiffs acknowledge—as they have from the outset of this case—that the Supreme Court upheld compulsory state bars (with strict limitations) in *Keller* and *Lathrop*. But those decision relied heavily on the logic of *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209 (1977), which the Supreme Court overruled in *Janus*, 138 S. Ct. at 2478-79. To the extent this Court nonetheless believes that *Keller* remains binding with respect to Plaintiffs' challenge to compelled membership, Plaintiffs preserve the issue and their right to challenge the broader constitutionality of unified bars before the Supreme Court.

But Plaintiffs should prevail even if *Keller* and *Lathrop* remain good law. Plaintiffs do not want to associate with or financially support an organization that lobbies for legislation, engages in race- and gender-based programs, and seeks to assist undocumented immigrants entering the United States. Nothing in either *Keller* or *Lathrop* holds that a state can compel bar membership *when a bar engages in political and ideological activities*. Indeed, the Supreme Court reserved that very question in *Keller*, declining to address "in the first instance" whether an individual can "be compelled to associate with

an organization that engages in political or ideological activities beyond those for which mandatory financial support is justified under the principles of *Lathrop* and *Abood*." *Keller*, 496 U.S. at 17.

The Bar erroneously contends that *Lathrop* resolved this question. Mot. 14-17. It did not. The *Keller* majority explicitly noted that the question "implicate[s] a much broader freedom of association claim than was at issue in *Lathrop*." *Keller*, 496 U.S. at 17. *Lathrop* simply held that "[g]iven the character of the integrated bar" at issue—which was evaluated through the lens of pre-*Keller* First Amendment doctrine—the Court was "unable to find any impingement upon protected rights of association." *Lathrop*, 367 U.S. at 843. But the case would have presented an entirely different associational question if the Court had applied its later holding in *Keller* and concluded that petitioners had been coerced to associate with a bar association that engaged in political or ideological activities. *See Keller*, 496 U.S. at 17.

Because precedent does not foreclose Plaintiffs' challenge to compulsory membership in these circumstances, the Court must apply "generally applicable First Amendment standards." *Harris*, 573 U.S. at 647.[2] The relevant standard here is strict scrutiny, which requires narrow tailoring and a compelling government interest. *See Citizens United v. FEC*, 558 U.S. 310, 340 (2010). But even if this Court applies "exacting scrutiny" instead of strict scrutiny, compulsory association with an ideological bar still must "serve a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms." *Janus*, 138 S. Ct. at 2465; *Harris*, 573 U.S. at 648-49; *Knox v. Services Emps. Int'l Union*, 567 U.S. 298, 310. The Supreme Court has not yet decided whether strict or

---

[2] The Supreme Court applied a lower standard of scrutiny in *Abood*, 431 U.S. 209. The lower *Abood* threshold does not apply here for two reasons. First, the Supreme Court expressly overruled *Abood* in *Janus*, so this Court is prohibited from expanding it to any new areas. Applying it to compelled association with a bar association that engages in political and ideological activities—a scenario the Supreme Court expressly declined to reach in *Keller*—would be a novel and unwarranted application of *Abood*. Second, even before overruling *Abood*, the Supreme Court had cautioned against applying *Abood*'s standard in "new situation[s]." *Harris*, 573 U.S. at 645-46.

exacting scrutiny is the appropriate standard of review in the context of compelled association with unions and bar organizations, specifically leaving the question open. *Janus*, 138 S. Ct. at 2465. Strict scrutiny is most consistent with the Supreme Court's First Amendment jurisprudence, which subjects all government action constraining association "to the closest scrutiny." *See NAACP v. Alabama*, 357 U.S. 449, 460-61 (1958).

But whatever level of scrutiny this Court applies, compelled membership in the Bar fails it. The only compelling interests the Supreme Court has recognized in the context of bar organizations are "regulating the legal profession" and "improving the quality of legal services." *Keller*, 496 U.S. at 13-14. Those interests are limited to activities such as "proposing ethical codes and disciplining bar members." *Harris*, 573 U.S. at 655. Furthering these limited interests does not require compelled membership in a bar that engages in political and ideological activities.

Texas has at least three alternatives that are "significantly less restrictive of associational freedoms." *Janus*, 138 S. Ct. at 2465. *First*, the Bar could stop engaging in political and ideological activities. This would significantly reduce the First Amendment harms inflicted on Plaintiffs. Since the Bar has no right to compel members to support ideological activities in the first instance, this is an easy solution. *Keller*, 496 U.S. at 14, *infra* at 12-13. *Second*, the Bar could continue engaging in political and ideological activities as long as attorneys are not compelled to join. Nearly twenty states do this, *see In re Petition for a Rule Change to Create a Voluntary State Bar*, 841 N.W.2d 167, 171 (Neb. 2013), and there is no evidence that the regulation of lawyers or the quality of legal services is inferior in these states. *Third*, the Bar could be split into two components—a compulsory section that regulates attorneys and a voluntary foundation supported by non-coerced contributions that engages in all other activities.[3] This would allow the State to capture the supposed regulatory benefits of a mandatory bar,

---

[3] Plaintiffs propose these as alternatives that are significantly less restrictive of associational freedom than the status quo of compulsory membership in a bar that engages in political and

while still allowing those interested in supporting the Bar's ideological activities to do so.

To prevail, the Bar "must demonstrate that [these] alternative measures ... would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014).[4] The Bar cannot meet this burden. Approximately twenty states regulate the legal profession without resorting to compulsory bar membership, including Illinois, New York, Ohio, Pennsylvania, and Tennessee. Mot., Apffel Decl. ¶ 34. The Bar asserts that there is a genuine dispute of material fact about the viability of the non-integrated bar alternatives because thirty states "have adopted and maintain integrated bars." Mot. 17 n.9. But the simple fact that nearly half of all states manage to regulate the legal profession without imposing the inherent associational harms of a mandatory bar makes clear that there are, in fact, less-restrictive alternatives that can also ensure adequate protection of the public.

In all events, the Bar misstates the relevant burden. Once Plaintiffs have identified less-restrictive alternatives, it is the Bar's burden to show why those alternatives would *fail* to achieve its interests. *See McCullen*, 573 U.S. at 495. The Bar's "conclusory statements" cannot serve to create a genuine issue of material fact, *Hatch v. Wal-Mart Stores Inc.*, 200 Fed. Appx. 310, 312 (5th Cir. 2006), and summary judgment for the Plaintiffs remains appropriate in light of non-integrated bar alternatives, ECF No. 6 at 11-12. Notably, the Bar also fails to address Plaintiffs' argument that the Bar could cure any associational harms by no longer engaging in political and ideological activities at all. ECF No. 6 at 11. In light of these less-restrictive alternatives, the Court should grant summary judgment for Plaintiffs—not the Bar.

---

ideological activities. But Plaintiffs do not believe that compulsory bar membership is *ever* constitutional. *See supra* at 8.

[4] *McCullen* did not apply strict scrutiny but instead the lower form of scrutiny set forth in *Ward v. Rock Against Racism*, 491 U.S. 781 (1989). Forcing Plaintiffs to associate with the Bar is not narrowly tailored under either standard in light of the availability of less-restrictive alternatives, but the issue is not even close if the Court concludes that strict scrutiny is the proper standard of review.

II.     **Compulsory Support For The Bar's Non-Regulatory Political And Ideological Expenditures Violates The First Amendment.**

The Bar engages in extensive political and ideological activities that Plaintiffs cannot be coerced to finance. The Bar does not dispute that it engages in such activities, but it urges this Court to adopt an astonishingly broad reading of *Keller* that would effectively give the Bar a blank check to compel attorneys to fund vast swaths of political and ideological activities they oppose. That argument is foreclosed by Supreme Court precedent and would eviscerate any meaningful First Amendment limits on the Bar's activities.

A.     **The Bar Misinterprets Supreme Court Precedent Regarding Coerced Funding Of Political And Ideological Activities.**

A mandatory bar may use coerced dues only for activities that are "necessarily or reasonably incurred for the purpose of regulating the legal profession or improving the quality of the legal service available to the people of the State." *Keller*, 496 U.S. at 14 (citation omitted). The Bar suggests that it can force attorneys to fund *any* activities that it deems "germane" to those interests, including political and ideological activities. Mot. 21. That is incorrect. Nothing in *Keller*, *Harris*, *Knox*, or *Janus* affirmatively grants bars the power to spend coerced dues on political and ideological activities. To the contrary, *Keller* expressly identifies "activities of an ideological nature" as an example of *non-germane* activities. As the Court explained:

> The State Bar may therefore constitutionally fund activities germane to those goals out of the mandatory dues of all members. It may not, however, in such manner fund activities of an ideological nature which fall outside of those areas of activity.

*Keller*, 496 U.S. at 14. The best reading of this language is that "activities of an ideological nature" necessarily "fall outside those areas" of permissible activity.

But even if *Keller* were open to multiple interpretations on this point, more recent Supreme Court precedent forecloses the Bar's interpretation. In *Harris*, decided in 2014, the Court explained that *Keller* "held that members of this bar *could not be required to pay the portion of bar dues used for political*

*or ideological purposes* but that they could be required to pay the portion of the dues used for activities connected with proposing ethical codes and disciplining bar members." *Harris*, 573 U.S. at 655 (emphasis added). *Harris* makes clear that, even under *Keller*'s "germaneness" framework, activities of a "political or ideological" nature are non-chargeable to objectors. They are non-germane as a matter of law: full stop. This mirrors the Supreme Court's decision in *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550 (2005). There the Court explained that *Keller* had "invalidated the use of the compulsory fees to fund speech on political matters" and held that "Bar or union speech with such content ... was not germane to the regulatory interests that justified compelled membership." *Id.* at 557-58. *Keller* also held that "making those who disagreed with [that speech] pay for it violated the First Amendment." *Id.* Thus, even if there were some ambiguity about the scope of *Keller*, *Harris* and *Johanns* resolve it decisively in Plaintiffs' favor.

This interpretation is further buttressed by the Supreme Court's recent decision in *Janus*. There, the Court similarly distinguished between speech that is "germane to collective bargaining" and speech that "instead concerns political or ideological issues." *Janus*, 138 S. Ct. at 2473. The Court never suggested that there was a third category of speech that concerned political or ideological issues but *was* germane to collective bargaining. And the Court further emphasized that even "under *Abood*"—the principal case upon which *Keller* relied—and other pre-*Janus* precedents, compulsory organizations are "flatly prohibited from permitting nonmembers to be charged" for speech that "concerns political or ideological issues." *Id.*

In the face of the Supreme Court's clear teachings to the contrary, the Bar asks this Court to radically reinterpret *Keller* and subsequent cases to permit it to use coerced dues for any political and ideological activities so long as they bear some tangential connection to legal services or the legal profession. *See* Mot. 21-30. The Court should decline the invitation, as the Bar's theory would allow it to use coerced dues to fund expenditures far beyond the sorts of activities approved in *Keller*—

13

"disciplining bar members" and "proposing ethical codes" for the profession. *See Harris*, 573 U.S. at 655. More fundamentally, the Bar's expansive view of its own authority and narrow view of the First Amendment is foreclosed by *Keller*, *Harris*, *Johanns*, and *Janus*.

### B. The Bar Engages In Extensive Political And Ideological Activities That Extend Far Beyond Any Legitimate Regulatory Functions.

"[F]reedom of speech includes both the right to speak freely and the right to refrain from speaking at all," and compelled subsidization of speech "seriously impinges on First Amendment rights." *Janus*, 138 S. Ct. at 2463-64. Under the proper First Amendment standard noted above, it is clear that the Bar engages in widespread non-regulatory activities that are highly political and ideological in nature. These activities cannot be financed through coerced dues. The Court should grant Plaintiffs Motion for Partial Summary Judgment on these issues and deny Defendants Cross-Motion.

***Legislative Program.*** The Bar runs a lobbying program that advocates for substantive changes to Texas law. Exs. B, C, J; *supra* at 3-4. The Bar's legislative agenda ranges from the State's definition of marriage and civil unions to child custody arrangements and trust law. *See* Exs. C, X, Y, Z, AA, BB; *supra* at 3. Yet lobbying is the paradigmatic example of what mandatory bar associations *cannot* do. *See Janus*, 138 S. Ct. at 2481 ("reject[ing] ... out of hand" the argument that "costs of lobbying" are chargeable); *see also Keller*, 496 U.S. at 15-16 (finding it "clear" that "compulsory dues may not be expended to endorse or advance a gun control or nuclear weapons freeze initiative").

The Bar insists that it can use coerced dues to engage in lobbying for proposed legislation that reflects its own view (but not Plaintiffs' view) of good policy. It boldly argues that every one of the forty-seven bills it supports is sufficiently related to attorney regulation or improving the quality of legal services to survive First Amendment scrutiny. Mot. 28. This despite the fact that many of the bills it supports are highly controversial and have nothing to do with regulating or improving the legal profession. *See supra* at 3-4; Ex. C. For example, the Bar claims that its support for a

constitutional amendment changing Texas's definition of marriage is proper post-*Obergefell* because "amending or repealing unconstitutional laws ... improves the quality of legal services" by reducing "the risk that lawyers, their clients, members of the public, or government officials will rely on laws that judicial decisions have rendered invalid." Mot. 29. If that were actually the rule, then the Bar would have carte blanche to lobby for *any* measure it deems related to improving "the law" writ large. But the Supreme Court has never held—or even suggested—that bar organizations have a roving mandate to spend coerced dues on efforts to "amend or repeal" what they believe to be unconstitutional laws.

Moreover, the Bar does not even attempt to justify its use of coerced dues to lobby for forty-plus other bills that are pending before the Texas Legislature. For example, it has no explanation for its support of a bill that would create civil unions "as an alternative to marriage" for both sexes—something no decision of the U.S. Supreme Court or this State's courts has ever held is necessary. Exs. C, Y; *see also* ECF No. 6 at 4. The Bar maintains—with a straight face—that every single bill it supports has no "apparent political or ideological coloration." Mot. 29. But this argument is untenable. Legislation and lobbying are inherently political, as their core objective is to achieve policy goals through legislation—policy goals that are not shared by many of the Bar's members who strongly oppose its political advocacy.

Finally, the Bar suggests that there is no First Amendment harm to Plaintiffs because "Members of the Bar's voluntary subject-matter sections are coordinating all lobbying activities," and Bar employees have not been "directly" involved in lobbying in 2019, the year this suit was filed. Mot. 9, 28. This argument is unavailing. The Members of the Board (Defendants here) voted to approve lobbying efforts on these bills, Ex. C; the bills bear the imprimatur of being supported by the Bar; and the Bar does not deny that it has engaged in direct lobbying efforts in the past. The Bar's suggestion that it does not *itself* engage in lobbying is also incomplete, as the Access to Justice

Commission—which the Bar funds though coerced dues—unabashedly engages in legislative activities. Mot., McAllister Decl. ¶¶ 56-58 (recounting legislative activities); Ex. JJ (Executive Director of the Access to Justice Commission thanking an employee for her "phenomenal work on [the Commission's] legislative initiatives during the 2019 legislative session" and discussing other lobbying efforts).

*Diversity Initiatives.* The Bar uses coerced dues to fund extensive "diversity initiatives" and has an entire "Office of Minority Affairs." Exs. F, G, H, I, K, L; *supra* at 3-4. The Bar insists that its diversity initiatives are not ideological. Mot. 29-30. But the very notion of having programs targeted at certain individuals based on their race, gender, or sexual orientation is highly ideological and has been the subject of national controversy for decades. *See, e.g., Grutter v. Bollinger*, 539 U.S. 306 (2003). Indeed, people of good faith—including members of the Supreme Court—disagree sharply about the merits of such programs. *Compare Schuette v. Coalition to Defend Affirmative Action*, 572 U.S. 291, 315 (2014) (Roberts, C.J., concurring) *with id.* at 337 (Sotomayor, J., dissenting). The Bar's assertion that such programs are not ideological blinks reality and cannot justify compelling Plaintiffs to finance them.

*Access to Justice Division and Programs.* The Bar's Legal Access Division, Access to Justice Commission, and related programming are not chargeable activities under *Keller*. Many of these programs seek to encourage pro bono work—a perfectly laudable goal, but one that sweeps beyond the Bar's permissible functions of regulating the profession and protecting the public from misconduct by lawyers. Moreover, much of the Bar's "access to justice" spending is designed to advance substantive ideological goals, such as opposing the federal government's immigration policies and lobbying the State to spend its funds in particular ways. *See* Exs. O, P, R; *see also supra* at 4-5.

*Legal Services Fee.* The Bar collects the State's legal services fee through its website. Ex. FF; State Bar, *How To Make Online Payments*, http://bit.ly/2EwCRjV (accessed May 27, 2019). This $65 fee funds civil legal services for the poor and indigent criminal defense. Tex. Gov't Code §§ 81.054(c); (j). The fee is effectively a compelled charitable contribution exacted as a condition of Plaintiffs practicing their chosen profession, and it cannot be justified by the Bar's interest in attorney regulation or improving the quality of Texas lawyering. This is inconsistent with the First Amendment.

*Bar Journal.* The *Texas Bar Journal* is the Bar's "official publication," on which it spends over $1.5 million each year. Ex. L, S. It is distributed to every one of the Bar's 120,000-plus members, Mot., Apffel Decl. ¶¶ 16, 58. The Bar brazenly suggests that the *Journal* is not "'political' or 'ideological' in nature," Mot. 27, despite its ample ideological content, *see, e.g.*, Exs. HH & II. Putting this in stark relief, Plaintiffs were forced to subsidize the most recent issue of the *Bar Journal*, which criticizes this very suit. Ex. HH, 312. "First Amendment values are at serious risk if the government can compel a particular citizen, or a discrete group of citizens, to pay special subsidies for speech on the side that it favors." *United Foods*, 533 U.S. at 411.

*CLE and Convention.* The Bar's ideologically charged CLE and Convention programming is neither necessary nor reasonably related to improving the quality of Texas lawyering. *See, e.g.*, Exs. N & Q; *see also* Mot. 26-27. While the Bar suggests that Plaintiffs have failed to prove the "purportedly ideological nature" of the Bar's programming, the programming is self-evidently ideological. *See, e.g.*, Ex. N ("The Paradox of Bodily Autonomy: Sex Confirming Surgeries and Circumcision"; "Intersectionality: The New Legal Imperative") & Ex. Q at 10-32 ("Diversity and Inclusion: The Important Role of Allies"; "Current Issues Affecting the Hispanic Community"; "LGBT Pathways to the Judiciary: Impact of Openly LGBT Judges in Texas"; "Implicit Bias"; "Texas Transgender Attorneys: A View from the Bar"; and a "Legislative Update [on] Proposed

Rulemaking Under the Trump Administration."). Moreover, the Bar's claim that it is neutral and offers programming covering a "wide variety of ... viewpoints" is unavailing, because the only evidence the Bar cites is its general disclaimer that Bar programming does not necessarily reflect the Bar's views. *See* Mot. 27 (citing Ex. 8 & Apffel Decl. ¶¶ 47, 53).

*Advertising.* In a footnote, the Bar asks this Court to uphold its half a million dollars a year in advertising expenditures that are funded through coerced dues. *See* Mot. 30 n.13. The Bar claims that *Keller* authorizes it "to inform lawyers and the public regarding the Bar's programs and the Bar's role in regulating the legal profession and advancing the quality of legal services." *Id.* But *Keller* approved no such expense, and the very next year the Supreme Court held that "[p]ublic relations expenditures designed to enhance the reputation of [a] profession" are not chargeable. *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 528 (1991).

*      *      *

By strictly prohibiting the Bar from engaging in non-regulatory political and ideological activities—as the Supreme Court instructs in *Keller* and *Harris*—this Court will faithfully implement Supreme Court precedent and ensure that Plaintiffs' First Amendment rights are protected.  To the extent the line is unclear between permissible and impermissible uses of compelled dues, the side that "should bear [the] risk" is the one "whose constitutional rights are not at stake"—the Bar. *Knox*, 567 U.S. at 321. Because the Bar violates the First Amendment by pervasively using compelled dues to fund ideological activities, the Court should deny the Bar's Cross-Motion for Summary Judgment and instead grant Plaintiffs' Motion for Partial Summary Judgment.

**III.    The Bar's Objection Procedures Are Inconsistent With The First Amendment And Supreme Court Precedent.**

The Bar's objection procedures violate the teachings of *Keller*, *Janus*, *Harris*, and *Knox. See* Ex. EE, § 3.14. Clear Supreme Court precedent requires the Bar to provide a detailed breakdown of its expenditures, an appeal of all chargeability determinations to a neutral decision maker, an option to

put funds into escrow pending resolution of objections, and opt-in rather than opt-out procedures when Bar funds are spent on political and ideological activities. *See Keller*, 496 U.S. at 16-17; *Hudson*, 475 U.S. at 310. Flatly ignoring these requirements, the Bar fails to publish a sufficient breakdown of its expenditures, *supra* at 6-7; Exs. K & L; does not provide for the placement of funds into escrow or offer an appeal to an impartial decision maker, *supra* at 6-7; Ex. EE, §3.14; and admits to having used "an 'opt out' refund procedure for decades," Ex. T.

The Bar contends that its procedures comply with the First Amendment, but its arguments are not persuasive. At the outset, the Bar asserts that "Plaintiffs are ill-positioned to challenge the adequacy of the protest policy, given that they have never even attempted to invoke it." Mot. 30. But the Supreme Court has squarely held that there is no exhaustion requirement in the context of § 1983 suits. *See Patsy v. Board of Regents*, 457 U.S. 496, 516 (1982) ("[W]e conclude that exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983."). Plaintiffs are under no obligation to take part in the Bar's burdensome and unconstitutional opt-out process in order to challenge it under the First Amendment. Indeed, the Bar gets things exactly backwards when it boasts that it has "no record of any person ... raising an objection under the protest procedure from the time of its adoption in 2005 until the filing of Plaintiffs' complaint." Mot. 10 (citing Apffel Decl. ¶ 81). This strongly suggests that the Bar's "daunting" administrative process deters attorneys from seeking relief, *Janus*, 138 S. Ct. at 2482, as it is extraordinarily unlikely that the Bar's 120,000 members unanimously agree that every penny of its expenditures can be funded through coerced dues, *see* Mot., Apffel Decl. ¶ 16.

The Bar then makes a stunning claim. It says that it does not have to comply with the Supreme Court's objection procedures because it does not engage in any impermissible activities. In the Bar's view, "the First Amendment imposes no obligation on the Bar to provide *any* protest procedure for Bar members" because "the Bar's activities are all 'germane to' the legitimate state

interests recognized in *Keller*." Mot. 31. This position is contradicted by *Keller* itself, which imposes "constitutionally mandated procedure[s]" on all "integrated" bar associations. *Keller*, 496 U.S. at 16-17 (citation omitted); *see also Hudson*, 475 U.S. at 302-04 & n.12.

The Bar half-heartedly argues that this Court should distinguish *Keller* because the *Keller* majority struck down the California Bar's electioneering expenses and this Court has not yet struck down any of the Texas Bar's expenditures. Mot. 31-32. But the *Keller* decision never ties *post hoc* determinations about the permissibility of expenditures to *ex ante* procedural requirements. *See* 496 U.S. at 16-17. Indeed, the Bar cites no authority in support of its approach. *Keller*'s prophylactic approach is consistent with the Supreme Court's First Amendment jurisprudence, which imposes prophylactic guardrails in the context of union agency fees, obscenity, overbreadth, vagueness, public forum permits, and more. *Hudson*, 475 U.S. at 303 n.12. The Supreme Court does so to ensure "that the government treads with sensitivity in areas freighted with First Amendment concerns." *Id.* For these reasons, the Bar cannot avoid complying with *Keller*, *Janus*, *Harris*, and *Knox* merely by promising it will never violate the Constitution.[5]

In the alternative, the Bar argues that its existing procedures satisfy *Keller*. *See* Mot. 31-32; Ex. EE § 3.14. *Keller* held that "an integrated bar could certainly meet its [procedural] obligation by adopting the sort of procedures described in *Hudson*." *Keller*, 496 U.S. at 17. It left open the question "whether one or more alternative procedures would likewise satisfy that obligation." *Id.* Here, the Bar does not even attempt to argue that its procedures meet the requirements of *Hudson*, which include "an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts

---

[5] Accepting the Bar's argument on its own terms, the Bar would be required to comply with Supreme Court precedent requiring notice and opt-in procedures if it has or will engage in even one impermissible expenditure. It blinks reality to suggest that every dollar spent by the Bar is in perfect compliance with the First Amendment.

reasonably in dispute while such challenges are pending." 475 U.S. at 310; Mot. 33-34. Instead, the Bar asks this Court to conclude—as a matter of first impression—that a compulsory bar association can satisfy its procedural obligations using looser, alternative procedures. Mot. 33-34. The Bar does not explain what alternative standard the Court should adopt, but believes its current procedures "more than satisfy any First Amendment requirements." Mot. 34.

This Court should not adopt a looser standard than the one countenanced by the Supreme Court in *Keller*, 496 U.S. at 16-17, and *Harris*, 573 U.S. at 303-310. In the decades since *Keller* was decided, the Supreme Court has significantly tightened the requirements in this area of law, to ensure robust protection of First Amendment associational rights. *See, e.g.*, *Knox*, 567 U.S. at 314-15; *Harris*, 573 U.S. at 638-646; *Janus*, 138 S. Ct. at 2460-63. Adopting a looser standard would thus run counter to the Supreme Court's recent jurisprudence. Moreover, the Supreme Court has explicitly overruled *Abood*, the case at the heart of *Keller*'s opt-out regime. *See Janus*, 138 S. Ct. at 2460; *Keller*, 496 U.S. at 15-17. Adopting a looser standard would impermissibly "extend" *Abood*, a precedent the Supreme Court had "refused to extend" even before overruling it in *Janus*, 138 S. Ct. at 2463.

Finally, the Bar relegates to a footnote its response to Plaintiffs' argument that *Janus* and *Knox* require the Bar to adopt opt-in rather than opt-out policies. Mot. 32 n.14. This may be because the President of the Bar concedes that the Bar "has had an 'opt out' refund procedure for decades." Ex. T. This directly contradicts the Supreme Court's teachings that "clear[]," "free[]," and "affirmative[]" consent is needed before an organization can use coerced dues to fund political or ideological activities. *Janus*, 138 S. Ct. at 2486. To the extent this Court concludes that the Bar has engaged in impermissible political or ideological activities, the Bar has clearly failed to obtain Plaintiffs' consent.

## CONCLUSION

The Court should deny Defendants' Cross-Motion for Summary Judgment (ECF No. 35) and grant Plaintiffs' Motion for Partial Summary Judgment on Liability (ECF No. 6).

Respectfully submitted,

Dated: May 31, 2019                    _/s/ Cameron T. Norris_

William S. Consovoy (VA 47704)
Jeffrey M. Harris (VA 93883)
Cameron T. Norris (VA 91624)
Samuel D. Adkisson (VA 93362)
CONSOVOY MCCARTHY PLLC
3033 Wilson Boulevard, Suite 700
Arlington, VA 22201
(703) 243-9423
cam@consovoymccarthy.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on May 31, 2019, I electronically filed the foregoing with the Clerk of the Court

for the U.S. District Court for the Western District of Texas by using the Court's CM/ECF system,

which will send notification of the filing to the following:

Thomas S. Leatherbury
VINSON & ELKINS LLP
Trammell Crow Center
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
tleatherbury@velaw.com

Joshua S. Johnson
Morgan A. Kelley
VINSON & ELKINS LLP
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
joshjohnson@velaw.com
mkelley@velaw.com

Patrick W. Mizell
Deborah C. Milner
VINSON & ELKINS LLP
1001 Fannin Street, Suite 2500
Houston, TX 77002
pmizell@velaw.com
cmilner@velaw.com

*Counsel for Defendants*

May 31, 2019

*/s/ Cameron T. Norris*
CAMERON T. NORRIS
*Counsel for Plaintiffs*

23